IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS



| | |
|---|---|
| MELVIN HALE, PhD,<br>Emporia, Kansas, | )<br>)<br>) |
| Plaintiff, | ) **JURY TRIAL DEMAND**<br>) |
| v. | ) Case No. 15-4947-SAC-KGS<br>) |
| EMPORIA STATE UNIVERSITY | )<br>) |
| Serve: General Counsel Kevin Johnson<br>1 Kellogg Circle<br>Emporia, Kansas 66801 | )<br>)<br>)<br>) |
| Defendants. | )<br>) |

## COMPLAINT

COMES NOW Plaintiff Melvin Hale, Pro Se, and for his Complaint against

Defendant Emporia State University, states and alleges as follows:

### DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues raised herein.

### DESIGNATION OF PLACE OF TRIAL

Plaintiff hereby requests that the trial of this cause be held in Topeka, Kansas.

### INTRODUCTION

1. This is an action seeking damages for defamation and false light invasion of privacy under Kansas law.

2. As set forth in more detail below, Defendant's agents and/or employees, who, at all times relevant to this Complaint, were employed at Emporia State University (ESU), published false representations about Plaintiff which a reasonable person would find highly offensive – that he, an Assistant Professor in the School of Library and Information Management (SLIM), and his wife, an Assistant to the Dean, falsely claimed that a hate crime occurred on campus in April 2015, and that an Emporia State University employee was the highly probable suspect.

## THE PARTIES

3. Plaintiff Melvin Hale is a resident of Emporia, Lyon County, Kansas. At all times relevant hereto, Plaintiff was an Assistant Professor at Emporia State University. He graduated with a doctorate from UCLA in March 2014.

4. Defendant Emporia State University is a Kansas State institution of higher learning established as Kansas Normal School in 1863, with a current enrollment of just over 6,000 students.

### Jurisdiction and Venue

5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because the matter in controversy exceeds the sum or value of $75,000 exclusive of interest and costs.

6. 10. The Court has personal jurisdiction over Defendant because the unlawful acts and conduct complained of herein occurred within the State of Kansas.

7. Venue is proper in this Court pursuant to 29 U.S.C. § 1391 because a substantial part of the acts and conduct giving rise to Plaintiff's injury claims occurred in Emporia, Lyon,

Kansas, which lies within the District of Kansas and because Defendant transacts business within the District of Kansas.

## FACTS COMMON TO ALL CAUSES OF ACTION

8. Plaintiff was engaged in his ordinary duties, attending a faculty meeting, as an Assistant Professor on April 8, 2015, when he received a text message from his wife Angelica Hale, who was the Assistant to the Dean for Marketing.

9. The text message indicated that the office of a student who worked with Angelica had been entered and certain things had been tampered with, and that the word "NIGGAZ" had been scrawled on the notepad on the student's desk.  A true and accurate copy of these text messages is attached as **Exhibit A** to Plaintiff's Complaint and is incorporated by reference herein.  The door to the office, located in a remote area of the library school on the fourth floor not normally visited by strangers, which was normally locked, was found unlocked.

10. Plaintiff and his wife were the sole African American employees of SLIM.

11. Plaintiff is one of only two tenure-track African American faculty at ESU.

12. ESU has no tenured African American professors.

13. The Dean of SLIM, Gwen Alexander, was informed of the incident that day by the Plaintiff and Angelica Hale.  The Dean promised to look into the situation.

14. The student was contacted by Angelica on a regular basis following the incident, but indicated that the Dean never approached her about the incident for more than two months, which is after the Plaintiff and his wife approached the Provost.

3

15. After more than two months, with no action by the Dean, Plaintiff and his wife contacted the Provost, David Cordle and the head of Human Resources, Judy Anderson on June 15 to set up a time to discuss the situation. A true and accurate copy of this email is attached as **Exhibit B** to Plaintiff's Complaint and is incorporated by reference herein. At a meeting on, or about June 30, 2015, Dr. Cordle indicated that he had talked briefly with Dean Alexander, and that she had told him that she had talked with the student the day of the incident, and that the student seemed to be just fine.

16. In June 2015, Angelica contacted Wendy Carlson, a nationally acclaimed forensic handwriting examiner, to examine a high resolution photograph of the note, and the handwriting of the Dean's Assistant, Debra Rittgers. On or about June 9, 2015, Angelica received a call from Wendy Carlson requesting more samples of Debra Rittgers handwriting, which were provided. On or about June 19, 2015, Angelica received a call that went to voicemail from Wendy Carlson stating that she had received the additional handwriting samples, but that in her expert opinion, Debra Rittgers, the Dean's Assistant, was still the most probable author of the racial slur found in the student's notebook. A true and accurate transcript of this voicemail is attached as **Exhibit C** to Plaintiff's Complaint and is incorporated by reference herein. Carlson will need additional samples of handwriting to arrive at a conclusive determination. Debra Rittgers has refused to take a handwriting examination.

