## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | |
|---|---|
| MELVIN HALE, PhD, | |
| *Plaintiff* | |
| v. | **JURY TRIAL DEMAND** |
| EMPORIA STATE UNIVERSITY; JACKIE VIETTI, in her capacity as Interim President of Emporia State University; DAVID CORDLE, in his capacity as Provost of Emporia State University, JUDY ANDERSON, in her capacity as Executive Director of Human Relations at Emporia State University; GWEN ALEXANDER, as Dean of the School of Library & Information Management at Emporia State University; CHRIS HOOVER, as Chief of Police at Emporia State University; DEBRA RITTGERS, as Assistant to the Dean of the School of Library and Information Management; and DOES 1 to 10, | **Case No. 15-4947-SAC-KGS** |
| *Defendants*. | |

### AMENDED COMPLAINT

COMES NOW Plaintiff Melvin Hale, Pro Se, and for his Amended Complaint against

Defendants, states and alleges as follows:

### DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues raised herein.

### DESIGNATION OF PLACE OF TRIAL

Plaintiff hereby requests that the trial of this cause be held in Topeka, Kansas.

## INTRODUCTION

1.  This is an action seeking damages for defamation and false light invasion of privacy under Kansas law, and due process under the 14th Amendment of the United States Constitution.

2.  As set forth in more detail below, Defendants, published false representations about Plaintiff which a reasonable person would find highly offensive – that he, an Assistant Professor in the School of Library and Information Management (SLIM), falsely claimed that a hate crime occurred on campus in April 2015. Defendants furthered claimed that Plaintiff's contract to work in a tenure-track position in the University should be terminated, for among other things, stating his belief that a long time Emporia State University employee was the highly probable suspect in the writing of the racial slur.

## THE PARTIES

3.  Plaintiff Melvin Hale is a resident of Emporia, Lyon County, Kansas. At all times relevant hereto, Plaintiff was an Assistant Professor at Emporia State University. He graduated with a doctorate from the University of California, Los Angeles in March 2014.

4.  Defendant EMPORIA STATE UNIVERSITY ("ESU") is a Kansas State institution of higher learning established as Kansas Normal School in 1863 in Emporia, Kansas, with a current enrollment of just over 6,000 students.

5.  Defendant JACKIE VIETTI is the duly appointed Interim President of ESU and is sued in her capacity as such.

6.  Defendant DAVID CORDLE is the duly appointed Provost of ESU and is sued in his capacity as such.

7.  Defendant JUDY ANDERSON is the duly appointed Executive Director of Human Relations at ESU and is sued in her capacity as such.

8.  Defendant GWEN ALEXANDER is the duly appointed Dean of SLIM at ESU and is sued in her capacity as such.

9.  Defendant CHRIS HOOVER is the duly appointed Chief of Police at ESU and is sued in his capacity as such.

10.  Defendant DEBRA RITTGERS is the duly appointed Assistant to the Dean of SLIM and is sued in her capacity as such.

11.  Plaintiff does not know the true names and capacities of the defendants sued fictitiously as DOES 1 to 10 ("DOE DEFENDANTS") and will amend this Amended Complaint to reflect such information as it is ascertained. Plaintiff alleges that the DOE defendants are, each, separately or in groups, in some manner responsible for the acts complained of herein. Plaintiff further alleges that the DOE DEFENDANTS were the agents, employees or responsible individuals or entities in respect to the allegations set forth in this Amended Complaint.

**Jurisdiction and Venue**

12.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because the matter in controversy exceeds the sum or value of $75,000 exclusive of interest and costs, and 42 U.S. Code § 1983 which affords citizens of the United States due process.

13. The Court has personal jurisdiction over Defendants because the unlawful acts and conduct complained of herein occurred within the State of Kansas.

14.  Venue is proper in this Court pursuant to 29 U.S.C. § 1391[b] because a substantial part of the acts and conduct giving rise to Plaintiff's injury claims occurred in Emporia, Lyon, Kansas, which lies within the District of Kansas and because Defendants transact business within the District of Kansas.

## FACTS COMMON TO ALL CAUSES OF ACTION

15.  Plaintiff was engaged in his ordinary duties, attending a faculty meeting, as an Assistant Professor on April 8, 2015, when he received a text message from his wife Angelica Hale, who was the Assistant to the Dean for Marketing.

16.  The text message indicated that the office of a student who worked with Angelica had been entered and certain things had been tampered with, and that the word "NIGGAZ" had been scrawled on the notepad on the student's desk.  A true and accurate copy of these text messages is attached as **Exhibit A** to Plaintiff's Amended Complaint and is incorporated by reference herein.  The door to the office, located in a remote area of the library school on the fourth floor not normally visited by strangers, which was normally locked, was found unlocked.

17.  Plaintiff and his wife were the sole African American employees of SLIM.

18.  Plaintiff is one of only two tenure-track African American faculty at ESU.

19.  ESU has no tenured African American professors.

20.  The Dean of SLIM, Gwen Alexander, was informed of the incident that day by the Plaintiff and Angelica Hale.  The Dean promised to look into the situation.

21.  The student was contacted by Angelica on a regular basis following the incident, but indicated that the Dean never approached her about the incident for more than two months, and only then after the Plaintiff and his wife had approached the Provost and the ESU Police.

22.  After more than two months, with no action by the Dean, Plaintiff and his wife contacted the Provost, David Cordle and the head of Human Resources, Judy Anderson on June 15 to set up a time to discuss the situation.  A true and accurate copy of this email is attached as **Exhibit B** to Plaintiff s Amended Complaint and is incorporated by reference herein.  At a meeting on, or about June 30, 2015, Dr. Cordle indicated that he had talked briefly with Dean Alexander, and that she had told him that she had talked with the student the day of the incident, and that the student seemed to be just fine.

23.  In June 2015, Angelica contacted Wendy Carlson, a nationally acclaimed forensic handwriting examiner, to examine a high resolution photograph of the note, and the handwriting of the Dean's Assistant, Debra Rittgers. On or about June 9, 2015, Angelica received a call from Wendy Carlson requesting more samples of Debra Rittgers handwriting, which were provided. On or about June 19, 2015, Angelica received a call that went to voicemail from Wendy Carlson stating that she had received the additional handwriting samples, but that in her expert opinion, Debra Rittgers, the Dean's Assistant, was still the most probable author of the racial slur found in the student's notebook.  A true and accurate transcript of this voicemail is attached as **Exhibit C** to Plaintiff s Amended Complaint and is incorporated by reference herein.  Carlson will need additional samples of handwriting to arrive at a conclusive determination.

24.  On, or about, July 1, 2015, Plaintiff and his wife went to the Emporia State University Police Department, and filed a complaint about the incident, and provided them with the information given by Wendy Carlson, and asked the Police Department to contact her.

25.  The following morning, an officer in the Police Department called Plaintiff and relayed the message that in the opinion of Police Chief Chris Hoover, no hate crime had occurred, so no formal report would be taken, and no investigation would be conducted.

26.  During the month of July, ESU Interim President Jackie Vietti instructed HR specialist Ray Lauber to provide her with a private report on the incident, and on allegations of retaliation by Dean Alexander brought forward by Plaintiff and his wife.

27.  In the Associated Press story that broke on July 29, 2015, the private report that Ray Lauber was working on for Dr. Vietti suddenly was called an "investigation" with results that would be made available to the campus and to the media.

28.  On September 9, Jackie Vietti and ESU General Counsel Kevin Johnson released the results of the "investigation" with a statement that said in part that "no hate crime had occurred." A true and accurate copy of this email is attached as **Exhibit D** to Plaintiff s Amended Complaint and is incorporated by reference herein.  The following day Dr. Vietti provided a follow a follow up statement that read "While the University concluded no hate crime occurred, I want to make it clear that Emporia State is not hiding behind the legal definition of a hate crime. A true and accurate copy of this email is attached as **Exhibit E** to Plaintiff s Amended Complaint and is incorporated by reference herein.

29.  In the same document referenced in the preceding paragraph (Exhibit E), Dr. Vietti took issue with Wendy Carlson's expert opinion.  Dr. Vietti wrote: "While it has been publicly

stated that she [Debra Rittgers] is the most likely suspect according to a nationally known forensic handwriting expert, no evidence has been produced to support that statement. Further, it is problematic, if not impossible, at this point to conduct a formal handwriting test given that the word now exists only as a picture on a cell phone."

30.  In a move meant to quell all dissent, Dr. Vietti concluded her statement with the following: "Therefore, Emporia State University is taking this opportunity to formally and publicly exonerate Debbie Rittgers of any wrong-doing in this matter. I solicit your support to do the same (Exhibit E)."

31.  Earlier, on or about July 7, Dean Alexander had made a similar comment to Plaintiff about Wendy Carlson.  The Dean stated that:  "I checked on that handwriting expert.  She is the first one that pops up, and I don't acknowledge [Wendy Carlson] as a handwriting expert.  If you sent her a different thing to analyze, she would always say the same thing.  A true and accurate transcript of this discussion is attached as **Exhibit F** to Plaintiff s Amended Complaint and is incorporated by reference herein.

32.  On September 15, 2015, Plaintiff and his wife conducted a protest march at ESU in which over 125 people participated.  The issues were the handling and outcome of the "investigation," and the treatment of the Hale's by the University.  A true and accurate copy of a Bulletin story covering the march is attached as **Exhibit G** to Plaintiff s Amended Complaint and is incorporated by reference herein.

33.  On September 16, 2015, Dr. Vietti sent Plaintiff a letter outlining conditions for continued employment at ESU.  One condition was that Plaintiff  "issue a retraction of your accusation of Debbie Rittgers as the author of the racial slur unless you provide the University

7

with credible, substantive evidence that Ms. Rittgers is the perpetrator."  A true and accurate

copy of this email is attached as **Exhibit H** to Plaintiff s Amended Complaint and is incorporated

by reference herein.

## COUNT I
## FALSE LIGHT INVASION OF PRIVACY

34.  Plaintiff hereby adopts, re-alleges, and incorporates by reference the allegations

contained in paragraphs 1 through 26 above.

35.  Plaintiff is a scientist, and as such, gives substantial credence to scientific methods

such as forensic handwriting examination.  For an academic institution to ignore forensics in

favor of heuristics is preposterous and unacceptable.

36.  By demanding that Plaintiff retract his opinion on who authored the racial slur, based

on scientific methods, ESU demonstrated its malice towards Plaintiff, and by so doing,

encouraged others to do the same.

37.  ESU alleges that Debra Rittgers offered to take a polygraph and a handwriting test to

prove her innocence, but ESU relieved her of that requirement for unspecified reasons.

38.  ESU knows that if Debra Rittgers has her handwriting compared to the writing on the

notebook, and Rittgers is shown to be the author of that slur conclusively, the results of their

"investigation," which deliberately ignored the forensic evidence, would be invalidated.

39.  By claiming that no hate crime occurred and that they were no valid instances of

racial discrimination in SLIM during the 2014-2015 school year, ESU portrayed Plaintiff as a

liar and a fraud.  The student newspaper, the Bulletin, wrote a scathing editorial comparing

Plaintiff and his wife to the Boy Who Cried Wolf.  Numerous similar comments were made by

readers of the Bulletin and other online news venues where the story was posted.  A true and accurate copy of this story is attached as **Exhibit I** to Plaintiff s Amended Complaint and is incorporated by reference herein.  The general story about our experiences was carried by the Associated Press as a Big Story, both before and after the so-called results, and it was seen nationally from coast to coast, as well as internationally.  A true and accurate copy of this email is attached as **Exhibit J** to Plaintiff s Amended Complaint and is incorporated by reference herein.

40.  Defendants sought to bolster the validity of their "investigation" by claiming that it was reviewed by two independent entities, neither of which has been made available for inquiry.

Defendants have presented Plaintiff with conditions for continued employment that imply that Plaintiff has failed to perform his duties, yet Defendants have failed to follow Defendants own processes for adjudicating job performance issues, and at no time have provided Plaintiff a forum in which to discuss his performance.

41.  Plaintiff has suffered severe embarrassment, great emotional pain, anguish, and grief of mind as a result of Defendants' actions, which were willful and reckless.

42.  As a direct result of these actions by Defendants, Plaintiff has suffered real and actual damages in excess of $75,000.00.

## COUNT II
## DEFAMATION

43.  Plaintiff hereby adopts, re-alleges, and incorporates by reference the allegations contained in paragraphs 1 through 35 above.

44.  The audience for Defendant's comments and conduct was international.  Educators, researchers and practitioners in the fields of library, education and archives who knew Plaintiff offered letters of support for Plaintiff to the University and to the American Library Association. A true and accurate copy of this letter is attached as **Exhibit K** to Plaintiff s Amended Complaint and is incorporated by reference herein.  A letter was sent to the administration from Black faculty and staff at ESU.  A true and accurate copy of this letter is attached as **Exhibit L** to Plaintiff s Amended Complaint and is incorporated by reference herein.