17. On, or about, July 1, 2015, Plaintiff and his wife went to the Emporia State University Police Department, and filed a complaint about the incident, and provided the information given by Wendy Carlson, and asked the Police Department to contact her.

18. The following morning, the Police Department called the Plaintiff and relayed the message that in their opinion no hate crime had occurred, so no formal report would be taken, and that no follow up to the incident would be done by the Police Department.

19. During the month of July, ESU Interim President Jackie Vietti instructed HR specialist Ray Lauber to provide her with a report on the incident, and on allegations of retaliation by Dean Alexander brought forward by Plaintiff and his wife.

20. In the Associated Press story that broke on July 29, 2015, the private report that Ray Lauber was working on for Dr. Vietti suddenly was called an "investigation" with results that would be made available to the campus and to the media.

21. On September 9, Jackie Vietti and ESU General Counsel Kevin Johnson released the results of the "investigation" with a statement that said in part that "no hate crime had occurred." A true and accurate copy of this email is attached as **Exhibit D** to Plaintiff's Complaint and is incorporated by reference herein. The following day Dr. Vietti provided a follow a follow up statement that read "While the University concluded no hate crime occurred, I want to make it clear that Emporia State is not hiding behind the legal definition of a hate crime. A true and accurate copy of this email is attached as **Exhibit E** to Plaintiff's Complaint and is incorporated by reference herein.

22. In the same document referenced in the preceding paragraph (Exhibit E), Dr. Vietti took issue with Wendy Carlson's expert opinion. Dr. Vietti wrote: "While it has been publicly stated that she [Debra Rittgers] is the most likely suspect according to a nationally known forensic handwriting expert, no evidence has been produced to support that statement. Further, it

is problematic, if not impossible, at this point to conduct a formal handwriting test given that the word now exists only as a picture on a cell phone."

23. In a move meant to quell all dissent, Dr. Vietti concluded her statement with the following: "Therefore, Emporia State University is taking this opportunity to formally and publicly exonerate Debbie Rittgers of any wrong-doing in this matter. I solicit your support to do the same (Exhibit E)."

24. Earlier, on or about July 7, Dean Alexander had made a similar comment to Plaintiff about Wendy Carlson. The Dean stated that: "I checked on that handwriting expert. She is the first one that pops up, and I don't acknowledge [Wendy Carlson] as a handwriting expert. If you sent her a different thing to analyze, she would always say the same thing. A true and accurate transcript of this discussion is attached as **Exhibit F** to Plaintiff's Complaint and is incorporated by reference herein.

25. On September 15, 2015, Plaintiff and his wife conducted a protest march at ESU in which over 125 people participated. The issues were the handling and outcome of the "investigation," and the treatment of the Hale's by the University. A true and accurate copy of a Bulletin story covering the march is attached as **Exhibit G** to Plaintiff's Complaint and is incorporated by reference herein.

26. On September 16, 2015, Dr. Vietti sent Plaintiff a letter outlining conditions for continued employment at ESU. One condition was that Plaintiff "issue a retraction of your accusation of Debbie Rittgers as the author of the racial slur unless you provide the University with credible, substantive evidence that Ms. Rittgers is the perpetrator." A true and accurate

copy of this email is attached as **Exhibit H** to Plaintiff's Complaint and is incorporated by reference herein.

## COUNT I
## FALSE LIGHT INVASION OF PRIVACY

27. Plaintiff hereby adopts, re-alleges, and incorporates by reference the allegations contained in paragraphs 1 through 26 above.

28. Plaintiff is a scientist, and as such, gives substantial credence to scientific methods such as forensic handwriting examination. For an academic institution to ignore forensics in favor of heuristics is preposterous and unacceptable.

29. By demanding that Plaintiff retract his opinion on who authored the racial slur, based on scientific methods, ESU demonstrated its malice towards Plaintiff, and by so doing, encouraged others to do the same.

30. ESU alleges that Debra Rittgers offered to take a polygraph and a handwriting test to prove her innocence, but ESU relieved her of that requirement for unspecified reasons.

31. ESU knows that if Debra Rittgers has her handwriting compared to the writing on the notebook, and Rittgers is shown to be the author of that slur conclusively, the results of their "investigation," which deliberately ignored the forensic evidence, would be invalidated.