45.  Plaintiff was forced to protest to confront the injustices which he felt, but that action may cause many potential employers to avoid him as a potential disruptor and whistle-blower.

46.  Defendants knew that they were causing harm to Plaintiff's reputation, but they acted with total disregard by purveying false and incomplete stories, and by shielding Debra Rittgers.

47.  Defendants released a false statement regarding hate crimes that clearly shows prevarication.  Hate crimes include vandalism, graffiti and hateful messages.  Defendants disregarded vandalism, which did occur in this case.  A true and accurate copy of this statement is attached as **Exhibit M** to Plaintiff s Amended Complaint and is incorporated by reference herein.

48.  Defendants ignored best practices in addressing hate crimes.  The Action Matters program at the University of Wisconsin is an example of best practices.  A true and accurate copy of this program is attached as **Exhibit N** to Plaintiff s Amended Complaint and is incorporated by reference herein.

49.  As a direct result of his activities to obtain justice, Plaintiff has lost numerous supporters, and ESU has isolated the Plaintiff from his colleagues by forcing him to work from home, denying him face-to-face courses with students.  All of Plaintiffs' classes are now online.

50.  By Defendants actions, Plaintiff was given unreasonable and highly objectionable publicity that attributed to him characteristics, conduct or beliefs that are false, and in so doing harmed the good reputation that the Plaintiff worked hard to attain.

51. The allegations made against Plaintiff by Defendants were highly offensive and would be considered highly offensive by any reasonable person.

52. Plaintiff earned his doctorate at age 60 from UCLA at a cost in excess of $250,000. In publishing false statements about Plaintiff, Defendants acted with reckless disregard, creating a setback for Plaintiff's future earnings and upward mobility.

53.  As a direct result of these actions, Plaintiff has suffered real and actual damages in excess of $75,000.

### III. COUNT THREE
### DUE PROCESS

54.  Plaintiff hereby adopts, re-alleges, and incorporates by reference the allegations contained in paragraphs 1 through 53 above.

55.  The Due Process provisions of the 14th  Amendment require that review of laws impacting rights deemed fundamental are analyzed using the strict scrutiny standard of review. *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997); *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673 (1976).

56.  As agents of the State of Kansas, Defendants were required to refrain from making public statements defaming Plaintiff, and casting Plaintiff in a false light, whether or not the statements abridged Plaintiff's civil rights.

57.  Defendants were required by Kansas law and institutional policies, to fully examine any and all complaints of criminal activity, such as that reported by Plaintiff, yet none of the Defendants did so, and instead, ignored Plaintiff's demands for transparency, depriving Plaintiff of due process while publicly implying that Plaintiff had been dishonest in the reporting of a hate crime, for which Plaintiff would be punished.

58.  Defendants demanded that Plaintiff retract a stated belief that Debra Rittgers was the author of the racial slur or face termination, yet Defendants refused to require Debra Rittgers to submit handwriting samples that would conclusively confirm whether or not she was the author of the racial slur, further depriving Plaintiff of due process while degrading his reputation.

59.  Defendants created fictional narratives depicting the physical scene of the student's office as open to public and not a locked private office; that it was a place where numerous unnamed individuals came and went throughout the day.  When confronted with the facts by the Plaintiff, Defendants refused to acknowledge the error of their narratives, or to follow Title IX procedures for investigating reports of bias on the ESU campus.

60.  Defendant Jackie Vietti refused all requests by Plaintiff to meet with him to discuss the facts of the incident, the findings of Wendy Carlson, a forensic handwriting examiner, or the negative personnel actions which were alleged against Plaintiff in documents given to Plaintiff by Jackie Vietti and/or Provost David Cordle, which included egregious conditions for continued employment, depriving Plaintiff of due process under the law.

61.  Defendants' conduct rises to the level not only of state-caused stigmatic harm, it crosses the boundary where Defendants' conduct created a tangible loss, the loss of employment, along with damaging Plaintiffs' public standing and reputation under the 14th Amendment.

62.  In *Paul v. Davis*, the U.S. Supreme Court ruled that reputational harm alone was insufficient to trigger a constitutional right to procedural due process, see *Paul v. Davis*, 424 U.S. 693, 712 (1976).   Only if some more tangible loss (e.g., concurrent loss of government employment) accompanies state-caused stigmatic harm does a constitutional right to procedural due process arise (Id. at 701).  These circumstances are fully met by the willful and reckless conduct of the Defendants.

63.  That Plaintiff has, and is, suffering reputational harm is unmistakable, as shown in **Exhibits O**, **P**, **Q**, **R**, **S**, and **T**, which are incorporated by reference herein.

64.  Before publicly posting defamatory information about Plaintiff, Defendants were required to give Plaintiff notice of the intent to post such information, and to provide Plaintiff an opportunity to present Plaintiff's side of the matter, see *Constantineau v. Grager*, 302 F. Supp. 861, 864 (E.D. Wis. 1969).  The Supreme Court affirmed this ruling in explicit terms: "Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential (*Constantineau*, 400 U.S. at 437).  In this case, Defendants were intent on silencing Plaintiff's objections to their narrative, and even went so far as to publicly exonerate the suspect, while denigrating the beliefs of the Plaintiff, which were grounded in forensic science.

65.  In *Monroe v. Pape*, the modern watershed § 1983 case, the Court had made clear that the existence of a state cause of action was no bar to raising a § 1983 suit in federal court: "It is

no answer that the State has a law which if enforced would give relief. The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked." 365 U.S. 167, 183 (1961).

66.  Defendants actions were intentional and reckless and grounded in malice, although malice is not a necessary component of defamation when the Plaintiff is not a public figure. Defendants fully intended to engender public reaction against Plaintiff by characterizing Plaintiff as professionally unfit, a false prophet, a teller of tales and a soon-to-be former employee.

67.  The harm that is caused when state actors, without due process of law, label and stigmatize individuals as wrongdoers thus runs more deeply than simply negatively impacting one's social standing. Unchallenged stigmatic injury also frustrates individual self-invention, and in that sense deprives the individual of liberty without due process of law.

68.  Defamation law safeguards the notion that one's reputation is slowly built up over time by integrity, honorable conduct, and right living. One's good name is a valuable possession which no state has a right to destroy without due process and valid evidence.  Defamation laws are conceived by the notion by which society polices its rules of deference and demeanor, thereby protecting the dignity of its citizens.  The Defendants in this case had no right to treat Plaintiffs' reputation as rubbish.  In so doing, they breached the rules of civility and communal membership.

69.  One need only consider Justice Stewart's language in concurrence in *Rosenblatt* to see the judicially conceptualized grounding of reputation in personal dignity: "The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being - a concept

at the root of any decent system of ordered liberty" *Rosenblatt v. Baer*, 383 U.S. 75, 92 (1966) (Stewart, J., concurring).   The Defendants in this case acted in callous disregard of Plaintiffs state, constitutional, and civil rights.

## IV. PUNITIVE DAMAGES

70.  Paragraphs 1-69 are incorporated herein by reference.

71. The acts and conduct of Defendants was willful, wanton, reckless, and malicious, and further, shows a complete and deliberate indifference to, and conscious disregard for, the rights of Plaintiff.  Therefore, Plaintiff is entitled to an award of punitive or exemplary damages in an amount sufficient to punish Defendants or to deter Defendants and others from like conduct in the future.

WHEREFORE, based on the foregoing, Plaintiff prays that this Court grant the relief sought including, but not limited to, actual damages in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from date of filing of suit, punitive damages in excess of Seventy-Five Thousand Dollars ($75,000.00), and all other relief deemed appropriate by this Court.

Respectfully submitted,

Melvin Hale, PhD, Plaintiff
Appearing *Pro Se*
P.O. Box 724
Emporia, KS 66801
melvinhale@ucla.edu
916-690-7927

# EXHIBIT "A"









# EXHIBIT "B"

**From:** Melvin Hale [r-----@yahoo.com]
**Sent:** Monday, June 15, 2015 10:31 AM
**To:** David Cordle
**Subject:** Racial Incident at SLIM

Dear David,

We have had a brief but positive relationship, so I regret to inform you that my/our experience working in SLIM has decidedly taken a turn for the worse. It has been made known to us in a most graphic and shocking manner that we are not respected, and that we are not welcome in the Library School. I say we because it involves both me and my wife.

After many years working in the private sector, in high levels of responsibility, I am all too aware that grievances of this nature are to be made via the chain of command. I can assure you that the information I want to share with you, and possibly the interim President, was immediately made known to my supervisor, Dean Alexander, as soon as it was known to us, but that more than 60 days have elapsed, and she has refused to even discuss the matter with the individuals that were directly impacted. In addition, it is becoming abundantly obvious that retaliatory measures are being directed at us. I still have an affinity for this institution, so I would like to offer you an opportunity to address this matter before it mushrooms into something else. What occurred was nothing less than a hate crime, and it appears to have never been officially reported. I have good reason to believe why this was not done. Forensic and circumstantial evidence point to internal sources.

I will leave it at this. I value my academic career, and I am not one to complain about imagined or insignificant events. I allow for human frailty and mistakes. This was none of those. It involves someone intentionally not only calling us the most derogatory and vulgar racial epitaph in the English language; they had the audacity to write it down.

I am available to meet with you, and the interim President if possible, privately, at your earliest convenience. I am here this week through Wednesday. I am teaching in Denver this weekend.

I am sending this message through Yahoo mail for obvious reasons.

Best regards,

Melvin

# EXHIBIT "C"

## Wendy Carlson Voicemail Message to Angelica Hale

**JUNE 19, 2015**

**Carlson**: Angelica. Hi, this is Wendy Carlson, your handwriting expert.  Hey, I've been looking at your other documents, and I just wanted to let you know that I feel that I'm sort of at the same position, that it is highly probable that it looks like Deb Rittgers writing.  I don't feel that I could get any more confident than that based on these limited questions letters, and not having exact comparable letters to compare to,  but otherwise there are some indications and some things in the writing, and patterns in the writing that appear to follow lines of similarities. So I'm willing to say that it is highly probable that she wrote it.  So, if you need that in writing, let me know, and I can prepare a letter of opinion for you.  Sorry it's taken me so long.  Everything kind of came on me this weekend and I just let things kind of slip away, so I 'm trying to get caught up.  Give me a call, 214-458-6009.  Thanks!

This is the html version of the file http://www.forensic.org/download_member_cv.php?id=307.
**Google** automatically generates html versions of documents as we crawl the web.

| Texas: | Colorado: |
|---|---|
| 3021 Ridge Road, Suite A, #130 | 1550 Larimer Street, Suite 251 |
| Rockwall, Texas 75032 | Denver, Colorado 80202 |
| Phone: (214) 458-6009 | Phone: (303) 330-8636 |
| Fax: (303) 265-9087 | Fax: (303) 265-9087 |

## Wendy Carlson

Expert Document Examiner

www.AmericasHandwritingExpert.com

ws.carlson@yahoo.com

# Curriculum Vitae

### Qualifications:

Wendy Carlson is a Certified Forensic Document Examiner and Registered Investigator. Ms. Carlson has been qualified as an Expert by State, Local, and Federal courts and has testified in Arizona, Arkansas, Colorado, Florida, Michigan, New York, Oklahoma, Pennsylvania, Texas, Utah, Virginia, Washington and Wyoming. She has studied handwriting and document examination and apprenticed under some of the leading court-qualified Forensic Document Experts in the U.S.A. Wendy has been appointed by federal and state court judges to render opinions on handwriting issues in Colorado and Texas and has completed forensic document examinations for government entities such as Grand Prairie Police Department, Hill County and State Bar of Texas in Texas; Offices of the State or Federal Public Defenders in Nevada, New York and Wyoming; Office of the General Counsel in Oklahoma; Buena Vista Police Department, Chaffee County Sheriff's Department, and City and County of Denver in Colorado.

In the last five years, Ms. Carlson has examined more than 10,000 documents and rendered opinions in approximately 850 active cases and multiple peer reviews involving questioned signatures, altered documents, handwritings, legal contracts, court documents, anonymous writing, and graffiti. Ms. Carlson has rendered opinions on documents from clients in the following states and foreign countries: Alabama, Alaska, Arkansas, Arizona, California, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, West Virginia, Wisconsin, Wyoming, Washington D.C., Albania, Bahamas, Canada, Chile, Cook Islands, Estonia, Haiti, Hong Kong, India, Kenya, Liberia, London, Morocco, New Zealand and Ukraine. Ms. Carlson has examined documents and rendered opinions for handwriting comparisons written in Afghani, Arabic, Chinese, Eastern Indian, English, Greek, Korean and Spanish writing.