32. By claiming that no hate crime occurred and that they were no valid instances of racial discrimination in SLIM during the 2014-2015 school year, ESU portrayed Plaintiff as a liar and a fraud. The student newspaper, the Bulletin, wrote a scathing editorial comparing Plaintiff and his wife to the Boy Who Cried Wolf. Numerous similar comments were made by readers of the Bulletin and other online news venues where the story was posted. A true and

accurate copy of this story is attached as **Exhibit I** to Plaintiff's Complaint and is incorporated by reference herein. The general story about our experiences was carried by the Associated Press as a Big Story, both before and after the so-called results, and it was seen nationally from coast to coast, as well as internationally. A true and accurate copy of this email is attached as **Exhibit J** to Plaintiff's Complaint and is incorporated by reference herein..

33. Defendants sought to bolster the validity of their "investigation" by claiming that it was reviewed by two independent entities, neither of which has been made available for inquiry.

34. Plaintiff has suffered severe embarrassment, great emotional pain, anguish, and grief of mind as a result of Defendants' actions, which were willful and reckless.

35. As a direct result of these actions by Defendants, Plaintiff has suffered real and actual damages in excess of $75,000.00.

## COUNT II
## DEFAMATION

36. Plaintiff hereby adopts, re-alleges, and incorporates by reference the allegations contained in paragraphs 1 through 35 above.

37. The audience for Defendant's comments and conduct was international. Educators, researchers and practitioners in the fields of library, education and archives who knew Plaintiff offered letters of support for Plaintiff to the University and to the American Library Association. A true and accurate copy of this letter is attached as **Exhibit K** to Plaintiff's Complaint and is incorporated by reference herein. A letter was sent to the administration from Black faculty and staff at ESU. A true and accurate copy of this letter is attached as **Exhibit L** to Plaintiff's Complaint and is incorporated by reference herein.

38. Plaintiff was forced to protest to confront the injustices which he felt, but that action may cause many potential employers to avoid him as a potential disruptor and whistle-blower.

39. Defendants knew that they were causing harm to Plaintiff's reputation, but they acted with total disregard by purveying false and incomplete stories, and by shielding Debra Rittgers.

40. Defendants released a false statement regarding hate crimes that clearly shows prevarication. Hate crimes include vandalism, graffiti and hateful messages. Defendants disregarded vandalism, which did occur in this case. A true and accurate copy of this statement is attached as **Exhibit M** to Plaintiff's Complaint and is incorporated by reference herein.

41. Defendants ignored best practices in addressing hate crimes. The Action Matters program at the University of Michigan is an example of best practices. A true and accurate copy of this program is attached as **Exhibit N** to Plaintiff's Complaint and is incorporated by reference herein.

42. As a direct result of his activities to obtain justice, Defendants have lost supporters, and ESU has isolated the Plaintiff from his colleagues by forcing him to work from home, denying him face-to-face courses with students. All of Plaintiffs' classes are now online.

43. By Defendants actions, Plaintiff was given unreasonable and highly objectionable publicity that attributed to him characteristics, conduct or beliefs that are false, and in so doing harmed the good reputation that the Plaintiff worked hard to attain.

44. The allegations made against Plaintiff by Defendants were highly offensive and would be considered highly offensive by any reasonable person.

45. Plaintiff earned his doctorate at age 60 from UCLA at a cost in excess of $250,000. In publishing false statements about Plaintiff, Defendants acted with reckless disregard, creating a setback for Plaintiff's future earnings and upward mobility.

46. As a direct result of these actions, Plaintiff has suffered real and actual damages in excess of $75,000.

## V. PUNITIVE DAMAGES

47. Paragraphs 1-46 are incorporated herein by reference.

48. The acts and conduct of Defendant's employees was willful, wanton, reckless, and malicious, and further, shows a complete and deliberate indifference to, and conscious disregard for, the rights of Plaintiff. Therefore, Plaintiff is entitled to an award of punitive or exemplary damages in an amount sufficient to punish Defendant or to deter Defendant and others from like conduct in the future.

WHEREFORE, based on the foregoing, Plaintiff prays that this Court grant the relief sought including, but not limited to, actual damages in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from date of filing of suit, punitive damages in excess of Seventy-Five Thousand Dollars ($75,000.00), and all other relief deemed appropriate by this Court.

Respectfully submitted,

*Melvin Hale*

Melvin Hale, PhD, Plaintiff
Appearing *Pro Se*
P.O. Box 724
Emporia, KS 66801
melvinhale@ucla.edu
916-690-7927