Ms. Carlson's expertise was featured in CNN, The Dallas Morning News, and The Houston Chronicle, as well as investigative reports by ABC's The Denver Channel and CBS4 in Denver, Colorado. Ms. Carlson was hired by the State of Colorado's Denver Election Division to teach employees how to identify a questioned signature prior to the 2011, 2012, 2013 and 2014 local and national elections.

### Forensic Examination Provided For:

Disputed documents or questioned signatures on wills, checks, contracts, deeds, account ledgers, suspect documents, forgeries, identity theft, anonymous letters and writings, alterations, obliterations, erasures, typewritten documents, altered medical records, graffiti, handwritten numbers, computerized and/or handwritten documents, suicide notes, and autograph authentication.

### Education:

International School of Forensic Document Examination, Los Angeles, California, 2007-2009

Certification after completion of a two-year course and apprenticeship under leading authorities in the field of Forensic Document Examination and Handwriting Identification from the International School of Forensic Document Examination. Attended weekly classes, lectures and teleseminars from Court Qualified Document Examiners and Instructors Bart Baggett, Robert Baier, Don Lehew, and Beth Chrisman. Prepared for, observed, and testified in actual court trials.

Twelve years experience assisting multiple trial attorneys in case and trial presentation, 1996-2008

American College of Forensic Examiners International

Certification after Completion of Registered Investigator Course, July 2010

Certification after Completion of Crime Scene Investigation Course, November 2010

Certification after Completion of Digital Forensics Introduction Course, November 2010

American Institute of Applied Science, Inc.

Completed lessons and exams for Questioned Documents course, April 2012

### Specific Areas of Training:

*Handwriting Identification and Discrimination, Signature Comparison, Techniques for Distinguishing Forged Signatures, Disguised Handwriting, Hand Printing, Block Printing, Altered Numbers, Anonymous Writing, Factors that Affect Writing, Altered Documents, Trial and Deposition Preparation, Document and Exhibit Preparation for Court, Discriminating Elements of Handwriting, Obliterated Writing, Ethics Requirements of a Document Examiner.*

**Laboratory Equipment and Library Available for Use in Examination:**

*Richter Optica S6.6 LCD Stereo Zoom Microscope with screen and camera, handheld magnifying devices and loupes of 3x-20x, Light Tracer light box, protractor, metric measuring devices, portable black light, Kodak 10x Optical IS digital camera, iMac computer and software, 21.5-inch flat screen monitor, multiple scanners, printers and copiers. Various books and articles on document examination, handwriting, and hundreds of detailed case studies from actual cases.*

**Professional Memberships:**

*American College of Forensic Examiners International*

*Center of Forensic Profiling*

*Forensic Expert Witness Association*

*Forensic Handwriting Institute*

*IMS ExpertServices*

*Sheriff's Association of Texas*

*Texas Police Association*

**Publications:**

*How to Spot a Forgery*

*Working With an Expert Witness*

**Lectures, Seminars and Continuing Education:**

*10/23/07 Handwriting Basics and Exemplars; Instructor: C. L. Baggett*

*11/06/07 Identifying Types and Characteristics; Instructor: Don Lehew*

*11/27/07 Assistance in preparation and observation of forgery arbitration held in Indiana with Robert Baier and C. L. Baggett*

*12/11/07 History of Handwriting and Document Examination, American Handwriting Systems; Professor: Bart Baggett*

*01/15/08 Individual Characteristics; Professor: Bart Baggett*

*01/29/08 Letter Forms - Construction and Deviations; Professor: Bart Baggett*

*02/12/08 Comparison of Writings and Exhibits as Demonstrative Evidence; Professor: Bart Baggett*

*02/26/08 Alteration of Documents; Forgery; Professor: Bart Baggett*

*03/11/08 Anonymous Writing; Review of Laboratory Requirements and Photography; Professor: Bart   Baggett*

*03/25/08 Disguised Writing and Review of Disguised Writing Assignment; Professor: Bart Baggett*

*04/08/08 Computer Generated Documents; Erasures and Obliterations; Professor: Bart Baggett*

*04/30/08 Attendance and observation of attorney/investigator/client meeting, oral argument before the court, and client exemplar production held in Connecticut with C. L. Baggett*

*05/13/08 Requirements of Document Examination; Future of Document Examination; Professor: Bart   Baggett*

*06/10/08 The Discrimination of Handwriting; Instructor:  Robert Baier*

*06/24/08 The Premises for the Identification of Handwriting and The Fundamentals of the Identification   Process; Instructor:  Robert Baier*

*07/22/08 The Discrimination and Identification of Writing; Instructor, Rick Roth*

*09/10/08 Special Problems in the Discrimination and Identification of Writing; Professor: Bart Baggett*

*10/01/08 The Extrinsical Factors Influencing Handwriting; Professor: Bart Baggett*

*10/15/08 Requirements for Exemplars, Results from Examinations; Professor: Bart Baggett*

*10/29/08 The Diagnosis of Writing Identification; Professor: Bart Baggett*

*11/12/08 The Scope and Sources of Document Examination; Professor: Bart Baggett*

12/03/08 *Science, Scientific Method, and Writing Identification; Professor: Bart Baggett*

12/10/08 *Review and Discussion of American Society for Testing and Materials; Professor: Bart Baggett*

    12/12/08 *Assistance in preparation and observation of forgery trial held in the Bahamas with C. L. Baggett*

02/18/09 *Understanding the Trial; Professor: Bart Baggett*

02/28/09 *Real Case Mock Trial*

03/11/09 *A Guide to Law and the Courts, and Rules of Evidence; Professor: Bart Baggett*

03/25/09 *Real Case Mock Trial*

06/23/07 *Trial and deposition appearance, testimony, and presentation; Lecturer: Carolyn West*

07/02/09 *ASTM Guidelines; Professor: Bart Baggett*

    07/09/09 *Jury Selection and an Understanding the Law and the Courts; Real Case Mock Trial; Professor: Bart Baggett*

07/23/09 *The Rules and Future Challenges to the Expert; Professor: Bart Baggett*

09/25/09 *Critical Incident Stress:  Statement Analysis and Interview v. Interrogation; Instructor: Faith   Wood*

01/28/10 *Working with the Expert Witness...the Plaintiff Attorney's Prospective; Lecturer:  Windle Turley,   Esq.*

07/15/10 *Certification after Completion of Registered Investigator Course, ACFEI, July 2010*

08/14/10 *Forensic Document Examination Seminar training and instruction with Professor Bart Baggett   and Instructor Robert Baier*

08/14/10 *Identity Theft and Prevention; Instructor Robert Baier*

08/15/10 *Testing of students for Certification at Handwriting University*

08/31/10 *Introduction to Forensic Document Examination; Instructors Bart Baggett and Beth Chrisman*

    09/29/10 *Attendance and observation of deposition held in Texas with C. L. Baggett*

    10/01/10 *Lecturer and Instructor - Introduction to Forensic Document Examination, Clear Lake High School, Houston, Texas*

    11/08/10 *CLE:  Demystifying Daubert:  Daubert's Effect on Your Work as an Expert Witness; presented by The TASA Group, Inc.*

    11/16/10  *Certification after Completion of Crime Scene Investigation Course, ACFEI, November 2010*

    11/16/10 *Certification after Completion of Digital Forensics Introduction Course, ACFEI, November 2010*

    04/15/11 *Lecturer and Instructor - "How to Spot a Forgery", Denver Elections Division, Denver, Colorado*

    03/08/12 *Continuing research on Science and the Scientific Method*

    03/11/12 *Continuing research on the Significance of Measurements in Forensic Document examination*

    04/02/12  *Continuing research on Disguised Handwriting*

    04/06/12 *Completed American Institute of Applied Science, Inc. lessons and exams for Questioned Documents course*

    06/08/12 *Lecturer and Instructor - "How to Spot a Forgery", Denver Elections Division, Denver, Colorado*

    08/17/12 *Attendance and observation of criminal trial with Bart Baggett, Expert QDE, in Los Angeles, California*

    10/12/12 *Lecturer and Instructor - Refresher Course:  "How to Spot a Forgery", Denver Elections Division, Denver, Colorado*

    10/16/12 *Continuing research regarding ESIGN, electronic documents and records, and electronic signatures*

    12/15/12 *Speaker - Holographic Wills and Signatures, Military Order of Purple Hearts Annual Meeting, Dallas, Texas*

    02/05/13 *Speaker - Introduction to the Science of Handwriting and Document Examination, Jesuit College Preparatory School, Forensic Science Department, Dallas, Texas*

    02/21/13  *Speaker - Introduction to the Science of Handwriting and Document Examination, Irma Lerma Rangel Young Women's Leadership School, Dallas, Texas*

    10/18/13 *Lecturer and Instructor - "How to Spot a Forgery", Denver Elections Division, Denver, Colorado*

    05/14/14  *Continuing research on handwriting of individuals with Parkinson's Disease*

    06/06/14  *Lecturer and Instructor - "How to Spot a Forgery", Denver Elections Division, Denver, Colorado*

    06/23/14 *Instruction and Training of new ballot and voter signature input equipment and software, Denver Elections Division, Denver, Colorado*

http://webcache.googleusercontent.com/search?q=cache:Uyoqao6kRQ..

Wendy S

*Printed December 19, 2014*

9/9/2015 1:10 PM

 **at&t**

ANGELICA G. HALE
ATTN: MELVIN AND ANGELICA HALE

EMPORIA, KS 66801-0724

**Page:** 4 of 12
**Bill Cycle Date:** 05/21/15 - 06/20/15
**Account:**
**Foundation Account:**

Visit us online at: **www.att.com**

---

**310** ANGELICA G. HALE

**Call Detail** - Continued

| Time | Place Called | Number Called | Rate Code | Feature Code | Min | Airtime Charges | LD/Addl Charges |
|------|------|------|------|------|------|------|------|
| **Thursday, 06/04** | | | | | | | |
| 04:00p | VMAIL CL | 310 | | SDDV | 2 | 0.00 | 0.00 |
| 04:01p | VMAIL CL | 310 | | SDDV | 1 | 0.00 | 0.00 |
| 04:02p | GRAND TX | 214-458-6009 | | SDDV | 2 | 0.00 | 0.00 |
| 04:23p | ELK GR CA | 916 | | SDDV | 1 | 0.00 | 0.00 |
| 04:26p | INCOMI CL | 916 | | SDDV | 12 | 0.00 | 0.00 |
| 04:49p | LAWREN KS | 785 | | SDDV | 3 | 0.00 | 0.00 |
| 05:27p | INCOMI CL | 620 | | SDDV | 7 | 0.00 | 0.00 |
| 05:35p | ELK GR CA | 916 | | SDDV | 1 | 0.00 | 0.00 |
| **Friday, 06/05** | | | | | | | |
| 09:42a | LAWREN KS | 785 | | SDDV | 2 | 0.00 | 0.00 |
| 10:21a | INCOMI CL | 785 | | SDDV | 2 | 0.00 | 0.00 |
| 11:07a | ELK GR CA | 916 | | SDDV | 1 | 0.00 | 0.00 |
| 11:34a | ELK GR CA | 916 | | SDDV | 1 | 0.00 | 0.00 |
| 12:55p | VMAIL CL | 310 | | SDDV | 1 | 0.00 | 0.00 |
| 03:03p | VMAIL CL | 310 | | SDDV | 1 | 0.00 | 0.00 |
| 08:37p | INCOMI CL | 916 | | SDDV | 1 | 0.00 | 0.00 |
| **Sunday, 06/07** | | | | | | | |
| 11:40a | VMAIL CL | 310 | | SDDV | 1 | 0.00 | 0.00 |
| 04:24p | FAIRFL CA | 707 | | SDDV | 18 | 0.00 | 0.00 |
| 04:44p | FAIRFL CA | 707 | | SDDV | 3 | 0.00 | 0.00 |
| **Monday, 06/08** | | | | | | | |
| 09:58a | ELK GR CA | 916 | | SDDV | 1 | 0.00 | 0.00 |
| 11:49a | ELK GR CA | 916 | | SDDV | 1 | 0.00 | 0.00 |
| 05:00p | ELK GR CA | 916 | | SDDV | 1 | 0.00 | 0.00 |
| **Tuesday, 06/09** | | | | | | | |
| 10:00a | INCOMI CL | 214-458-6009 | | SDDV | 3 | 0.00 | 0.00 |
| 10:03a | ELK GR CA | 916 | | SDDV | 3 | 0.00 | 0.00 |
| 12:08p | VMAIL CL | 310 | | SDDV | 2 | 0.00 | 0.00 |
| 03:08p | INCOMI CL | 916 | | SDDV | 1 | 0.00 | 0.00 |
| 03:13p | ELK GR CA | 916 | | SDDV | 12 | 0.00 | 0.00 |
| 04:30p | ELK GR CA | 916 | | SDDV | 1 | 0.00 | 0.00 |
| **Thursday, 06/11** | | | | | | | |
| 11:32a | ELK GR CA | 916 | | SDDV | 3 | 0.00 | 0.00 |
| 12:01p | VMAIL CL | 310 | | SDDV | 1 | 0.00 | 0.00 |
| 02:42p | ELK GR CA | 916 | | SDDV | 4 | 0.00 | 0.00 |
| 05:05p | ELK GR CA | 916 | | SDDV | 1 | 0.00 | 0.00 |
| **Friday, 06/12** | | | | | | | |
| 12:21p | ELK GR CA | 916 | | SDDV | 1 | 0.00 | 0.00 |
| 01:30p | INCOMI CL | 916 | | SDDV | 8 | 0.00 | 0.00 |
| 04:15p | INCOMI CL | 916 | | SDDV | 1 | 0.00 | 0.00 |
| 04:51p | INCOMI CL | 620 | | SDDV | 2 | 0.00 | 0.00 |
| 06:18p | VMAIL CL | 310 | | SDDV | 1 | 0.00 | 0.00 |
| **Saturday, 06/13** | | | | | | | |
| 08:47a | EMPORI KS | 620 | | SDDV | 2 | 0.00 | 0.00 |
| 09:00a | EMPORI KS | 620 | | SDDV | 1 | 0.00 | 0.00 |

| Time | Place Called | Number Called | Rate Code | Feature Code | Min | Airtime Charges | LD/Addl Charges |
|------|------|------|------|------|------|------|------|
| **Saturday, 06/13** | | | | | | | |
| 10:15a | VMAIL CL | 310 | | SDDV | 1 | 0.00 | 0.00 |
| **Monday, 06/15** | | | | | | | |
| 10:28a | INCOMI CL | 916 | | SDDV | 4 | 0.00 | 0.00 |
| 10:35a | ELK GR CA | 916 | | SDDV | 29 | 0.00 | 0.00 |
| 11:45a | ELK GR CA | 916 | | SDDV | 1 | 0.00 | 0.00 |
| 12:12p | ELK GR CA | 916 | | SDDV | 1 | 0.00 | 0.00 |
| 12:16p | INCOMI CL | 916 | | SDDV | 1 | 0.00 | 0.00 |
| 01:15p | ELK GR CA | 916 | | SDDV | 1 | 0.00 | 0.00 |
| 01:26p | ELK GR CA | 916 | | SDDV | 1 | 0.00 | 0.00 |
| 01:38p | ELK GR CA | 916 | | SDDV | 2 | 0.00 | 0.00 |
| 01:59p | ELK GR CA | 916 | | SDDV | 57 | 0.00 | 0.00 |
| 03:27p | VMAIL CL | 310 | | SDDV | 1 | 0.00 | 0.00 |
| 03:34p | VMAIL CL | 310 | | SDDV | 1 | 0.00 | 0.00 |
| 04:18p | ELK GR CA | 916 | | SDDV | 57 | 0.00 | 0.00 |
| 05:32p | INCOMI CL | 916 | | SDDV | 1 | 0.00 | 0.00 |
| 07:08p | VMAIL CL | 310 | | SDDV | 2 | 0.00 | 0.00 |
| **Tuesday, 06/16** | | | | | | | |
| 10:46a | ELK GR CA | 916 | | SDDV | 1 | 0.00 | 0.00 |
| 11:00a | ELK GR CA | 916 | | SDDV | 1 | 0.00 | 0.00 |
| 11:20a | INCOMI CL | 916 | | SDDV | 1 | 0.00 | 0.00 |
| 08:47p | KIRKWO MO | 314 | | SDDV | 6 | 0.00 | 0.00 |
| 10:27p | VMAIL CL | 310 | | SDDV | 2 | 0.00 | 0.00 |
| **Wednesday, 06/17** | | | | | | | |
| 01:45p | VMAIL CL | 310 | | SDDV | 1 | 0.00 | 0.00 |
| 05:02p | EMPORI KS | 620 | | SDDV | 4 | 0.00 | 0.00 |
| **Thursday, 06/18** | | | | | | | |
| 11:22a | VMAIL CL | 310 | | SDDV | 1 | 0.00 | 0.00 |
| 03:23p | VMAIL CL | 310 | | SDDV | 1 | 0.00 | 0.00 |
| **Friday, 06/19** | | | | | | | |
| 08:23a | VMAIL CL | 310 | | SDDV | 3 | 0.00 | 0.00 |
| 02:24p | VMAIL CL | 310 | | SDDV | 3 | 0.00 | 0.00 |
| 02:33p | GRAND TX | 214-458-6009 | | SDDV | 4 | 0.00 | 0.00 |
| 02:36p | GRAND TX | 214-458-6009 | | SDDV | 3 | 0.00 | 0.00 |
| 02:44p | VMAIL CL | 310 | | SDDV | 3 | 0.00 | 0.00 |
| **Subtotal** | | | | | 486 | 0.00 | 0.00 |

**Rate Code:**

SDDV = Mobile Share with Unlimited Talk & Text

**Data Detail**

| Time | To/From | Type/Unit | Rate Code | |
|------|------|------|------|------|
| **Text Messages** | | | | |
| **Thursday, 05/21** | | | | |
| 01:07p | Sent | 916 | MTM TEXT MESSAG | UNLMSG | 0.00 |
| 02:29p | Rcvd | 916 | MTM TEXT MESSAG | UNLMSG | 0.00 |
| 09:27p | Rcvd | 707 | Text Message | UNLMSG | 0.00 |
| 10:46p | Sent | 707 | Text Message | UNLMSG | 0.00 |
| 10:46p | Rcvd | 707 | Text Message | UNLMSG | 0.00 |
| 10:48p | Sent | 707 | Text Message | UNLMSG | 0.00 |
| 10:49p | Rcvd | 707 | Text Message | UNLMSG | 0.00 |

# EXHIBIT "D"

**Subject:** FW: University Update

**From:** Melvin Hale (mhale8@emporia.edu)

**To:** reefresh@yahoo.com;

**Date:** Tuesday, October 13, 2015 11:38 AM

---

**From:** Jackie Vietti
**Sent:** Wednesday, September 09, 2015 4:29 PM
**Subject:** University Update



**September 9, 2015**

Dear Emporia State Faculty, Staff, and Students,

Today, I have been meeting personally with individuals and groups most closely touched by the allegations of a hate crime and racial discrimination in our School of Library and Information Management. The internal investigation has been completed, and all of these people deserved to hear the outcome personally.

Now I can share with you the outcome as well and ask for your collaboration as we move forward.

On July 10, 2015, I directed that an internal investigation be conducted by ESU Human Resources into an alleged hate crime and a concern over potential discrimination or harassment in the School of Library and Information Management. This investigation was conducted as outlined in the University Policy Manual [3D.0106.05(A)(2)].

An extra step was added to the process to address any concern regarding the objectivity of the internal investigation. That step included a review by two external, independent consultants. This review encompassed an analysis of the process used to conduct the investigation and an assessment of the evidence upon which the findings and conclusions are based.

Both independent reviewers, an attorney in a Kansas-based multi-partner firm and a human resources management consultant who is a former member of the Higher Learning Commission Board of Trustees and the Ohio Ethics Commission, concurred that Emporia State's internal investigation processes and findings were logical, thorough and fair.

Although the investigation materials and the independent reviewers' reports are confidential personnel documents, I am sharing the following information to answer the three key questions that were the focus of the investigation.

**Question 1: Was a hate crime committed in the School of Library and Information Management on or about April 8, 2015?**

**Answer:**

The internal investigation concluded and both independent reviewers concurred that no hate crime was committed. A police report was made July 1 to ESU Police and Safety claiming that a hate crime was committed. The alleged hate crime consisted of the writing of a racially derogatory word in a graduate student's notebook and the circumstances around which the word was written.

This report was investigated and the investigation report passed on to the Lyon County Attorney, which is the standard procedure. The Lyon County Attorney concluded that no crime had been committed as writing an offensive word is not a crime. In addition, none of the circumstances surrounding the writing of this word are criminal:

- ·    The word was written on a page within a student's notebook
- ·    The notebook was in a non-private office to which many people have access throughout the day
- ·    No one has admitted to writing the word
- ·    The page on which the word was written was discarded by the student at the end of the semester
- ·    No evidence has been offered or discovered proving who wrote

the word, and

·      No crime was committed in order to write the word in the notebook.

Since writing the word in question is not a crime, regardless of how offensive, and since the circumstances that existed surrounding the writing of this word are not criminal, no crime was committed. Without a crime having been committed there is nothing to which the designation "hate crime" can be attached. Thus, there has been no hate crime.

Specifically, there is a general misconception about the definition of a hate crime. Kansas law does not contain any crime known or referred to as a "hate crime." It is true, however, that upon conviction of a felony, the sentence imposed can be increased beyond the maximum penalty allowed by law if evidence is presented proving beyond a reasonable doubt that the motivation for the crime was race, color, religion, ethnicity, national origin or sexual orientation of the victim.

Kansas law on this issue is consistent with the Clery Act and the Uniform Crime Reporting definitions, which define a hate crime as a felony or other serious crime where the victim was intentionally selected because of the perpetrator's bias of race, gender, perceived gender identity, religion, sexual orientation, ethnicity/national origin, or disability.

**Question 2: Has racial discrimination occurred in the School of Library and Information Management during the 2014-2015 Academic Year?**

**Answer:**

Each allegation was investigated and the investigation found no evidence of racial discrimination in any instance. The internal investigation included personal interviews of 19 witnesses and resulted in approximately 350 pages of notes, documentation and other information. Specific allegations that had been claimed to be instances of racial discrimination were evaluated, as was the overall working environment within the School of Library and Information Management (SLIM). Both independent reviewers concluded that the internal investigation and its findings were thorough and appropriate.

The university has concluded that although a hostile environment based on

unlawful discrimination does not exist in SLIM, certain aspects of the working environment in SLIM need to be addressed.

**Question 3: Are there further observations or recommendations to be made for SLIM?**

**Answer:**

Through the investigative process, issues related to the work environment for all SLIM faculty and staff have been identified. We have identified opportunities in SLIM including, but not limited to:

- ·   The need for better and more effective collaboration,
- ·   The need for a more open environment in which differing views are valued and appreciated,
- ·   Better adherence to university protocols and processes,
- ·   The need to review particular SLIM systems and processes, and
- ·   Specific performance issues within SLIM.

Moving forward, this investigation provides the opportunity for the university to take a critical look at our processes, policies and initiatives. We are looking forward to those next steps. We appreciate your respect that any disciplinary actions that might arise from this situation would be addressed appropriately and most importantly, privately.

Provost Cordle and I have met with Black Faculty and Staff and Latino Faculty and Staff representatives, who embrace the opportunity to work together to advance the common good of all associated with Emporia State University as well as the broader community. I will be calling on others to elevate the conversation of inclusivity on campus and to work together to develop an action plan to build a more inclusive campus community. I welcome your thoughts about how we can accomplish this goal.

While there still may be differing perspectives regarding this issue, it is now time for us to move forward, coming together to focus on our shared interest of building a better, stronger, more inclusive Hornet Nation, all to the aim of changing lives for the common good.

Yours for ESU,



Jackie Vietti
Interim President



---

## Attachments

- image001.jpg (18.80KB)
- image002.jpg (651B)
- image010.jpg (3.10KB)
- image011.jpg (33.42KB)

# EXHIBIT "E"

| | |
|---|---|
| **Subject:** | FW: Additional University Update |
| **From:** | Melvin Hale (mhale8@emporia.edu) |
| **To:** | angelicahale7@yahoo.com; reefresh@yahoo.com; |
| **Date:** | Thursday, September 10, 2015 4:53 PM |

fyi

**From:** Jackie Vietti
**Sent:** Thursday, September 10, 2015 4:29 PM
**Subject:** Additional University Update



**September 10, 2015**

Dear Emporia State Faculty, Staff, and Students,

Yesterday afternoon you received communication from me about the University's findings related to the alleged hate crime and racial discrimination as well as actions planned by or already in motion by the University. While it is a matter of perspective, as always, it remains my conviction that the University conducted a logical, thorough and fair investigation, as corroborated by two independent reviewers. Does racial discrimination and/or marginalization occur on our campus? Some believe it does; others do not. But in this particular instance we found no substantive evidence that it occurred in SLIM during the 2014-15 academic year. That said we are committed to working with others in Hornet Nation to identify the issues related to both and to develop a plan to address them in a systemic, sustainable way.

While the University concluded no hate crime occurred, I want to make it clear that Emporia State is not hiding behind the legal definition of a hate crime. The University has stated publicly that the written racial slur discovered by a SLIM graduate student in her notebook is reprehensible. Again, the University is committed to working with others to determine the best means to preclude this kind of action from ever happening again on our campus.

What the University finds equally intolerable, in addition to the written racial slur, are multiple public messages that accuse a long-time member of Hornet Nation, Debbie Rittgers, of writing the slur. While it has been publicly stated that she is the "most likely suspect" according to "a nationally known forensic handwriting expert", no evidence has been produced to support that statement. Further, it is problematic, if not impossible, at this point to conduct a "formal handwriting test" given that the word now exists only as a picture on a cell phone. As added information during the investigation interview process, each interviewee was asked if he/she wrote the word. Ms. Rittgers' response was that she did not, and she then offered to take a lie detector test to prove her innocence. In conversation with Ms. Rittgers today when she discovered the latest public accusation, she volunteered to take a formal handwriting test if that would clear her reputation. The University does not plan to accept her offer at this time for a variety of sound reasons, including the fact that the original sample is no longer available. Therefore, Emporia State University is taking this opportunity to formally and publicly exonerate Debbie Rittgers of any wrong-doing in this matter. I solicit your support to do the same.

This University has stood the test of time admirably for 150+ years. As your current leader with an earned reputation for acting always with integrity and transparency, I again ask that we move forward from here to lay the foundation for the next 150, working together to build a better, stronger, more inclusive Hornet Nation in which no one is marginalized, no one is disrespected or subjected to any kind of slur, and no one's voice is unheard. It is by listening intently to all voices, participating in hard, absolutely honest conversations, and committing to be part of the solution that we will we be able to do so.

Thank you for engaging with me in my hard, absolutely honest conversation and for hearing my voice.



Jackie Vietti
Interim President



---

## Attachments

- image001.jpg (18.80KB)
- image002.jpg (651B)
- image010.jpg (3.10KB)
- image011.jpg (33.42KB)

# EXHIBIT "F"

**JULY 7, 2015**

**Excerpt from Discussion (Melvin Hale with Gwen Alexander)**

**Hale**: Our feeling has been, particularly since the handwriting expert, is that Deb is getting away with too much.

**Alexander**: I checked on that handwriting expert. She is the first one that pops up, and I don't acknowledge [Wendy Carlson] as a handwriting expert. If you sent her a different thing to analyze, she would always say the same thing. She's got all that stuff online, but you're an information professional, you know not to believe everything that's written, everything that you read.

# EXHIBIT "G"



Emporia State University's

# THE BULLETIN

### The Students' voice since 1901

HOME   POLICIES   ADVERTISING   EMPLOYMENT   POLICE REPORTS   STAFF

NEWS ▾   OPINION ▾   SPORTS ▾   HORNET LIFE ▾   VIDEO ▾   BLOGS ▾   FULL ISSUE   THE BULLSHIT ▾

Filed under News

# Hale must retract or face the axe

Sarah Spoon, staff writer • October 1, 2015 • 2 Comments

Melvin Hale, assistant professor of the School of Library and Information Management, faces termination if he does not retract his claim that Debbie Rittigers wrote the racial slur.

"This is a(n excerpt of a) letter I got from Dr. Vietti the day after the march," said Melvin Hale. "'Emporia State University is setting the following conditions as expectations of your continued employment as a professor…That you will issue a retraction of your accusation of Debbie Rittgers as the author of the racial slur unless you provide the university with credible summative evidence that Mrs. Rittgers is the perpetrator'…She had some other conditions that, to me, are equally problematic that under no circumstances would I agree to any of them."

A press release from Vietti on Sept. 10 said that the university "formally and publicly exonerate(s) Debbie Rittgers of any wrong-doing in this matter."



Melvin Hale, Assistant Professor of SLIM

The release also said that Rittgers offered to take a lie detector test and take another hand writing test to prove her innocence. "ESU put out the false story that the handwriting is untestable because it exists in the form of a cellphone photo," said Melvin Hale. "There was enough written material there for Wendy Carlson to move forward. A lot of their examination happens under a microscope, anyway so it is being done under conditions where the handwriting is being enlarged."

Gwen Alexander, dean of SLIM, has been accused by the Hales of ignoring their request for an investigation. Alexander is currently on administrative leave with Gary Wyatt, associate provost, stepping in as dean of SLIM during her leave.

The Hales filed the claim as a next step in their process to seek justice, they said. They were unsatisfied with ESU's handling and internal investigation of the racial slur. Melvin Hale also claims that much of the information ESU is giving out to the students is false.

The Hales had approached Wendy Carlson, a forensic document examiner, and asked her to compare the racial epithet and handwriting from Debbie Rittgers. Carlson has been qualified as an expert in 15 states by judges in court and has testified in multiple trials. Carlson has also consulted on thousands of documents from 46 states in the United States and from foreign countries.

"It is my professional expert opinion that it is highly probable that Deb Rittgers authored the racial slur," Carlson said. "Because I don't feel I have enough evidence to state with complete certainty that she wrote it I must qualify my opinion. With more samples of Deb's handwriting I might be able to determine with complete confidence that she was the author. However, unless or until I obtain more of her handwriting I can only make a determination of high probability of her authorship."

The Hale's confirmed paying Wendy Carlson for her consultation, as she is a professional consultant and requires a fee. According to Carlson's website, her consultation fee is $300.

The Hale's evidence from Carlson is not seen as legitimate by ESU, according to the Hales.

Angelica Hale, former assistant to the dean of SLIM, filed a harassment claim with the Kansas Human Rights Commission against Emporia State, citing the incident in SLIM that occurred last semester.

She accused ESU of discriminating against her because of her race and her retaliation over the racial slur.

"I want for them (ESU) to acknowledge the outcome of the independent investigation and what it reveals and accept that instead of coming after the person who reports the thing that happened," Angelica Hale said. "This is an independent investigation and I just want fairness. I want justice."

The Hales said they are hoping that by appealing to the Kansas Human Rights Commission they will conduct an impartial investigation to discover what really happened.

"During an investigation, a field investigator will interview the complainant, review relevant documents, conduct interviews with witnesses, and summarize the case for the investigating commissioner," according to the KHRC website, khrc.net. "All information discovered throughout the course of the investigation is confidential and is gathered in an objective and impartial manner."

"A set of expectations has been presented to Dr. Hale to be completed prior to and upon his return to campus," said Dr. Jackie Vietti, Interim President at ESU. "One of the conditions does relate to public comments he has made regarding Debra Rittgers, but it is an incomplete statement that Dr. Hale's employment will be terminated if he does not make a retraction. The University is unable to comment further due to the fact this is a personnel matter."

Hale is not, however, currently on suspension.

"Dr. Hale remains an employee of the college, teaching his assigned on-line classes for the fall semester at a distance," Vietti said. "His physical return to campus is predicated on acceptance of a set of expectations that is designed to foster a positive work environment for all within SLIM, including Dr. Hale."

Neither Melvin Hale nor Vietti would  speak about the other expectations.

"The expectations are a personnel matter that the University is not at liberty to discuss, as is the case with all matters pertaining to personnel," Vietti said.

The Hale's are planning a second march to take place on October 27th, from 11:30 p.m. until 2:00 p.m.

 Print

# EXHIBIT "H"

# EMPORIA STATE
# U N I V E R S I T Y

■ *Office of the* PRESIDENT

Campus Box 4001
1 Kellogg Circle
Emporia, Kansas 66801-5415
620-341-5551
620-341-5553 fax
www.emporia.edu

September 16, 2015

Dr. Melvin Hale, Assistant Professor
███████████

Emporia, KS 66801-5537

Re:    Mandatory Referral
Administrative Leave With Pay

Dear Melvin,

In response to the investigation into allegations of racial harassment and discrimination in the School of Library and Information Management and the concerns that came to light during the course of that investigation, coupled with the continued escalation of the tension between you and Dr. Alexander, Emporia State University is setting the following expectations as conditions of your continued employment as Assistant Professor in the School of Library and Information Management. Please consider the expectations below, as amended from the letter dated September 9, 2015, and provide a response by end of end of business Friday, September 18, 2015 regarding your acceptance of the expectations.

Beginning immediately and to be completed no later than October 15, 2015 as an Assistant Professor in SLIM, we expect the following:

1)    That you will contact the Fit for Duty Program through HealthQuest, the Employee Assistance Program. ███████████████████████████████████████████ Specific instructions for this expectation are outlined below. Costs associated with this referral will be paid by the university.

2)    That you will make serious, positive efforts to engage with Dr. Alexander in a mediation session to come to consensus on steps for a professional working relationship. This session will be paid for by the university.

3)    That you will participate in a mediation session with SLIM faculty and staff with the interest of identifying ways to repair relationships and move forward positively with the department. This session will be paid for by the university.

The above steps are to be completed prior to your returning as an Assistant Professor in SLIM. Until that time you will remain on leave with pay status.



An Equal Opportunity Employer

Upon your return from your cooling off period, the following on-going conditions must be met for your continued employment as an Assistant Professor in SLIM:

1)  That you will acknowledge, accept, be aware of, and change your behaviors that are unacceptable in the workplace. These behaviors include, but are not limited to, raising your voice, accusing others using inflammatory statements, or engaging others in a way that may otherwise be perceived as intimidating or bullying.

2)  That you will issue a retraction of your accusation of Debbie Rittgers as the author of the racial slur unless you provide the University with credible, substantive evidence that Ms. Rittgers is the perpetrator.

3)  That you will agree to follow University grievance process and procedures in the future, should situations occur that warrant such action.

The mandatory referral to the Fit For Duty Program through HealthQuest, the Employee Assistance Program (EAP), is in accordance with K.S.A. 75-2949(i) and Kansas Administrative Regulation 1-9-19 which authorize the appointing authority to relieve an employee from duty for the safety and protection of persons or property and to place the employee on administrative leave with pay. You are mandated to **contact ComPsych**, our EAP provider, **no later than noon on Monday, September 21, 2015**. You may reach ComPsych at this toll-free number – **(888) 275-1205, Option 7**. Please refer to your **Client Record # 3511127** when you reach a representative. They will assist in referring you to a counselor to complete the steps of the program. Please be advised that you must sign the Authorization Form: Formal Referral document by September 18, 2015 and return to HR with a postmark date of September 19, 2015. You must meet the above referral contact deadline and successfully complete any requirements specified by your counselor to be compliant with this expectation.

Please understand that these expectations constitute the conditions of your employment, and are non-negotiable. Failure to meet them will result in disciplinary action up to and including termination.

Melvin, by investing in the steps outlined above, the University looks forward to your continued professional growth in SLIM as well as at Emporia State University.

Sincerely,

Jackie Vietti

Jackie A. Vietti
Interim President

# EXHIBIT "I"



HOME   POLICIES   ADVERTISING   EMPLOYMENT   POLICE REPORTS   STAFF

NEWS ▾   OPINION ▾   SPORTS ▾   HORNET LIFE ▾   VIDEO ▾   BLOGS ▾   FULL ISSUE   THE BULLSHIT ▾

Filed under Opinion Columns, Staff Editorials

# Those who cry wolf

September 10, 2015 • Leave a Comment

   

Yesterday, Jackie Vietti, interim president, announced that the report on the racial discrimination that allegedly happened in the School of Library Information and Management (SLIM) in regards to Melvin and Angelica Hale.

The meeting was held at 5:30 p.m. in the President's Conference Room in Plumb Hall. During the meeting, the results of the investigation were announced as the following: "No hate crime was committed; No racial discrimination occurred; and ESU Interim President and the Administration will work with faculty and staff to build a more inclusive community and with those within the SLIM to ensure a positive working environment."



CARTOON by ITZEL LOPEZ-VARGAS

The incident with the Hales against the university occurred around April 8, when the graduate student found a racial slur written in his/her notebook that wasn't there originally and went to report it to Gwen Alexander, the dean of SLIM.

However, nothing was said about it again until July 1, when the Hales contacted Emporia State Police and Safety and accused one of their coworkers for writing the word. There were a few emails that were exchanged between Melvin and Vietti between July 5 and 8. By July 9, The Lyon County Attorney, Marc Goodman, agreed with the original findings of the ESU Police and said that no hate crime happened. By July 14, Ray Lauber, the associate director of Human Resources started an investigation and by July 30, news had reached the Associated Press in Kansas City about the happenings within SLIM and other alleged racial problems at ESU. Even though nothing was found, Vietti is still working to bring inclusivity onto the ESU campus.

"While any action, slur or otherwise, that marginalizes any member or group of Hornet Nation is reprehensible, it is now time for us to move forward and continue to work together for a better, stronger Hornet Nation in order to achieve our vision of changing lives to serve the common good," said Vietti in a press release.

The federal definition of a hate crime is a traditional offense like murder, arson, or vandalism with an added element of bias, according to FBI.gov. What happened at ESU was not an actual crime. The question that now arises is if the whole situation was blown out of proportion. Next, why were the Hales being so secretive and asking for their lawyer to be present for the interview and to read the story *The Bulletin* published on the alleged discrimination that occurred that was previously discussed?

But they're all for receiving media coverage for the March on Emporia that's occurring Sept. 15.

It's frustrating  because it seems the Hales wouldn't talk to our reporter seemingly because they didn't know what angle we were going to take and may not have wanted us to possibly  portray them and their cause in a negative light. However, when it seems to make them look like victims, they're all for getting the media coverage.



# EXHIBIT "J"

 **THE BIG STORY**

# Emporia State couple claims racial harassment at university

By MARGARET STAFFORD Jul. 29, 2015 7:24 PM EDT

    1



KANSAS CITY, Mo. (AP) — A black couple who have been working for a small university in eastern Kansas says the school is retaliating against them for complaining about a racial incident.

Angelica Hale, a dean's assistant at Emporia State University, said she resigned Monday out of frustration over the university's handling of the complaint. She and her husband, Melvin Hale, an assistant professor in the university's School of Library and Information Management, said they have endured a hostile work environment since reporting in April that someone had gone into the office of Angelica Hale's graduate assistant and tampered with several items before leaving a racial epithet on a piece of paper.

In a telephone interview Wednesday, the Hales said Gwen Alexander, dean of the School of Library and Information Management, initially said she would investigate the incident but then did nothing and instead chastised Melvin Hale for complaining to a university provost and making a complaint to Emporia police. At one point, Alexander told Melvin Hale that he should "recognize that he was in Kansas now," he said.

"We don't understand why (Alexander) wouldn't want this incident investigated," Melvin Hale said. "If she is genuinely concerned about our happiness being at Emporia State, she should definitely be on our side to figure out what happened. Her anger and attitude make it clear that she would rather not deal with this in any way, shape or form."

The school issued a statement saying it's following all its policies and procedures for such complaints.

"The incident is under investigation," spokeswoman Gwen Larson said. "We will act accordingly when the investigation is concluded."

Angelica Hale said Alexander had been pleased with her work since the couple arrived at the school in July 2014 and had suggested she would be in line for a full-time job after her one-year contract ended in August. Instead, Hale said she was recently told her contract would not be renewed, so she resigned. Melvin Hale said Alexander has suggested he might not be named director of the school's archive studies program, which he said was the reason he came to Emporia after graduating from UCLA.

The couple also says Alexander and many other employees in the school have been unfriendly and treated them coldly since their complaint.

The Hales said they plan to stay in Emporia, where they bought a house six blocks from the university, and work to change what they say are negative attitudes toward minorities at the school of about 3,900 students and few minority faculty employees.

Larson said the school has no tenured black professors and four who are on tenure tracks, out of a full-time faculty of about 253.

The Hales are planning a march Sept. 15 when representatives of the American Library Association are visiting.

"They will meet a group of people complaining about how minorities are treated at the university," Melvin Hale said. "I'm done being nice. I'm done holding my tongue."

# EXHIBIT "K"

*Concerned Library and Information Science educators, researchers, and practitioners*

Monday, August 24, 2015

To: Emporia State University Board of Trustees, Emporia State University President, Provost, and Executive Director of Alumni Relations

From: Library, Information and Archival Science educators, researchers, and practitioners

Re: Racial climate

As educators, researchers, and practitioners in the library, information, and archival sciences, we wish to express our deep concern about how events have unfolded at Emporia State University regarding the investigation of Ms. Angelica Hale and Dr. Melvin Hale's complaints of experiencing a hostile work environment and a racist act within the School of Library and Information Management. We note also that a statement of support for the Hales issued by the University's Black Faculty and Staff and Latino Faculty and Staff on August 11, 2015 draws attention to a pervasive sentiment among Black and Latino staff of injustice, inequality, and racialized intimidation on the campus.

Kansas history is U.S. civil rights history, from its entry to the Union in 1861 as a free state, to landmark decisions such as Brown vs the Board of Education Topeka, KS. Kansas may in many ways resemble the worst of U.S. racial history, but in the most important way, Kansas is a state of freedom and respect for human dignity and rights. We stand in solidarity with the Hales in their quest for justice for not just themselves but for all.

The Emporia State University Policy Manual states that:

"Emporia State University values and welcomes the benefits of diversity, and pledges to current and prospective students, faculty, staff, administrators, and the public that we expect and demand the worth and dignity of all people be recognized without regard to any classification that might preclude a person from consideration as an individual. The University regards inappropriate behavior, unfair treatment or harassment of any individual to be inconsistent with its goals of providing an atmosphere in which students, faculty, staff and administrators may safely learn, work, and live" (http://www.emporia.edu/acadaff/pdf/EmployeePolicyManual.pdf).

We ask, therefore, that Emporia State University live up to the ideals of the best in Kansas history and what is in its own policies and procedures. We call upon you to conduct a full and objective investigation regarding the issues that Dr. Melvin Hale and Ms. Angelica Hale have raised. It is only fair to offer an opportunity to be heard when parties feel that they have been wronged. We offer our names here not in representation of any institution or association but rather as concerned individual professionals.

Very truly yours,

*Laura Peterson*

1

*Concerned Library and Information Science educators, researchers, and practitioners*

Lorna Peterson, Ph.D.
Emerita Associate Professor University at Buffalo
Past President Association for Library and information Science Education
Member American Library Association
Member Black Caucus of the American Library Association
Granddaughter of ESU, formerly Kansas State Normal School, graduate, Corinne (nee  Albertye) Lythcott


Anne Gilliland, Ph.D.
Professor and Director of Archival Studies, Department of Information Studies, UCLA
Director of the Center for Information as Evidence, Graduate School of Education and Information
Studies, UCLA
Director, Archival Education and Research Initiative (AERI)
Fellow, Society of American Archivists

Sibyl E. Moses, Ph.D.
Formerly Associate Professor, Graduate School of Library and Information science, The Catholic
University of America, Washington, D.C.
Member Black Caucus of the American Library Association

Cheri Smith
Program Director, Academic Outreach & Engagement
Hesburgh Libraries - Psychology Librarian
University of Notre Dame

Michelle Caswell, Ph.D.
Assistant Professor
UCLA

John Ellison, Ph.D.
Emeritus Associate Professor
University at Buffalo

Silvia Lloyd, Ed.D.
School librarian
Mount Vernon (NY) City School District

Patti J. Poe
Continuing Education Consultant
Northeast Kansas Library System
4317 West 6th
Lawrence, KS 66049
ESU SLIM MLS 1993
Kansas Library Association President 2003 - 2004 (2 terms)
Kansas Library Association Presidential Award, Outstanding New Professional, 1996

Suzanne Hildenbrand, Ph.D.
Emerita Professor, University at Buffalo

2

*Concerned Library and Information Science educators, researchers, and practitioners*

Kathleen de la Peña McCook, Ph.D.
Past President Association for Library and information Science Education
Life member of REFORMA

Dan O'Connor, Ph.D.
Associate Professor
Rutgers, The State University of New Jersey

Anna Foote
Northeast Kansas Library System,
Children's Services and Continuing Education Support
4317 West 6th Street
Lawrence, KS 66049

Kathleen Weibel
Retired Director of Staff Development
Chicago Public Library

Kamaria Hatcher
Prince George's County Memorial Library System
Prince George's County, Maryland

Leslie L. Morgan, First Year of Studies & Africana Studies Librarian
Poverty Studies: Consultation & Instructional support
LINK Librarian to Walsh Hall
Hesburgh Libraries - Academic Outreach & Engagement Program
President, Indiana Black Librarians Network (IBLN)
Black Caucus, American Library Association
University of Notre Dame

# EXHIBIT "L"

# EMPORIA STATE
# U N I V E R S I T Y

August 11th, 2015

To the Senior Administration of Emporia State University:

The Black Faculty and Staff (BFS) and the Latino Faculty and Staff (LFS) of Emporia State University (ESU) would like to formally declare its support of former Assistant to the Dean of Library and Information Management (SLIM), Angelica Hale and Assistant Professor, Dr. Melvin Hale.  Based on our understanding of the recent occurrence and intentional mishandling of a racially motivated hate-crime against Dr. and Mrs. Hale on Emporia State campus, the Black & Latino Faculty and Staff find it necessary to not only stand in solidarity with our colleagues, but to implore the administration of this university to give sincere attention and due diligence to the proper investigation of this issue.

We would expect that as valued employees of the institution, that ESU would be timely and transparent in its handling of this incident and the culture that precipitated it. We find the Administration's response (official or otherwise) to this matter to be representative of a potentially hostile work environment that has done little to nothing to ensure the professional and cultural integrity of ESU.

The formal statement the university itself released should be sobering to the senses of Emporia State's administration.  The tense climate that has been created as a result of the incident further calcifies the notion that not only is the university not progressing in the area of diversity and minority employment, but it is actually regressing illegally regarding the issues of race. When the hate crime was brought to the attention of Dean Alexander, she conveniently reminded Dr. Hale that **"This is Kansas,"** as to assert the acceptability of this type of environment and behavior. We emphatically refuse to accept the types of actions and attitudes that support the notion that our state, city, or institution can be unapologetically racist and exclusionary to individuals who live and work in it with pride. This matter is important to us and we expect the administration of Emporia State University to respond appropriately.

We call on the University to take this incident as an opportunity to reaffirm and strengthen its commitment to Diversity.  As Ms. Hale acknowledges in her open letter:

*"ESU has no tenured African American professors and only four tenure-track African American professors, yet it's over 150 years old?!"*

This observation is one that is woefully accurate, painting a vivid picture of the shortcomings of the Emporia State University at seeking out, attracting, and retaining motivated and qualified black professionals to lead our campus.  There are currently four black faculty members.  Out of those four faculty, one will be exiting ESUs campus this upcoming October.  Our black faculty colleague in the college of Business is **not** on tenure track after three years of employment at Emporia State.

To address the underlying causes that are creating an environment that is not conducive to a positive experience, the BFS & LFS calls on the Administration to create a transparent, strategic, campus diversity plan that specifically addresses the following:

a. The inclusion of both an African-American Emporia State Employee and someone from the Diversity Education Committee as part of the current university presidential committee search.

b. Reassigning the universities Affirmative Action Officer position to someone else in the Human Resource department.  Currently, there is no one that represents under-represented populations on the campus in the Human Resource department.

c. Other areas on campus that need attention:
     1. There is no staff of color in Academic Advising
     2. There is no full time staff of color in Student Wellness
     3. There is no professional staff of color in Residential Life
     4. There is no staff of color in the ESU Foundation
     5. There is no staff of color in Career Services

d. The creation of a Senior Administration Position created (VP or Dean) geared towards the enrichment of diverse enrollment management procedures for students & staff, affirmative action, campus wide diversity initiatives and the reporting of discrimination and harassment

We believe that a transparent plan would be in the best interests of the ESU community as well as it will keep all of us responsible and accountable to the wellness and fairness that we expect from an institution like ESU.

Our sincere hope is that Emporia State University, the Kansas Board of Regents, and the various law enforcement agencies that obtain the jurisdiction to act on this matter will coalesce to allow justice to prevail and set a new precedence for racialized intimidation at this institution. In the opinion of the remaining Black & Latino Faculty and Staff, to sit passively in the face of such flagrant acts of intimidation and disregard places us in the vulnerable position of becoming the next to be targeted with no recourse. For these reasons, we find it necessary to share our perspective and to open up the opportunity for the ESU administration to take a more substantive approach to reconciling this matter.

The Black & Latino Faculty and Staff are requesting a meeting with ESU Administration to discuss the concerns and objectives raised in this letter.  We would request both an acknowledgement of receipt of this letter by **Interim President Jackie Vietti** within **2 days** as well as a meeting scheduled with us within **1 week**.  In our attempt to be leaders in this area, we have shared our support of the Hales, shared our concerns of the state of diversity at ESU, asked for reasonable changes based on best practices of diversity in higher education, and lastly a dialog with the administration.  If our request for an acknowledgement of concerns along with a meeting go unheeded, we reserve the right to follow up these concerns in other forums.

Sincerely,

Representatives from Black Faculty & Staff
Representatives from Latino Faculty & Staff

Doug Smith, Ph.D.
Instructor, College of Business
Dsmith35@emporia.edu

Jason C. Brooks
Director of Diversity & Inclusion
Jbrooks5@emporia.edu

Sonja Ezell, Ph.D.
Assistant Professor
College of Education
sezell@emporia.edu

Amir Cuffe
Admissions Counselor
acuffe@emporia.edu

Gregory Robinson, Ph.D.
Assistant Professor
English, Modern Languages, and Journalism
Grobins2@emporia.edu

Javier Gonzalez
Director of Fraternity and Sorority Life
Jgonzal9@emporia.edu

Roxana Peraza
Admissions Counselor
rperaza@emporia.edu

George Head
Technology Support Specialist – Information
Technology
ghead@emporia.edu

Jane Lackey
Administrative Assistant – Registration
jlackey@emporia.edu

# EXHIBIT "M"

# Is Emporia State University Hiding Behind the Legal Definition of a Hate Crime?

## Dr. Melvin Hale, PhD

### September 15, 2015

One day after announcing the results of the "investigation" stating the university's position that "no hate crime occurred," Interim President Jackie Vietti issued a follow up announcement. It reads in part:

> "While the University concluded no hate crime occurred, I want to make it clear that Emporia State is not hiding behind the legal definition of a hate crime."

When we met with ESU General Counsel Kevin Johnson and Dr. Jackie Vietti to review the results of the "investigation," last week, this is what **we** were told.  After Dr. Vietti asked the first question about whether or not a hate crime was committed on or around April 8th, 2015, and answered her own question **that there was not**, she said:  "**Kevin, please explain the rationale for that.**"

---

**Kevin:** "Writing a word on a piece of paper, no matter how offensive, or what the word is, is not a crime, it's just writing a word on a piece of paper.  The circumstances under which the word was written shows there was no crime committed in order to get that word onto that paper. There was just no crime committed. Also, under Kansas law, there is nothing that is called a hate crime. There is no criminal statute that says, this is a hate crime. There is just all the regular crimes that there are. However, in the sentencing statutes, there is a departure sentence can be given after there has been a felony conviction. A person that has been convicted of a felony, and it's the sentencing hearing, then the prosecutor can, if the prosecutor chooses, request or argue for a departure from the maximum penalty and ask for a penalty that is beyond what the maximum is by statute. It's what's called a departure from the guidelines. And there are several reasons under which that can be done, and one of them is if the person has been convicted of a felony, if it's proven in a separate hearing beyond a reasonable doubt that they committed the crime against this particular victim on the basis of race, color, religion, all of the different classifications, for any one of them or more, then the sentence can be enhanced, it can be more, and it is not called a hate crime, but that is where the hate crime idea comes from. There's kind of a general misconception that there are hate crimes. **There aren't**.  That's how it works. The sentence can be made stiffer.  And I think that the perception, and I'm just guessing, comes from TV, comes from **common usage**.  There are a lot of things that seem to be the way things are accepted, as being the way things are, but they really aren't, and so, **the only way there could be a hate crime in this situation is if a felony had been committed, and someone was convicted of that felony**, and it was shown that they committed that felony for the purpose of one of those reasons.  So, if there is no underlying crime, there's no underlying felony, **there can't be a hate crime**.  It's just nothing in there.  And the Lyon County attorney, he's the prosecutor for this county, it's his job to make a determination, as to whether or not to prosecute anything, and he said there was no crime.  **So that's that!**"

---

You are free to draw your own conclusions.

Please Copy and Share

# EXHIBIT "N"

Case 5:15-cv-04947-SAC-KGS   Document 4   Filed 11/04/15   Page 65 of 86



# Action Matters

**"The time is always right to do what is right." - Dr. Martin Luther King Jr.**

"Walking a friend home from a party, donating to a local food pantry or expressing concern for a friend"; whether the task is big or small, your *action matters*.

Taking action is essential for all of us to make our university a better place.  Action Matters is a strategy that helps empower you to act when others stand idly by. It's time for the students, faculty and staff at UW Oshkosh to make this university a better, more tolerant environment through our actions.



**Steps for Intervening**

**Step 1:** Notice the event

**Step 2:** Interpret the event as a problem

**Step 3:** Assume personal responsibility

**Step 4:** Know how to help

**Step 5:** Implement the help (take action!)

Adapted from the University of Arizona's STEP UP! Program



## Bias Incident

You are walking in your residence hall when you notice someone has written the N-word written on the white board on your floormate's door. You are concerned about your floormate seeing the comment and feeling unsafe.

You:

**1** Don't do anything.

**2** Erase it quickly and continue on your way.

**3** Let a CA, Hall Director, the Counseling Center or Campus Victim Advocate know about the incident.

**4** Report the incident using the online Bias Incident Report form.

**5** Call University Police to take pictures and report the bias incident.

**6** Knock on the door and express your concerns about their white board.

**7** Personal option: _____

_____

_____

_____

_____

uwosh.edu/umatter



UW Oshkosh Counseling Center
Student Success Center, Suite 240
800 Algoma Boulevard
Oshkosh, WI 54901-8613
(920) 424-2061 • FAX (920) 424-1066



# EXHIBIT "O"

  **iOTW REPORT.com**

HOME   THE BULLPEN   iOTW IMAGES   iOTW PET PORTRAITS   CONTACT/SOCIAL MEDIA   ABOUT US   BLOG ROLL   ARCHIVES



Save your own PC. Now at BEST BUY   LEARN MORE   FIX ME STICK   VIRUS REMOVAL DEVICE


See how a bottle becomes a new pair of jeans at iWantToBeRecycled.org

KEEP AMERICA BEAUTIFUL
Give your garbage another life. Recycle.


## Black Professor Demands Hate Crime Investigation, Sues School When They Find No Crime

by BigFurHat • 14 Comments

It seems that too many blacks today think this is what justice is:

They make an accusation. The defendant is immediately guilty. If not, there will be hell to pay.

It's juvenile thinking.



Here's the dipshit – Melvin Hale

Hale and his wife most likely concocted a hate crime hoax (someone wrote a racial slur on a piece of paper and slipped it under the door. How original.) and is suing because he says his reputation has been damaged.

Listen dopey. You're damaging the reputations of a lot of good black people with your adolescent antics.

Keep it up. You're kind are setting back race relations to its nadir.

IF YOU'RE USING SCRIPTS TO BLOCK OUR REVENUE WITHOUT DONATING YOU'RE CONTRIBUTING TO IOTWREPORT'S DEMISE




See how a bottle becomes a new pair of jeans at iWantToBeRecycled.org
KEEP AMERICA BEAUTIFUL
Give your garbage another life. Recycle.

# EXHIBIT "P"

 

# Black Professor Demands Hate Crime Investigation Then Sues When He Doesn't Like The Results



**RACE**

**OCTOBER 16, 2015**



**BRIAN ANDERSON**

Brian Anderson is the author of horror novels Man-Made Monsters and Cryptic Creatures and has written for some major Hollywood studios. He is a family man, musician, muscle car enthusiast, and supporter of the 2nd Amendment.





Melvin Hale is an assistant professor in Emporia State's School of Library and Information Management. His wife Angelica Hale was an assistant to the dean of the school. They are both black and reported a racial incident that was almost certainly bullshit last April. They demanded a hate crime investigation and got it. Unfortunately, the results of the investigation found that no hate or racism occurred, so now they are suing the university.

The story goes like this: Last April someone allegedly wrote a racial slur on a piece of paper and slipped it under the office door of Angelica Hale's grad assistant. Right off the bat you can see that this supposed incident wasn't directed at either of the Hales. In any case, Melvin Hale publicly accused an unnamed person, presumably a faculty member, of perpetrating this hate crime without a shred of evidence.

After making a spectacle of himself, Hale demanded that the university investigate the incident as a hate crime. The school conceded and looked into the matter. According to **The AP:**

> In September, the university said an investigation of the incident and its aftermath found no evidence of a hate crime or racial discrimination.

I think that's a nice way of saying this was yet another hate crime hoax.

Since the unsubstatiated hate crime, Angelic Hale's contract was not renewed and the university no longer employs her. She has filed a complaint with the Kansas Human Rights Commission alleging she was called derogatory names because of her race and terminated for complaining about it.



Melvin Hale is still employed, but he has been told he too will be fired if it doesn't tone it down. He said the university has asked him to stop accusing university employees of racism and for him to behave in a more professional manner. Hale says he will not comply with the request.

So now comes the lawsuit. Melvin Hale filed a $150,000 lawsuit in federal court accusing Emporia State of racial discrimination, as well as damaging his reputation and career.

**Melvin Hale alleges in his lawsuit that the university's findings damaged his reputation by portraying him as a liar and a fraud.**

Here's how I see it: The Hales were campus agitators that constantly complained about racism that didn't exist. They likely staged a hate crime because they couldn't prove their claims of racism any other way. When the university investigated and found that the hate crime was bullshit and that the Hales were probably behind it, Melvin Hale filed a lawsuit in an attempt to save face. They should be arrested for theft because they just stole a page out of Al Sharpton's playbook.

These two "racial justice warriors" just made things a lot harder on legitimate prospective black employees. Whether Emporia State will admit it or not, they will think twice before hiring other black professors. If it comes down to two applicants, one black and one white, with equal qualifications, they're going with the white one. After all of the stink and grief caused by the Hales, they'd be crazy not to.



**15 Comments**   Downtrend                                    1 Login

♥ Recommend 1    📤 Share                                  Sort by Best

[ Join the discussion… ]

**Paul Mariani** · 7 hours ago
Another racism hoax. Lefties are so full of sh!t.
10 ∧ | ∨ · Reply · Share ›



**Blackbeard** · 6 hours ago

And in other news...ISIS releases new, even more barbaric video in an effort to regain mantle from Planned Parenthood.

6 ^ | ∨ · Reply · Share ›



**southernlawman** · 6 hours ago

He's a nigro- he has no career.

4 ^ | ∨ · Reply · Share ›



**Fronto** ➜ southernlawman · 5 hours ago

Hey bud,Sis is doing good and I'm back.I can click on articles now.Could'nt tell you what happened before.I'm still entertaining the idea of flaming the latest till they ban me.Glad to be back at downtrend though.

^ | ∨ · Reply · Share ›



**southernlawman** ➜ Fronto · 3 hours ago

I'm very happy to hear that!! I include her and yourself in my prayers every day. I feel honored to do so.

^ | ∨ · Reply · Share ›



**Wayne Seavers** · 6 hours ago

IMO using the tax code to steal from whites (i.e. me) to pay for blacks who have no intention of ever working is a hate crime. Who do I sue??

3 ^ | ∨ · Reply · Share ›



**Cisco** · 5 hours ago

Stupid left wing whacko knee-grows.

2 ^ | ∨ · Reply · Share ›



**goodfite** · 6 hours ago

Non-threatening name calling or using racial slurs does not meet the criteria for proving a hate crime. We'd all be in jail if it did, and Melvin Hale is a N-word.

2 ^ | ∨ · Reply · Share ›



**MR LEE** · 6 hours ago

I'z be black! And because I'z be black, I'z should be getting all mize demands cause I'z be black!

2 ^ | ∨ · Reply · Share ›



**gene** · 5 hours ago

I read the story, then re-read the headline as: Burrhead mongrel plays lawsuit lotto.

1 ^ | ∨ · Reply · Share ›



**Realist** · 5 hours ago

His actions pretty well sum up the direction his race is headed.

1 ^ | ∨ · Reply · Share ›



**Raptor Keeper** · 5 hours ago

Melvin Hale should be admitted to a psych ward and his home searched for firearms.

He's deluded.

He is a loose cannon nutjob and he will be the next mass shooter.

He can be stopped now before he kills innocent people.

1 ^ | ∨ · Reply · Share ›



**Collin R. Hinrichs** · 6 hours ago

Call me crazy, but I don't think this guy has the legal background needed to determine if an investigation was insufficient and sue. Humangirl-give us an experienced legal opinion here, please.

1 ∧ | ∨ · Reply · Share ›



Jackalope · an hour ago

How much u wanna bet neither of them would have made it this far in life without affirmative action?

∧ | ∨ · Reply · Share ›



**Nick Hall** · 6 hours ago

Just say it as it is spooks being spooks and to think they can reproduce and they are like rabbits then lets blame everyone for ourfaults instead of taking some resonibility for your own sorry false acvusations and shut your watermelon eating mouth up already you want racism keep it up because you are the poster child of it.

∧ | ∨ · Reply · Share ›

Downloaded from:

http://downtrend.com/71superb/black-professor-demands-hate-crime-investigation-then-sues-when-he-doesnt-like-the-results/

October16, 2015

# EXHIBIT "Q"



**James Alt**
October 20 at 9:03am · 🌐

Academic Racial Justice Warriors Melvin and Angelica Hale Added to Hate Hoax List

Even in academia, it is possible to push blacks-as-victims B.S. too far over the top:

An assistant professor who has been embroiled in controversy with Emporia State University for months over allegations of racial discrimination has filed a federal lawsuit accusing the school of hurting his reputation and damaging his career.

In a lawsuit filed Wednesday, Melvin Hale, an assistant professor in the university's School of Library and Information Management, accused Emporia State of defamation and invasion of privacy. He is seeking a jury trial in Topeka.

Too bad he can't get a change of venue to the South Bronx. He could sue for $billions and win. As it is, he is demanding at least $150,000.

Hale and his wife, Angelica, who are black, have alleged someone wrote a racial slur on a piece of paper in the office of Angelica Hale's graduate assistant in April. … In September, the university said an investigation of the incident and its aftermath found no evidence of a hate crime or racial discrimination.

Looks like we have yet another hate hoax on our hands.

Melvin Hale alleges in his lawsuit that the university's findings damaged his reputation by portraying him as a liar and a fraud.

Even if being a liar and a fraud isn't enough to get him fired, being an obnoxious jackass might be.

Hale, who has been allowed to teach only online classes from home this semester, said he has been told he would be fired if he did not take several steps, including changing some behaviors in the workplace and retracting public statements naming a university employee as the person who most likely wrote the racial slur. He has said he would not meet the conditions.

He won't be the first race-baiting Hale to get canned:

The lawsuit comes about a month after Angelica Hale, whose position as assistant to the dean of the library information department was not renewed, filed a complaint with the Kansas Human Rights Commission contending she was called derogatory names because of her race and terminated in retaliation for complaining.

Downtrend provides sensible analysis:

The Hales were campus agitators that constantly complained about racism that didn't exist. They likely staged a hate crime because they couldn't prove their claims of racism any other way. When the university investigated and found that the hate crime was bullsh** and that the Hales were probably behind it, Melvin Hale filed a lawsuit in an attempt to save face. They should be arrested for theft because they just stole a page out of Al Sharpton's playbook.

These two "racial justice warriors" just made things a lot harder on legitimate prospective black employees. Whether Emporia State will admit it or not, they will think twice before hiring other black professors. If it comes down to two applicants, one black and one white, with equal qualifications, they're going with the white one. After all of the stink and grief caused by the Hales, they'd be crazy not to.

Congratulations, Melvin and Angelica. Even if ham-fistedly overplaying the race card destroys your careers, at least you made the Hate Hoax List.



↗ Share

# EXHIBIT "R"



machetes.

3 ↑ ↓ View in discussion

Discussion on **Downtrend** · 36 comments

## Black Professor Demands Hate Crime Investigation Then Sues When He Doesn't Like The Results

**goodfite** · 18 days ago

Non-threatening name calling or using racial slurs does not meet the criteria for proving a hate crime. We'd all be in jail if it did, and Melvin Hale is a N-word.

4 ↑ ↓ View in discussion

Discussion on **Infowars** · 669 comments

## Middle School Assignment: Would You Save Whites or Blacks from Sinking Ship?

**goodfite** · 18 days ago

Liberalism is a mental disorder.

**Join Disqus to get your own profile like this.**

Facebook    Twitter    Email

https://disqus.com/home/discussion/downtrend/black_professor_demands_hate_crime_investigation_then_sues_when_he_doesnt_like_the_results/#comment-2311326599

Find in page    Highlight All    Match Case

# EXHIBIT "S"



# Moonbattery

**Oct 19 2015** | Academic Racial Justice Warriors Melvin and Angelica Hale Added to Hate Hoax List

Even in academia, it is possible to push blacks-as-victims B.S. too far **over the top**:

> An assistant professor who has been embroiled in controversy with Emporia State University for months over allegations of racial discrimination has filed a federal lawsuit accusing the school of hurting his reputation and damaging his career.
>
> In a lawsuit filed Wednesday, Melvin Hale, an assistant professor in the university's School of Library and Information Management, accused Emporia State of defamation and invasion of privacy. He is seeking a jury trial in Topeka.

Too bad he can't get a change of venue to the South Bronx. He could sue for $billions and win. As it is, he is demanding at least $150,000.

> Hale and his wife, Angelica, who are black, have alleged someone wrote a racial slur on a piece of paper in the office of Angelica Hale's graduate assistant in April. … In September, the university said an investigation of the incident and its aftermath found no evidence of a hate crime or racial discrimination.

Looks like we have yet another hate hoax on our hands.

> Melvin Hale alleges in his lawsuit that the university's findings damaged his reputation by portraying him as a liar and a fraud.

Even if being a liar and a fraud isn't enough to get him fired, being an obnoxious jackass might be.

> Hale, who has been allowed to teach only online classes from home this semester, said he has been told he would be fired if he did not take several steps, including changing some behaviors in the workplace and retracting public statements naming a university employee as the person who most likely wrote the racial slur. He has said he would not meet the conditions.

He won't be the first race-baiting Hale to get canned:

> The lawsuit comes about a month after Angelica Hale, whose position as assistant to the dean of the library information department was not renewed, filed a complaint with the Kansas Human Rights Commission contending she was called derogatory names because of her race and terminated in retaliation for complaining.

**Downtrend** provides sensible analysis:

> The Hales were campus agitators that constantly complained about racism that didn't exist. They likely staged a hate crime because they couldn't prove their claims of racism any other way. When the university investigated and found that the hate crime was bullsh** and that the Hales were probably behind it, Melvin Hale filed a lawsuit in an attempt to save face. They should be arrested for theft because they just stole a page out of Al Sharpton's playbook.
>
> These two "racial justice warriors" just made things a lot harder on legitimate prospective black employees. Whether Emporia State will admit it or not, they will think twice before hiring other black professors. If it comes down to two applicants, one black and one white, with equal qualifications, they're going with the white one. After all of the stink and grief caused by the Hales, they'd be crazy not to.

Congratulations, Melvin and Angelica. Even if ham-fistedly overplaying the race card destroys your careers, at least you made the **Hate Hoax List**.



Melvin Hale, obnoxious pseudo-victim.

**11 Comments**          Moonbattery                                    1  Login ▾

♥ Recommend          ↪ Share                                          Sort by Newest ▾

   Join the discussion…

   **grayjohn** · 15 days ago
He looks like the Uncool Ice T.
∧ | ∨ · Reply · Share ›

   **Donna M** · 15 days ago
Isn't it, just, "ABSOLUTELY WONDERFUL!",
That academia that demotes higher education, has such stupidly incompetent
"MORONS!" In it!
Like really? Isn't that the whole problem?
They can't "figure" themselves, a way out of a paper bag!
They're not quite, the brightest lightbulbs in the room...to begin with?
Soooo...they conspire amongst themselves to "dim" the other lights around them,
so they appear to be "brighter", than they are!
Unfortunately, their illumination is extremely "weak" and very haphazard!
The surrounding area is highly "incidentally dangerous and accident prone"!
Then, when something "unexpected" happens, they conveniently, put the blame of
their incompetance on anyone or anything "other" than themselves!
Truly, in dealing successfully with the wholesale idiocy these people...for us is...
That we continue, unwaveringly, to see them for what they are and act appropriately
and accordingly...
And "NOT" cave to their lowered expectations of generalized, abysmal
incompetence and standards!
∧ | ∨ · Reply · Share ›

   **Mike_W20** · 15 days ago
Pretty sure I saw this guy in the 1989 film, "The Gods Must be Crazy", when he was
younger and leaner.

Was someone upset about him teaching using the Bushman click language I
wonder.





**MAS** · 15 days ago

Melvin Hale suffers from mouth breather syndrome (just look at his pic) must be a perfect choice for professor. OK mom & dad want to tell me again why you are paying for your kids to be taught...strike that...indoctrinated by colleges and government schools that hire people like this low life as professors?

∧ | ∨ · Reply · Share ›



**ouch!** · 15 days ago

The Hales sound like perfect candidates for a WH invite.

Hell, it worked for Ahmed LeFaux.

1 ∧ | ∨ · Reply · Share ›



**NotKennedy** → ouch! · 15 days ago

Are you thinking about the little clocksucker with no jewels in his movement? Another poster boy for Planned Parentocide.

∧ | ∨ · Reply · Share ›



**studyhardkids** · 15 days ago

That's a professor? Should he at least have a tweed jacket on?

1 ∧ | ∨ · Reply · Share ›



**Appalled By The World** · 15 days ago

"Hale and his wife, Angelica, who are black, have alleged someone wrote a racial slur on a piece of paper in the office of Angelica Hale's graduate assistant in April".

LOL. For some reason I find this hilarious.

∧ | ∨ · Reply · Share ›



**JeffersonSpinningInGrave** · 15 days ago

"If it comes down to two applicants, one black and one white, with equal qualifications, they're going with the white one."

As someone who has been on both sides of the hiring procedure in an academic setting, I doubt the above statement. I doubt it very much. If they have a black candidate for any faculty position, and that candidate is anywhere near qualified, it won't matter who else applies for the job. The black candidate will get it.

2 ∧ | ∨ · Reply · Share ›



**Henry** · 15 days ago

...



2 ∧ | ∨ · Reply · Share ›



**NotKennedy** · 15 days ago

There may have been a reason that African ancestors offloaded defectives.

1 ∧ | ∨ · Reply · Share ›



## Representative Hate Hoax List

Dorothy Bland

Georgia Tech Person of Preferred Pigmentation

Melvin and Angelica Hale

Haakon Gisvold

University of Delaware

Ahmed Muhamed

Ashley Powell

Garnet Coleman

John Sherman

Carol Anne and Laura Stutte

Minati Roychoudhuri

Frank Elliott

Planned Parenthood

Sean King

Julie Baker

Vincent Broughton

Rick Jones

Connie St Louis

Rachel Dolezal

Tahera Ahmad

Phony University of Minnesota rape victim

Sarah Silverman

Kassim Alhimidi

George Washington University swastika

Adam Hoover

Ambreen Sharif

Charles Blow

Morgan Triplett

Desiree Nall

Oberlin College

Lena Dunham

Rolling Stone/Jackie

University of Chicago Facebook hoax

Adam Saleh and Sheikh Akbar

Daniele Watts

Keith Jones

Sweet Briar College hoaxer

Grand Valley State University student

Richard Kennedy

Anonymous Hercules Middle-High School student

Joe Williams

Andrea Brazier

Genesis Hernandez

Danya Morales

Toni Christina Jenkins

Dylan Bleier and Matt Alden

Meg Lanker-Simons

Olander Cuthrell

Charlie Rogers

Sharmeka Moffitt

Joseph Baken

Alexandra Pennell

Aimee Whitchurch and Christel Conklin

Quinn Matney

Aubriana Banks

Sarah Marshak

Floyd Elliot

Tawana Brawley

Crystal Gail Mangum

Kerri Dunn

Leah Miller

Ahmad Saad Nasim

Moonbattery is powered by WordPress



Alibi3col theme by Themocracy

# EXHIBIT "T"



ALL - US CRIME - ASIA - EUROPE - US POLITICS - US NEWS - MIDDLE EAST - BUSINESS - AFRICA - CANADA - EXECUTIONS

## ZERO CENSORSHIP

**Uncensored breaking news 24/7.** Trending stories about important issues and events.

0 new

### US News

All Headlines    Pictures    Videos

# Black Professor Melvin Hale Demands Hate Crime Investigation Then Sues When He Doesn't Like The Results



Posted by: Damn YANKEES (ZEROCENSORSHIP.COM)

An assistant professor who has been embroiled in controversy with Emporia State University for months over allegations of racial discrimination has filed a federal lawsuit accusing the school of hurting his reputation and damaging his career.

In a lawsuit, Melvin Hale, an assistant professor in the university's School of Library and Information Management, accused Emporia State of defamation and invasion of privacy. He is seeking a jury trial in Topeka.

READ MORE: BLACKS ONLY: White students not allowed to take part in university Ferguson protest

Hale and his wife, Angelica, who are black, have alleged someone wrote a racial slur on a piece of paper in the office of Angelica Hale's graduate assistant in April. They contend Gwen Alexander, the dean of SLIM, did not investigate the incident and retaliated against them for complaining. In September, the university said an investigation of the incident and its aftermath found no evidence of a hate crime or racial discrimination.

Melvin Hale alleges in his lawsuit that the university's findings damaged his reputation by portraying him as a liar and a fraud. Hale, who has been allowed to teach only online classes from home this semester, said he has been told he would be fired if he did not take several steps, including changing some behaviors in the workplace and retracting public statements naming a university employee as the person who most likely wrote the racial slur. He has said he would not meet the conditions.

**More Education Articles**

(Excerpt) Read more at: **emporiagazette.com** ...
Photo credit(s): downtrend.com