**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF KANSAS**

MELVIN HALE, PH.D.,

               *Plaintiff*

v.

        Case No. 15-4947-SAC-KGS

        Case Assigned to the Hon. Sam
        A. Crow

EMPORIA STATE UNIVERSITY, *et al*.,

               *Defendants*.

**HALE'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON ALL CLAIMS**

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION      1

II.     STATEMENT OF MATERIAL UNDISPUTED FACTS      2

A.     The cooling off period was characterized by *repeated ignoring*      3
B.     The cooling off period prevented Hale from *engaging in free speech.*      3
C.     ESU engages in *retaliation*      4
D.     Alexander and Smith set up the *pretext* for adverse employment action      5
E.     Vietti and Johnson told *false stories* regarding Hale and the Bias Incident      4
F.     Hale was *threatened* with termination if he did not sign away constitutional rights      6
G.     Hale's conduct was viewed by his colleagues as *professional*, *gracious* and *reasonable*      7
H.     ESU *incentivized* the repeated ignoring of Hale during the cooling off period      7
I.     Repeated ignoring via the cooling off period has *negative effects*      7

III.    STANDARD OF REVIEW      8

| IV. | LAW AND ARGUMENT | 9 |
|---|---|---|
| A. | Defendant's conduct in the "extended cooling off period" would chill a person | 9 |
| B. | Plaintiff's conduct was protected activity | 12 |
| C. | Plaintiff's actions as a government employee amounted to engaging in free speech | 13 |
| D. | Plaintiff is a member of a protected class | 15 |
| E. | Defendants cannot proffer legitimate, non-retaliatory rationale for taking adverse actions | 15 |
| F. | Defendants lacked clearly articulated policies for the reporting of bias incidents | 21 |
| G. | Defendants violated Title VII retaliation law during the "cooling off period" | 22 |
| H. | Defendants' retaliatory motive satisfies the "but for" cause of the adverse action | 22 |
| I. | Defendant's adverse actions amounted to retaliation | 23 |
| J. | There was a causal connection between the adverse employments actions | 24 |
| K. | Direct Evidence of Discriminatory Animus Towards Plaintiff Palpable in Audio | 25 |
| L. | Vietti and Defendants Encouraged Title VII and First Amendment Violations | 27 |
| M. | Hale Has Standing to Sue Defendants | 28 |
| V. | DAMAGES | 29 |
| VI. | CONCLUSION | 30 |

## INDEX OF EXHIBITS

| A. | Audio recording and partial transcript of recorded conversation between Hale and Dow |
|---|---|
| B. | Audio recording of SLIM faculty meeting, August 26, 2015 |
| C. | Letter from Cordle defining the cooling off period |
| D. | ESU Title VII policy and prohibitions |
| E. | Email from SLIM student re: no references from Hale |
| F. | Email from Dr. Hale to Angelica Hale about Dow saying that Lauber said don't talk to him |
| G. | BSU abandoned Hale and BSU Vice President Deidra Elijah kept the money |
| H. | Photocopy of Brenda's Notepad with the racial slur "NIGGAZ" written on it |
| I. | Vietti rebuffed Hale's efforts to meet but she did meet with Rittgers and others |
| J. | Deidra Elijah and two other BSU members selling March On Emporia t-shirts |
| K. | Agenda for the American Library Association's External Review Panel for Accreditation |
| L. | ESU Interim President Jackie Vietti meets with the BSU on Sept. 17, 2015 in closed session |
| M. | BSU agendas from Sept. 17 and from Sept. 24, 2015 where "disassociating" is discussed |
| N. | Threats against a SLIM student for supporting Hale by Denver Regional Director David Willis |
| O. | SLIM student calls ESUs conduct "reprehensible" on Change.org petition |
| P. | August 26, 2015 email from Hale to Alexander re: her hostile behavior in the faculty meeting |
| Q. | Dow's opinion that the bias incident was a "crime" and that Hale's were trying to solve it |
| R. | Abject lies told by Vietti & Johnson in their Sept. 9, 2015 press conference |

S.      May 5, 2015email from Alexander to Angelica Hale asking her to do Brenda's evaluation
T.      Jason Brooks promoted to Assoc. Dean of Diversity for abandoning Hales' cause
U.      Sept. 21, 2015 email from Prof. Shelly Rowley explaining the pressures on Derek Wilson
V.      University provides privately funded scholarship to Deidra Elijah
W.      Hale loses support after ESU promulgates results of their "investigation"
X.      Cordle termination letter to Hale in which Hale is placed in a perpetual cooling off period
Y.      Open Access Journal article: "Angry Employees: Revisiting Insubordination in Title VII Cases"
Z.      Email from Sutton to Hale in which she describes his demeanor throughout as graceful

# TABLE OF AUTHORITIES

Page

**FEDERAL CASES**

*Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc.*
    912 F.2d 1238, 1241 (10th Cir. 1990)    6

*Bacchus Indus., Inc. v. Arvin Indus., Inc.*
    939 F.2d 887, 891 (10th Cir. 1991)    6

*Bennett v, Windstream Commc'ns, Inc.*
    792 F.3d 1261, 1265-66 (10th Cir. 2015)    6

*Conaway v. Smith*
    *853 F.2d 789, 794 (10th Cir. 1988)*    6

*Crown Central Petroleum Corp. v. NLRB*
    430 F.2d 724, 731 (5th Cir. 1970)    18

*Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.*
    938 F.2d 1105, 1110 (10th Cir. 1991)    6

*Dooley v. Parks & Recreation/or the Parish a/Ea. Baton Rouge*
    No. 10-31254,2011 U.S. App. Lexis 15278 (5th Cir. 2011)    22

*Goodwin v. City of Pittsburgh*
    480 F. Supp. 627 (W. D. Pa. 1979)
    aff'd 624 F.2d 1090 (3rd Cir. 1980)    16

*Grant  v. Hazelett  Strip  Casting  Corp.*
    880 F.2d 1564, 1569, 51 EPD Par. 39,245 (2d Cir. 1989)                    2, 23

*Hamilton v. Boise Cascade Exp.*
    280 F. App'x. 729, 731 (10th Cir. 2008)                                   15

*Henry v. Wyeth Pharmaceuticals, Inc.*
    616 F.3d 134, 148 (2d Cir. 2010)                                          25

*Hicks v. City of Watonga. Okla.*
    942 F.2d 737, 743 (10th Cir. 1991)                                         6

*Hugh H. Wilson Corp. v. NLRB*
    414 F.2d 1345, 1355-56 (3d Cir. 1969)                                     18

*Jimenez v. City a/New York*
    605 F. Supp. 2d 485,529 (S.D.N.Y. 2009)                                   14

*La Grande v. DeCresente Distrib. Co.*
    370 Fed. App'x 206, 212 (2d Cir. 2010)                                    10

*NLRB v. Florida Medical Center*
    576 F.2d 666, 673 (5th Cir. 1978)                                         17

*NLRB v. Mueller Brass Co.*
    501 F.2d 680, 685-86 (5th Cir. 1974)                                      17

*NLRB v. Southwestern Bell Telephone Co.*
    694 F.2d 974 (5th Cir. 1982)                                              17

*NLRB v. Steinerfilm, Inc.*
    669 F.2d 845, 851-52 (1st Cir. 1982)                                      17

*Sarno v. Douglas Elliman-Gibbons & Ives. Inc.*
    183 F.3d 155, 159 (2d Cir. 1999)                                          10

*Sumner v. U.S. Postal Serv.*
    899F.2d 203, 209 (2d Cir. 1990)                                           14

*Thoman v. Philips Med. Sys.*
    2007 WL 203943 (D.N.J. 2007)    15

*Todisco v. United States*
    298 E2d 208 (9th Cir. 1962)    13

*United States v. Kandiel*
    865 E2d 967,973-974 (8th Cir. 1988)    13

*United States v. McKeever*
    169 E Supp. 426, 430 (S.D.N.Y. 1958)    13

*United States v. McMillan*
508 E2d I01,104 (8th Cir. 1974)    13

*Vitus v. Beatrice Co.*
    11 F.3d 1535, 1538-39 (10th Cir. 1993)    5


**U.S. Supreme Court**

*Allen v. Wright*
    468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984)    26

*Anderson v. Liberty Lobby, Inc.*
    477 U.S. 242, 247 (1986)    5

*Burlington Northern & Santa Fe Railway Co. v. White*
    548 U.S. 53, 68 (2006)    8, 20

*Celotex Corp. v. Catrett*
    477 U.S. 317, 323 (1986).    6

*Crawford v. Metro Gov't of Nashville & Davidson County*
    555 U.S. 271, 129 S. Ct. 846, 849 (2009)    10

*Garcetti v. Ceballos*
    547 U.S. 410, 421 (2006)    11

*Lujan v. Nat'l Wildlife Fed.*
 497 U.S. 871,883 (1990)      26

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp..*
 475 U.S. 574, 586-87 (1986)      6

*Pickering v. Board of Ed. of Township High School Diet. 205, Will Cty.*
 391 U. S. 568 (1968)      11

*Rankin v. McPherson*
 483 U. S. 378, 384 (1987)      11

*United States v. Treasury Employees*
 548 U.S. 53, 68 (2006)      8

*Univ. of Tex. Southern Med. v. Nassar*
 133 S. Ct. 2517, 570 U.S., 186 L. Ed. 2d 503 (2013)      20

*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*
 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982)      26

## STATUTES AND RULES

Title VII
First Amendment
42 U.S.C. § 1983
42 U.S.C. § 2000e-3(a)      26

Fed. R. Civ. P. 56(c)      5
Fed. R. Evidence 901(a)      2, 13

Local Rule  7-1

References:  [1, 2, 3]      2, 16

---

[1] EEOC, "Revised Enforcement Guidance on Recent Developments in Disparate Treatment Theory.," Text, (January 23, 2009), https://www.eeoc.gov/policy/docs/disparat.html.

[2] "Jefferson Muzzles," *Jefferson Muzzles*, accessed August 7, 2016, http://jeffersonmuzzles.org/complete-list/.

[3] "Animus," *The Free Dictionary*, n.d.

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF KANSAS**

MELVIN HALE, PH.D.,

                                    *Plaintiff*

v.                                                              Case No. 15-4947-SAC-KGS

                                                              Case Assigned to the Hon. Sam
                                                              A. Crow
EMPORIA STATE UNIVERSITY, *et al.*,

                                    *Defendants*.

---

## MELVIN HALE'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON ALL CLAIMS

(Plaintiff's Motion, Declaration of Melvin Hale and Declaration of Angelica Hale filed separately.)

### I.  INTRODUCTION

On June 15, 2016, this Court denied Emporia State University *et al's*. motion to dismiss this action, thus permitting Hale's retaliation and freedom of speech claims to move forward toward trial.  In its ruling denying the motion to dismiss the Court invited Hale to illuminate the extended cooling off period for the purpose of determining if "the cooling off period would chill a person of ordinary firmness from engaging in protected speech."  This motion for summary judgment is narrowly focused on the issues raised by the Court in its order, which involves developing a more complete record of the cooling off period.  It also addresses the pretext that Hale believes defendants will use to cloak their unlawful actions.

Hale offers the Court exceptional *direct evidence* of discriminatory motive and retaliation in the form of two lawful recordings: The first is a conversation he had with Dr. Mirah Dow on the evening of August 17, 2015, **Exhibit A (**Declaration of Melvin Hale, hereinafter, "M. Decl."

pg. 4).   The second recording is of the SLIM faculty meeting held on August 26, 2015, **Exhibit B** (M. Decl. pg. 5).  Both are introduced into evidence in accordance with Fed. R. Evidence 901(a).  This evidence can be added to the mountain of direct and circumstantial evidence already presented in this case.  Direct evidence of discriminatory motive may be any written or verbal policy or statement made by a respondent or respondent official that on its face demonstrates a bias against a protected group and is linked to the complained of adverse action.[1]

*Grant v. Hazelett Strip Casting Corp.*,  880 F.2d 1564, 1569, 51 EPD Par. 39,245 (2d Cir. 1989).

The actions that defendants took against Hale reified a management culture which demands docility and passivity, and appears to have no conception whatsoever of constitutional safeguards for protected speech.  It is not surprising that ESU received a *Jefferson Muzzle Award* in 2016 for anti-speech activity in 2015 related to Hale's complaint of discrimination.  "The Thomas Jefferson Center has awarded Jefferson Muzzles to those individuals and institutions responsible for the more egregious or ridiculous affronts to free speech during the preceding year."[2]  It has been doing so for twenty-five years.

## II.  STATEMENT OF MATERIAL UNDISPUTED FACTS

### Undisputed Facts Principally in Support of Plaintiff's Motion for Summary Judgment on Title VII retaliation and § 1983 First Amendment Retaliation claims.

Cordle defined Hale's *extended cooling off period* as follows: "The current prohibition on your being present in any SLIM office or area will remain in effect through the end of your 2015-16 academic year appointment. The current prohibition on communication between you and anyone at SLIM beyond what is necessary for the instruction of your assigned courses will remain in effect through the end of your 2015-16 academic year appointment; since no instruction will be assigned for Spring Semester 2016, you are therefore prohibited from

---

[1] EEOC, "Revised Enforcement Guidance on Recent Developments in Disparate Treatment Theory.," Text, (January 23, 2009), https://www.eeoc.gov/policy/docs/disparat.html.
[2] "Jefferson Muzzles," *Jefferson Muzzles*, http://jeffersonmuzzles.org/complete-list/.

contacting any SLIM faculty member, staff member, administrator, or student for any reason after December 15, 2015."  **Exhibit C** (M. Decl. pg, 8).

## A.  The cooling off period was characterized by *repeated ignoring*.

1. Ostracizing a member of the ESU community is an explicit violation of ESUs Title II policy.  **Exhibit D** (Doc. 56, pg. 35).

2. Students in SLIM were told not to contact Hale for a reference during the cooling off period. **Exhibit E** (Doc. 56, pg. 106).

3. Ray Lauber, the internal investigator, gave instructions to Mirah Dow not to talk to Dr. Hale.  **Exhibit F** (Doc. 56, pg. 37).

4. Not only did the BSU cut off all contact with Hale, BSU Vice President Deidra Elijah refused to pay Angelica Hale for March on Emporia t-shirts that the BSU had sold, neither did she return leftover t-shirts.  **Exhibit G** (Doc. 56, pg. 3).

5. Lauber and all the defendants ignored the handwriting evidence on the notepad that was on Brenda's desk.  **Exhibit H** (A. Decl., pg. 2).

6. Vietti rebuffed numerous requests from Hale to discuss his claims of a bias incident with her.  **Exhibit I** (Doc. 20, pg. 14).

7. Vietti had numerous discussions with Debra Rittgers and others involved with the investigation. Exhibit I (Doc. 20, pg. 14).

## B.  The cooling off period prevented Hale from *engaging in free speech*.

8. Hale could not contact anyone in SLIM to his discuss Title VII claims of discrimination during the cooling off period or the extended cooling off period. Exhibit C (M. Decl. pg, 8).

9. Before the cooling off period, there was cooperation between Hale and the BSU for addressing perceptions of racism on campus.  **Exhibit J** (Doc. 56, pg. 77).

10. Dr. Hale was prevented from meeting with the ALA External Review Panel for accreditation.  **Exhibit K** (M. Decl. pg, 6).

11. SLIM faculty members were allowed state their opinions about SLIM and the program to the ERP while Hale was ignored.  Exhibit K (M. Decl. pg, 6).

12. Interim President Vietti met with the ESU Black Student Union on or about September 17, 2015 to the discuss the results of the investigation.   **Exhibit L** (Doc. 20-1, pg. 15).

13. After meeting with Vietti, the ESU BSU discussed disassociating itself from members of their community, and simultaneously began avoiding Hale on campus. **Exhibit M** (Doc. 56, pg. 102).

**C.  ESU engages in *retaliation*.**

14. Mirah Dow told Hale that ESU was looking for any excuse to terminate him.  Exhibit A @ **9:0**8 (transcript pg. 1, M. Decl. pg. 4, 5).

15. Mirah Dow told Hale that ESU had no qualms about playing dirty and creating a pretext, because "they've got a lot to lose." "That's the game here." Exhibit A @ **2:32** (transcript pg. 1, M. Decl. pg. 4, 5).

16. Dow claimed that Gwen Alexander did not want to hear anything more about doing something about the bias incident right before the Hales went public about the bias incident that was never thoroughly investigated.  Exhibit A @ **11:25** (transcript pg. 2, M. Decl. pg. 4, 5).

17. Dow stated that Hale should be careful not to raise his voice or even sound tense because "they're looking for anything they can."  Exhibit A @ **54:15** (transcript pg. 11, M. Decl. pg. 4, 5).

18. Dow stated that ESU had done the same things to many others before him, and that they were not above punishing her if she disagreed with what they were doing to Hale.  Exhibit A @ **32:05** (transcript pg. 5, M. Decl. pg. 4, 5).

19. Dow stated that she was concerned and afraid of ESU administrators retaliating against her, and that she was afraid of losing "power."  Exhibit A @ **32:05** (transcript pg. 5, M. Decl. pg. 4, 5).

20. Although there have been innumerable posts on the ESU SCALA page in Facebook, only those who favor or support the Hales have been removed and/or criticized. **Exhibit N** (Doc. 56, pg. 24).

4

21. Jordan Heguy, a strong student supporter of Hale in SLIM was screamed at by SLIM Regional Director David Willis for speaking out against racism at SLIM, and posting her views on the ESU SCALA page, although she was an officer in SCALA.  Exhibit N (Doc. 56, pg. 24).

22. Another SLIM student who signed the Change.org petition supporting Hale stated that failure to punish racist acts and retaliation committed by ESU amounted to reprehensible behavior.  **Exhibit O** (Doc. 56, pg. 25).

23. Hale was removed at the last minute from teaching a face-to-face LI801 Foundations of Library and Information Management class in Portland.  Exhibit A @ **28:20** (transcript pg. 5).

24. The adjunct professor to whom Hale's class was re-assigned, Ashley Todd-Diaz, had never taught the 801 class, and Mirah Dow stated that it was "impossible" for her to teach that foundational class as Hale would have done, and that she offered her opinion to Alexander, who rebuffed her in a high-handed manner.  .  Exhibit A @ **29:27** (transcript pg. 5, M. Decl. pg. 4, 5).

**D.  Alexander and Smith set up the *pretext* for adverse employment action.**

25. Hale was prevented from saying anything about the upcoming march against racism in ESU in the faculty meeting on August 26, 2015, and two days later ESU instituted the permanent SLIM "cooling off period".  **Exhibit B** @ **10:05** (M. Decl. pg. 5).

26. SLIM associate dean Andrew Smith called Hale's attempt to say something about the September 15, 2015 march against racism in the August 26, 2015 faculty meeting "inappropriate" and "not appropriate."  Exhibit B @ **10:05** (M. Decl. pg. 5).

27. SLIM dean Gwen Alexander said whatever she wanted to say about the march in the faculty meeting, but shut Hale down for wanting to say a few words about it.  Exhibit B @ **10:05** (M. Decl. pg. 5).

28. Faculty and staff in SLIM were instructed not to discuss the march or the issues raised by Hale. Exhibit B @ **10:05** (M. Decl. pg. 5).

29. Hale sent Alexander an email in which he questioned her hostile behavior in the faculty meeting, and stated that their prohibition to discussing the march and sharing letters of support was a prohibition on free speech.  **Exhibit P** (M. Decl. pg. 6).

30. Alexander instructed SLIM faculty to critically analyze his claims, and to accept the official results of the "investigation" when they were published.  She said "Use your critical thinking skills to realize that this is not based on fact!"  Exhibit B @ **10:05** (M. Decl. pg. 5).

31. The following day, August 27, Alexander and Smith angrily shut Hale down in Alexander's office for wanting to discuss the issues raised in the faculty meeting.  (M. Decl., pg. 7).

32. Alexander asked Hale to open her door, making their dispute public.  (M. Decl., pg. 8).

**E. Vietti and Johnson told *false stories* regarding Hale and the Bias Incident.**

33. Dow stated that she believed that a crime did occur, and that she wished that Vietti would acknowledge that.  **Exhibit Q** (Doc. 20, pg. 11).

34. Vietti and Johnson, in the aforementioned press conference, informed the press that Hale took advantage of a situation that only came to him and his wife's attention as a *fluke*.  **Exhibit R** (Doc. 49, pg. 6).

35. Contrary to Johnson's pronouncement, Dean Alexander *was* at work in SLIM on April 8, 2015.  (M. Decl., pg. 4).

36. Vietti and Johnson portrayed Brenda, the graduate assistant in whose office the racial slur was found, as having no work-related connection to Angelica Hale whatsoever**. Exhibit R** (Doc. 49, pg. 5).

37. Angelica was Brenda's direct supervisor at the time of the bias incident.  **Exhibit S** (Doc. 49-1, pg. 7).

38. Alexander asked Angelica to write Brenda's performance evaluation, only to be told it was already done.  Exhibit S (Doc. 49-1, pg. 7).

**F.  Hale was *threatened* with termination if he did not sign away constitutional rights in exchange for continued employment.**

39. A separation agreement presented to Hale by Cordle and Johnson on October 12, 2015 contained a clause prohibiting Hale from filing any complaints, which Hale

interpreted as including Title VII or EEOC complaints, as a condition of continued employment, in direct violation of Title VII law.  Exhibit C (M. Decl. pg, 8).

**G.  Hale's conduct was viewed by his colleagues as *professional*, *gracious* and *reasonable* during the time he was engaged in conflict with the administration.**

40. On August 12, 2015 Hale's colleague, Asst. Professor Sarah Sutton, stated in an email that "I really appreciate how gracefully you've handled the whole situation. I greatly appreciate that and respect you for it.  **Exhibit Z** (M. Decl., pg. 10).

41.  Dow stated that Hale was "prudent" and not "unreasonable."  Exhibit Q (Doc. 20, pg. 11).

**H.  ESU *incentivized* the repeated ignoring of Hale during the cooling off period.**

42. Jason Brooks, formerly Director of Diversity and Inclusion at ESU, was promoted to Associate Dean for Diversity and Inclusion after he shut down all communication and support for Hale during the extended cooling off period.  **Exhibit T** (Doc. 20, pg. 20).

43. Honors College President Derek Wilson was threatened with being removed from office for supporting Hale.  **Exhibit U** (Doc. 56, pg. 63).

44. In December, 2015, the university announced in the media that Elijah received a new privately funded scholarship for the school year for education majors.  **Exhibit V** (Doc. 56, pg. 11).

**I.  Repeated ignoring via the cooling off period has *negative effects*.**

45.  After Hale was placed in the cooling off period, he saw an enormous decline in support on campus. **Exhibit W** (Doc. 20, pg. 20).

46. Hale's failure to create a portfolio during the cooling off period was one of the reasons defendants' claimed that his contract was not renewed.  **Exhibit X** (Doc. 13, pg. 96).

47. Hale was blamed for receiving poor student reviews during the cooling off period. Exhibit X (Doc. 13, pg. 96).

48. A journal article states that "management may have forfeited its right to subservient and respectful behavior in [certain] circumstances."  **Exhibit Y** (M. Decl. pg, 14).

### III.  STANDARD OF REVIEW

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); accord *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Vitus v. Beatrice Co.*, 11 F.3d 1535, 1538-39 (10th Cir. 1993).  A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248, *Bennett v, Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1265-66 (10th Cir. 2015).  A "genuine" factual dispute requires more than a mere scintilla of evidence. *Anderson*. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact.  See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hicks v. City of Watonga. Okla.*, 942 F.2d 737, 743 (10th Cir. 1991).  Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990); see also *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).  The nonmoving party may not rest on her pleadings but must set forth specific facts. *Applied Genetics*, 912 F.2d at 1241.

The Court must view the record in a light most favorable to the party opposing summary judgment. See *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.*, 938 F.2d 1105, 1110 (10th Cir. 1991).  Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative. See *Anderson*, 477 U.S. at 250-51.  "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on

suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

The Court's findings and rulings in its June 15, 2016 decision, and governing legal precedent, establish that plaintiff has demonstrated a *prima facie* showing of Title VII retaliation and § 1983 First Amendment retaliation.  Now the burden of evidence production shifts to the respondent.  Plaintiff herein provides the Court with relevant facts and evidence to ascertain that it is entitled to summary judgment.

## IV.  LAW AND ARGUMENT

**A.      Defendant's conduct in the "extended cooling off period" would chill a person of ordinary firmness from reporting discrimination and opposing discrimination.**

There can be no more classic example of employer conduct that "might dissuade[] a reasonable worker from making or supporting a charge of discrimination" than terminating an employee who will not agree to give up that right and threatening an employee with termination if he files a charge of discrimination.  The "cooling off period" which was imposed upon Hale at ESU qualifies as employer conduct that would chill a reasonable worker from reporting discrimination or engaging in protected speech.  Hale was banished from his workplace, office and colleagues amid false stories about his conduct and beliefs concocted by the defendants as pretext not only to this Court, but to the community, the students, the faculty, and the world.  Indeed, defendants told so many falsehoods relating to Hale and the bias incident, as evidenced in Hale's Opposition to Vietti's motion to dismiss (Doc. 49) and Hale's Opposition to Wilson's

and Elijah's motion to dismiss (Doc. 56), that this Court cannot reasonably construe at face value any claims made against Hale in the instant litigation by any of the defendants.  Plaintiff has shown by a preponderance of evidence that defendants displayed no restraint whatsoever when lying; and aggressively encouraged and coerced others to do the same, or to adopt their falsehoods (Doc. 13, pg. 43, and Doc. 56, pg. 63).  In direct response to falsehoods promulgated by defendants, plaintiff was forced to go public with the facts, and to begin work on a book with his wife entitled *Django Unchained and The March on Emporia State: Two Against the System*. None of plaintiff's activities can be labeled "publicity stunts."  What could very well be labeled a publicity stunt was Vietti's and Johnson's September 9, 2015 press conference in which the entire narrative was fictive.  Doc.  49, pgs. 3-16.

The Supreme Court has ruled that "context matters" when evaluating adverse conduct. Though it excluded "petty slights, minor annoyances, and simple lack of good manners" as actionable conduct, the Court left room under its objective standard for an employee to demonstrate in context that an employer's actions were adverse. *Burlington Northern & Santa Fe Railway Co. v. White,* 548 U.S. 53, 68 (2006).  The Court posed two hypotheticals to illustrate its holding:

[1] A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children.

[2] A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination, *Burlington* at 69.

The cooling off period began under false pretense on August 28 and was expected to end on September 18, 2015. During the cooling off period, Hale was instructed not to go to SLIM offices, or to talk to anyone in SLIM about anything. Any and all communication between Hale and SLIM would be filtered by either Wyatt during his time as acting dean, or Dow as interim dean. Hale could not discuss his civil rights claims. He was prevented from using direct evidence to disprove the lies being told on him. He was restricted in who he could talk to, and where he could go on the ESU campus. It became unpleasant and uncomfortable to go on campus anyway because he was treated as a pariah by the administration of ESU, and they were not subtle about it in any way. Hale's experience conforms to hypothetical number two, which makes it a *prima facie* violation of Title VII to impose exclusion as a form of punishment for protected activity. It is also against protected speech, a First Amendment retaliation violation. The Court went on to state, "[h]ence, a legal standard that speaks in general terms rather than specific prohibited acts is preferable, for an 'act that would be immaterial in some situations is material in others." A "cooling off period" which excludes a worker from ever entering their office, while being forced to perform work duties, such as teaching classes remotely, and removes that worker from participating in professional activities while still evaluating that employee against their peers, would significantly restrict their professional advancement, and "might well deter a reasonable employee from complaining about discrimination." The extended cooling off period negatively impacted Hales ability to create his faculty portfolio and student evaluations. Dow and Cordle confirm that the cooling off period negatively impacted Hales' evaluation. Doc. 13, Pg. 96.

**B.      Plaintiff's conduct was protected activity.**

Although Hale was involved in more than one activity which could be characterized as "protected," the initial protected activity was reporting the writing of the racial slur found on Brenda's notepad to Alexander, with the expectation that it would be followed up with something affirmative.  When Alexander ignored Hale, Hale went to Dow to see if she could get a different reaction from Alexander.  For some reason, Alexander makes no mention of Dow contacting her after Hale gave up, insinuating that Hale dropped the ball, when in fact she had told Dow to get lost.  Retaliation in this case is on account of Hale's report of racism at ESU and SLIM.

Hale both reported racially discriminatory conduct and participated in protest marches demanding an end to racism and retaliation.  The signs in the march tell the story. Doc. 17-1, pgs. 8-12. Reporting or opposing discrimination meet the requirements for Title VII protected activity.  In defining the "opposition clause," the Supreme Court has rejected a definition of "oppose" that would require an employee to "actively" and "consistently" oppose an employer's practice or to "instigate" or "initiate" the opposition.  In *Crawford v. Metro Gov't of Nashville & Davidson County*, the Court held that an employee has an actionable claim of retaliation where she "speaks out about discrimination not on her own initiative, but in answering questions during an employer's internal investigation."  555 U.S. 271, 129 S. Ct. 846, 849 (2009).

Retaliation is a separate claim from discrimination, and does not require racial discrimination.  "Even if the employee cannot prevail on the underlying claim of discrimination (for example, where the employee does not satisfy the 'severe or pervasive' threshold for proving a hostile work environment claim), s/he can prevail on a retaliation claim if s/he in good faith, reasonably believed the employer was engaging in discriminatory conduct.  See *La Grande*

*v. DeCresente Distrib. Co*., 370 Fed. App'x 206, 212 (2d Cir. 2010); *Ragusa v. Malverne Union*

*Free Sch. Dist*., No. 08-5367-cv, 2010, U.S. App. Lexis 12640, *8 n,4 (2d Cir. June 21,2010)

(finding that the plaintiff "need not be disabled within the meaning of the ADA to pursue her

retaliation claim, providing she can demonstrate 'a good faith, reasonable belief that the

underlying challenged actions of the employer violated the law'" (quoting *Sarno v. Douglas*

*Elliman-Gibbons & Ives. Inc*., 183 F.3d 155, 159 (2d Cir. 1999) (citation omitted)).

**C.     Plaintiff's actions as a government employee amounted to engaging in free speech as**

**a private person and on a matter of public concern, and defendants took an adverse action**

**against him which was motivated by his free speech.**

The Supreme Court noted that for many years "the unchallenged dogma was that a public

employee had no right to object to conditions placed upon the terms of employment — including

those which restricted the exercise of constitutional rights." *Connick*, 461 U. S., at 143. That

dogma has been qualified in important respects. See id., at 144-145.  The Court has made clear

that public employees do not surrender all their First Amendment rights by reason of their

employment.  Rather, the First Amendment protects a public employee's right, in certain

circumstances, to speak as a citizen addressing matters of public concern. See, e. g., *Pickering v.*

*Board of Ed. of Township High School Diet. 205, Will Cty., 391 U. S. 568 (1968)*; *Rankin v.*

*McPherson*, 483 U. S. 378, 384 (1987); *United States v. Treasury Employees*, 513 U. S. 454, 466

(1995).  Using the first step of the Pickering analysis, if the free speech is made pursuant to the

employee's ordinary job duties, then the employee is not speaking as a citizen for First

Amendment purposes, and the inquiry ends.  *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).

But if the "employee spoke as a citizen on a matter of public concern, the inquiry turns to

whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public."

Plaintiff was informed of an incident that he reasonably believed was not benign involving the word "NIGGAZ."  Hale's report of what he considered a hate crime was not part of his regular duties, and such a matter was certainly one of public concern.  Had it been objective and impartial, the investigation envisioned by Hale would have relieved him of any further involvement in the matter except as requested or directed by his employer.  An impartial investigation did not occur, so Hale believed that the public, including the students on campus, had a right to know what had happened, and more importantly, to know about the abject failure of university public policy on the reporting of discrimination.  Best practices were not followed. The manner in which Hale was shut down by Alexander and Smith for even mentioning the march was itself indicative that ESU and the administration did not want to hear what was wrong with their practices on a matter of public interest.  The fact that the Hales' story was carried by the Associated Press and numerous news and media outlets nationwide, and was followed by numerous supporters and detractors solidifies the matter as one of public interest.  Hale viewed his actions as necessary and protected activity not bound in any manner to his work as an Assistant Professor at Emporia State.  In *Garcetti*, the Supreme Court ruled that "Giving employees an internal forum for their speech will discourage them from concluding that the safest avenue of expression is to state their views in public. *Garcetti* at 424.  Defendants did exactly the opposite, unlawfully refusing to have any real meaningful dialog with Hale, thereby forcing him to state his views in public.  Defendants cannot have it both ways.

**D.      Plaintiff is a member of a protected class.**

Although Title VII does not apply solely to members of a protected class, Hale is an African American male, a member of a protected class.  Title VII of the Civil Rights Act of 1964 protects individuals against employment discrimination on the basis of race and color, as well as national origin, sex, and religion. Title VII applies to employers with 15 or more employees, including state and local governments. It also applies to employment agencies and to labor organizations, as well as to the federal government.

**E.      Defendants cannot proffer legitimate, non-retaliatory rationale for taking adverse actions against Hale that are in fact not pretextual.**

Hale believes that Defendant's actions are all pretextual.  Defendant's claim that "Plaintiff's claims are barred by the doctrine of unclean hands as a result of unprofessional, abusive, and inappropriate conduct toward his colleagues, coworkers, and superiors at ESU." Doc. 64, pg. 23.  Plaintiff will show by *direct evidence* (the recording of Dow and of the faculty meeting, and observations by Sarah Sutton and Mirah Dow) that his conduct was always been appropriate and professional.  It was the conduct of former SLIM Dean Gwen Alexander and Associate SLIM Dean Andrew Smith in a faculty meeting on August 26, 2015, and the way they flew into a rage the next day in Alexander's office that crossed the line, constituting a clear violation of Hale's civil rights under Title VII and the First Amendment.  These incidents cannot be viewed in isolation.  Audio of the faculty meeting was legally recorded by Hale, and it clearly demonstrates discriminatory animus towards Hale by Smith and Alexander.  Hale's demeanor was described as calm and reasonable even under pressure.  That cannot be said of the demeanor of Smith and Alexander.  In the faculty meeting, not only did they display naked hostility towards Hale, they displayed hostility towards lawful protests against racism.

Federal Rule of Evidence 901(a) provides in general terms that the requirement of authentication or identification as a condition precedent to the admissibility of evidence is satisfied by proffered proof sufficient to support a finding that the matter in question is what its proponent claims it to be. A foundation for authentication of sound recordings was established in the federal courts in *United States v. McKeever*, 169 E Supp. 426, 430 (S.D.N.Y. 1958), rev'd on other grounds, 271 E2d 669 (2d Cir. 1959) and upheld in cases such as *United States v. McMillan*, 508 E2d I01,104 (8th Cir. 1974), cert. denied, 42 1 U.S. 916 (1975); see also *United States v. Kandiel*, 865 E2d 967,973-974 (8th Cir. 1988), cert. denied, 487 U.S. 1210 (1988); *Todisco v. United States*, 298 E2d 208 (9th Cir. 1962).  Hale recorded the August 26, 2015 SLIM faculty meeting on his Samsung 4 cellphone.  Within 48 hours after the August 28 faculty meeting, where Hale was shut down by the dean and associate dean for protected activity, he was placed into the permanent cooling off period from which he never emerged.

Animus of the type shown by Alexander and Smith is defined in the law as "ill will or hostility" and "animosity."[3]  Smith angrily and publicly shut down Hale in front of the faculty for him requesting to "say a few words about the march," which was a protected activity. Alexander was so eager to have a word that she took the floor away from Smith and talked about it anyway.  Hale was attempting to engage in a protected activity: speaking about the march in an appropriate forum, the faculty meeting.  Alexander joined with Smith in shutting Hale down, and then went on an extended rant disparaging both Hale and the march, holding in her hand a flyer which Hale had created.  She angrily shouted "This is not love!"  (*Love not Hate* was the primary message and slogan for the marches.)  Alexander characterized Hale's allegations as outrageous and untrue, and told others to look critically, meaning negatively, at Hale's positions. Immediately after being confronted in a hostile manner by Alexander and Smith in her office,

---

[3] "Animus," *The Free Dictionary*, n.d., http://medical-dictionary.thefreedictionary.com/animus

Hale was placed in a terminal "cooling off period" the next day.  The courts generally recognize

three methods for proving causation, and the first one is temporal proximity between the

protected activity and the adverse action.  In this case, from start to finish, temporal proximity is

about 48 hours.  The other two methods are: (2) proof that other similarly situated employees

were treated more favorably; and (3) direct proof of the employer's retaliatory intent.  *Jimenez v.*

*City a/New York,* 605 F. Supp. 2d 485,529 (S.D.N.Y. 2009) (citing *Sumner v. U.S. Postal Serv.*,

899F.2d 203, 209 (2d Cir. 1990)).  Two out of three isn't bad, because #3 also applies.

Defendant's claims of a "legitimate non-discriminatory reason" (LNDR) for the adverse

actions taken against Hale are discredited because direct discriminatory animus was publicly

exhibited towards plaintiff by each of the defendants, for his reporting discrimination, and that

animus was the real reason plaintiff's voice was silenced in the cooling off period.  Hale is on

record stating that the instant litigation is being undertaken to give him the voice that was denied

him at ESU and SLIM.  "[A]t the pretext stage the plaintiff must produce evidence beyond the

mere assertion that the alleged justification is implausible and show that discriminatory animus

actually motivated the employer's decision (citing pre-*Reeves* decisions)); *Hamilton v. Boise*

*Cascade Exp.*, 280 F. App'x. 729, 731 (10th Cir. 2008)("Although we do not require 'pretext

plus,' specifically that a plaintiff demonstrate that the reason was false *and* a motive for

discrimination, the falsity combined with other circumstances in the case must permit the

inference that unlawful discrimination was a motivating factor in the decision"); *Thoman v.*

*Philips Med. Sys.*, 2007 WL 203943 (D.N.J. 2007)."  Cordle himself characterized the incident

as something "to be expected." Exhibit C.  The behavior of Smith and Alexander in the August

26 faculty meeting, and in her office the next day, is direct evidence of discriminatory animus.

Cordle fails to connect Alexander's and Smith's rabid behavior in the faculty meeting on August 26, 2015 to the confrontation that occurred in Alexander's office on August 27, 2015, but he should have.  Hale informed Cordle of this connection.  Hale told Cordle that he placed much of the blame for Alexander's and Smith's ongoing retaliation directly on him for not taking action when Hale first came to him at the end of June to discuss it.  Cordle said at conclusion of that meeting that he had "five issues" he was going to follow-up on and get back to plaintiff. Cordle never did.  Cordle repeatedly ignored Hale until Alexander and Smith had a blowout with Hale.  Hale's conduct was polite and professional in the faculty meeting.  The recording proves as much, even though his protected activities were being denigrated and he was being vilified. The audio recording of the August 26 faculty meeting is astonishing direct evidence of wrongdoing all too often lacking in innumerable meritorious Title VII cases that are dismissed. The evidence of discriminatory animus in this case is profoundly real, undeniable and untenable. Defendants own words convict them, laying bare their malice.  This malice somehow became contagious, all over campus.  Some people openly sneered at Hale, and others turned their backs to him, or left the area he was in.  A chilling effect indeed.  It was hurtful coming from the members of the Black Student Union, but not so much from Jason Brooks.  He feeds at the ESU trough, and so does his family.  Such is the power of institutional  racism and discrimination. This is why ostracizing is prohibited conduct.  Articles published in the school newspaper The Bulletin , advised by ESU Journalism Professor Max McCoy, aided the ESU pretext, that Hale and his wife were unbalanced, and worse, failed opportunists.  Amazingly enough, it was Dow who told Hale that ESU had a lot to lose, and would stop at nothing to put him on the defensive, including using dirty tricks.  The cooling off period is the ultimate dirty trick.

In *Goodwin v. City of Pittsburgh* 480 F. Supp. 627 (W. D. Pa. 1979) *aff'd* 624 F.2d 1090 (3rd Cir. 1980) the court performed a mixed motive analysis when "It concluded that a "retaliatory motive . . . played a substantial causal role in the decision to fire [plaintiff] when, on only one occasion, he called his boss "a 'liar,' under circumstances which were, at the least, provoked, and, at most justified."  The court continued, "[t]o be sure, calling a supervisor a liar is a serious matter.  However, it takes on less significance if it occurs privately, during a heated debate initiated by the employer, about the employee's decision to engage in protected activities."  The court ruled that Goodwin had satisfied Title VII's burden of showing pretext and entered judgment in his favor.  The actions of Alexander and Smith are more egregious than those in *Goodwin*.  In the mixed motive analysis the relationship between the alleged insubordination and the perceived discrimination are considered, and the proportionality of the response.

In cases similar to this, the National Labor Relations Board (NLRB) looks to the Provoked Insubordination Doctrine.  "It has long been settled that an employer may not rely on employee conduct that it has unlawfully provoked as a basis for disciplining an employee."  See, e.g., *NLRB v. Steinerfilm, Inc*., 669 F.2d 845, 851-52 (1st Cir. 1982) (ordering reinstatement of discharged employee where discharge was result of employee's intemperate reaction to unfair treatment by employer); *NLRB v. Florida Medical Center*, 576 F.2d 666, 673 (5th Cir. 1978); *NLRB v. Mueller Brass Co*., 501 F.2d 680, 685-86 (5th Cir. 1974) (also applying the doctrine of provoked insubordination, and explaining its rationale).  In *NLRB v. Southwestern Bell Telephone Co.,* 694 F.2d 974 (5th Cir. 1982), a supervisor deliberately provokes a dispute with a shop steward in the hearing of other employees, and then suspends the steward without pay for four hours on the grounds of insubordination.  The Fifth Circuit affirmed the district's ruling that

the company provoked the disturbance, and ordered the steward's hours and pay be reinstated. "Having chosen to argue in front of the other workers, the Company can hardly be heard to complain about the public nature of the first part of the discussion. Indeed, it was [the shop steward] who first suggested that the two retire to a private office to continue the negotiations." Hale entered Alexander's office by permission and left when requested.  Alexander ordered that the door be opened so that she could obtain witnesses to their dispute, thus ESU should hardly be heard to complain about the public nature of the dispute.  Plaintiff's voice was repeatedly ignored when desiring to speak about protected activity; animus for reporting a hate crime, a protected activity.  [T]he employee's language must actually be "indefensible in the context of the grievance involved." *Crown Central Petroleum Corp. v. NLRB*, 430 F.2d 724, 731 (5th Cir. 1970) (quoting *Hugh H. Wilson Corp. v. NLRB*, 414 F.2d 1345, 1355-56 (3d Cir. 1969), cert. denied, 397 U.S. 935, 90 S. Ct. 943, 25 L. Ed. 2d 111 (1970)) (emphasis in original).  Plaintiff had a protected right to say a few words about the march against racism at ESU, and national faculty support, in the faculty meeting on August 26, 2015.  Plaintiff had a right to confront Alexander and Smith for shutting him down when engaging in a protected activity.  Throughout this ordeal, the record indicates that Hale was "gracious,"  "responsible," and "prudent," and not unreasonable towards his colleagues in SLIM.

In an additional move meant to disguise their retaliatory motives, defendants ostensibly placed Alexander in a cooling off period.  Their motive was that this move would allow them to deny that Hale was treated differently from a person not a member of a protected class, although it can be readily proven that Alexander continued to work while suspended with ESUs knowledge.  What should be of interest to the Court is that after Cordle announced to SLIM that Alexander was coming back to work after completion of the tasks that they had asked her to do

while in the cooling off period, after meeting with her and Cordle, the department refused to agree to work with her any longer because her conduct was deemed unprofessional and abusive. Alexander was then permanently removed and replaced with Dow as Interim Dean of SLIM. How can defendants use as pretext the interactions of someone the department refused to work with after her confrontation with Hale?  The removal of Alexander should vindicate Hale.

## F.     Defendants lacked clearly articulated policies for the reporting of bias incidents.

"It generally is necessary for employers to establish, publicize, and enforce anti-harassment policies and complaint procedures. As the Supreme Court stated, 'Title VII is designed to encourage the creation of anti-harassment policies and effective grievance mechanisms.'" *Ellerth*, 118 S. Ct. at 2270.

"An anti-harassment policy and complaint procedure should contain, at a minimum, the following elements:

- A clear explanation of prohibited conduct;

- Assurance that employees who make complaints of harassment or provide information related to such complaints will be protected against retaliation;

- A clearly described complaint process that provides accessible avenues of complaint;

- Assurance that the employer will protect the confidentiality of harassment complaints to the extent possible;

- A complaint process that provides a prompt, thorough, and impartial investigation; and

- Assurance that the employer will take immediate and appropriate corrective action when it determines that harassment has occurred."[4]

Alexander stated that the university did not have a policy for reporting a hate crime where the suspect was unknown.  Such a "requirement," to have a known suspect in order to

---

[4] EEOC, "Enforcement Guidance."

have a policy, is ludicrous because victims often do not know the identity of the perpetrator(s). ESU has recognized this as a serious problem since Hale pinpointed it out, hence the creation of the University Diversity Initiative (UDI), which will address policies and procedures for reporting discrimination and harassment.

**G.     Defendants violated Title VII retaliation law during the "cooling off period."**

 "This practice of not speaking to the Hales became rampant after the slanderous press conference, and after defamatory things were said about the Hales in private closed door meetings."  "Vietti shunned plaintiff and invited others to do the same; a *prima facie* violation of Racial and/or Ethnic Harassment."  For the purposes of brevity in answering this legal question, Hale directs the Court to review the actions of defendants that resulted in Hale being repeatedly ignored, enumerated in Hale's Opposition to Wilson and Elijah.

**H.      Defendants' retaliatory motive satisfies the "but for" cause of the adverse employment action.**

In a recent decision, the Supreme Court expressly rejected the EEOC's view that a Title VII retaliation plaintiff need demonstrate only that retaliation was one of several motivating factors in the employer's decision, instead deciding that such a plaintiff must prove that the employer's retaliatory motive was the "but for" cause of the adverse employment action.  *Univ. of Tex. Southern Med. v. Nassar*, 133 S. Ct. 2517, 570 U.S., 186 L. Ed. 2d 503 (2013).  Hale contends that the evidence shows that until he complained of discrimination, his status in SLIM was not in question, and his reviews were exemplary for a first year professor, and that but for his demands that defendants properly investigate and address an incident of hate speech at ESU that he would not have been subject to retaliation or termination.

**I.      Defendant's adverse actions amounted to retaliation.**

How "adverse" must an employer's actions be to constitute retaliation?  The Supreme Court addressed this question in *Burlington Northern & Santa Fe Railway Co. v. White*, creating an "objective standard" under which an action challenged as retaliatory must be "materially adverse" to a reasonable employee. 548 U.S. 53, 68 (2006). The Court in *Burlington* resolved a circuit split on the definition of "adverse employment action."  Until 2006, the federal courts of appeals were divided over how severe an employer's adverse action must be to fan within the statute.  Most broad: "Any activity reasonably likely to deter" an employee from vindicating protected rights. (Ninth Circuit)  Middle ground: An employment action that a reasonable employee would find "materially adverse," i.e. resulting in tangible injury or harm. (Seventh Circuit, D.C. Circuit)  Most narrow: The employer has taken an "ultimate employment action" (i.e. firing, demotion) against the employee. (Fifth Circuit, Eighth Circuit).  The Supreme Court ultimately resolved the "Circuit Split" in favor of a middle-of-the-road "materially adverse" standard, but defined "materiality" objectively from the perspective of a "reasonable employee." Depending on the Circuit, case law pre-dating Burlington Northern may not remain good law. Dr. Hale believes that his claims survive under the narrowest reading, but that the middle reading is more appropriate: "An employment action that a reasonable employee would find "materially adverse," i.e. resulting in tangible injury or harm."

ESU administrators allege that preventing Dr. Hale from regular faculty activities and offices was not retaliatory during an extended cooling off period that lasted indefinitely, depriving him of professional services and associations. However, it is not a stretch of the imagination to come to the conclusion that a jury could certainly conclude otherwise; that this cooling off period, in which Hale was virtually quarantined, would deter a reasonable employee

from complaining about discrimination.  Depriving Dr. Hale of his office and contact with his colleagues, important updates and teaching facilities can be adjudged retaliatory.  It takes no imagination whatsoever to conclude that termination of his contract for performing constitutionally protected activities would chill an employee for taking such a risk.

**J.      There was a causal connection between the adverse employments actions performed by the defendants and plaintiff's protected activity.**

Alexander and others state that Hale was performing more than satisfactorily before the report of the hate crime.  An employee must ultimately demonstrate a causal nexus between his or her protected conduct and the employer's retaliatory response. The courts of appeals recognize three methods of proving causation: (1) temporal proximity between the protected activity and the adverse action; (2) proof that other similarly situated employees were treated more favorably; and (3) direct proof of the employer's retaliatory intent. *Jimenez, supra* (citing *Sumner)*.  The evidence presented in this case demonstrates that the temporal proximity between the protected activity and the adverse action are intertwined.  There are virtually no degrees of separation.  The Fifth Circuit has held that although "close timing" can support a *prima facie case* of retaliation, "once the employer offers a legitimate, nondiscriminatory reason that explains both its adverse action and the timing, the plaintiff must offer some evidence from which the jury may infer that retaliation was the real motive." *Dooley v. Parks & Recreation/or the Parish a/Ea. Baton Rouge*, No. 10-31254,2011 U.S. App. Lexis 15278 (5th Cir. July 22, 2011).  The actions defendants took to shut Hale down and silence him were brazen and extreme.

Vietti gave Hale a letter on September 9, 2015 in the context of unveiling the results of the "investigation," demanding that he go to counseling for unprofessional conduct, or else he would face termination.  By forcing Hale to sign such a letter on the selfsame day that they

announced false narratives about his report of a hate crime campus-wide and repeated it in a national press conference, the causal connection is immediate. Vietti sought to extinguish Hale's believability with respect to his report of the hate crime. She also wanted to hide behind the shield of a "personnel matter" as a means of deflecting pointed questioning. Their entire press conference was pretext. What was stated as having the strongest possible factual foundation was in fact packages lies prepared for a "friendly" media audience who would not dare embarrass them. Hale was portrayed as a kook, someone who operated on "a fluke."

The entire press conference punished Hale for protected activity. It labeled everything that Hale claimed or did as ludicrous, and refused to answer tough questions. Alexander labeled the situation a personnel matter in July, when it clearly was not, as a pretext at that juncture to shut down discussion on Title VII issues by characterizing them as "personnel matters." According to Alexander, just being in the presence of Judy Anderson, who incidentally was not invited to Cordle's meeting by the Hale, made the matter a "personnel matter" according to Alexander. Armed with their August 27th pretext, defendants doubled down on the "it's a personnel matter" defense, and used this weapon to squelch all discussion about the hate crime on the ESU campus and in the community. The chilling effect was universally felt. Vietti, Johnson and the defendants are still attempting to promote the falsehood that the institution and the people who run it are upstanding, and operate with the best motives, but the facts disagree.

## K.    Direct Evidence of Discriminatory Animus Towards Plaintiff Palpable in Audio Recording.

Direct evidence of discriminatory motive may be any written or verbal policy or statement made by a respondent or respondent official that on its face demonstrates a bias against a protected group and is linked to the complained of adverse action. *Grant  v. Hazelett  Strip*

*Casting Corp.*, 880 F.2d 1564, 1569, 51 EPD Par. 39,245 (2d Cir. 1989). The Court has read

numerous documents in this case that refute defendant's façade of a fair investigation. Smith and

Alexander are agents of the respondent. When the Court listens to Alexander and Smith on the

audio recording, they are listening to the official voice of ESU. Smith loudly stated that he

"objected," and that Hale's request was "not appropriate" in the faculty meeting. Alexander then

enters into a full-scale rant against Hale. All of this was done in a public setting. Hale was shut

down, and the faculty was chilled. Dow shortly thereafter commenced the faculty meeting

sounding upbeat like nothing had happened. Why is Dow such a chameleon? She is afraid of

retaliation and retribution. She does not want to lose her seat at the table. Where is she to go?

She has a special needs adult child at home being taken care of full-time by her husband. She

grew up in that town! Dow is fixated on staying at ESU, and maintaining her comfortable life,

and will tolerate whatever ESU does despite her sincere reservations. When ESU shuts someone

down, and Hale is not the first, it is not a pretty sight. ESU does not play by ethical rules or the

constitution and laws of the United States. Not another word was said about blatant

discrimination and retaliation and violations of freedom of speech enacted by the dean and

associate dean right in front of the faculty, although the library school teaches that library culture

is "non-censoring," and protective of freedom of speech. Hale himself taught this in the ethics

section of Foundations of Library and Information Science, course number LI801.

 ESU, SLIM faculty and the ALA all failed. The ALA fully accredited SLIM in 2015

against the backdrop of the two Marches On Emporia, Hale's quarantine, Rajesh Singh's lawsuit

in this district, community petitions to the ALA and ESU, and numerous articles in the press and

social media critical of ESUs handling of the investigation, and the treatment of the Hales. The

ALA was complicit in repeatedly ignoring Hale.  The defendants don't give straight answers.  Hale brought this litigation to get straight answers.  Transparency is what this matter needs.

What happened on August 27 is merely the fruit of Smith and Alexander's actions on August 26.  Was Hale supposed to bottle up their vicious and malicious treatment inside of himself and move about as if nothing was wrong?  That isn't reasonable.  When Hale entered Alexander's office and announced his reason for being there, Smith and Alexander once again flew into a rage.  When Hale entered the office and announced his intentions, Alexander and Smith commenced where they had left off the previous day in the faculty meeting; they began to talk loudly and to rage against Professor Hale.  Hale responded  back about the lies, and left the office as requested.  The next day, August 28, Cordle placed Hale into the cooling off period removing him from SLIM.  The scene in Alexander's office was predicated by her actions, and the actions of Andrew Smith.  By recording the statements of Alexander and Smith in the faculty meeting Hale was able to preserve what is often lacking in Title VII cases: direct evidence of prohibited conduct and discriminatory animus.

L.    **Vietti and Defendants Encouraged Title VII and First Amendment Violations.**

Vietti, Johnson, ESU administrators, and all the defendants, as agents of ESU, encouraged adverse actions against Hale in retaliation for his report of a hate crime.  "A supervisor who has knowledge of the protected activity need not expressly order an agent to take adverse action against an employee (in retaliation); a jury can find causation where the supervisor encouraged treating the employee adversely."  (*Burlington No*., 548 U.S. at 69).  For example, in *Henry v. Wyeth Pharmaceuticals, Inc*., the court of appeals held that an employee proffered sufficient evidence of causation where a human resources representative was aware of the plaintiffs internal complaints of discrimination (as well as his subsequent complaints to the

EEOC and N.Y. State Division of Human Rights) and worked with plaintiffs direct supervisors to scrutinize his performance. *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 148 (2d Cir. 2010). Vietti encouraged everyone to "do the same," accept the false results of the biased investigation, and to support the university.  Dr. Hale was portrayed as unstable and untrustworthy.  He was a race-baiting opportunist who saw an opening that he could take advantage of for personal gain. That message was not lost on her audience.  Hales' support on the ESU campus immediately dried up after her communications with the public, meetings with constituents, a campus wide email to all students, faculty and staff and national press conferences.  Proclaiming that the investigation was "fair, thorough, and logical," and "fact-based," Hale was dismissed as aberrant.

Victims of discrimination must show that the employer engaged in "actions that affect employment or alter the conditions of the workplace" whereas a victim of retaliation may show that the employer took "actions not directly related to his employment or by causing [] harm outside the workplace."  42 U.S.C. § 2000e-3(a).  Plaintiff has provided ample evidence of harm caused to him, both inside and outside the workplace.

**M.    Hale Has Standing to Sue Defendants.**

Title VII provides a right of action to "persons aggrieved." 42 U.S.C. § 2000e-5(1) ("[A] civil action may be brought against the respondent named in the charge ... by the person claiming to be aggrieved.)  Although the court declined to find the term "person aggrieved" co-extensive with Article III standing (i.e. injury in fact caused by a defendant that is remedial in the federal courts), it found that persons within the "zone of interest" that Title VII seeks to protect have standing to sue. 131 S. Ct. at 870  (quoting *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871,883 (1990)).  "[T]he purpose of Title VII is to protect employees from their employers' unlawful actions."  Defendants cannot claim that Hale lacks standing to file suit.  At the core of the

standing doctrine is the requirement that a plaintiff "allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984), citing *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc*., 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).

## V.  DAMAGES

Plaintiff's predicates its calculation of damages on the very real proposition that his career has been irreparably damaged in the narrow discipline of Library and Information Science, and that it is unlikely that he will be offered a comparable full-time tenure-track faculty position with similar benefits all due directly and solely to the conduct of the Defendants, which triggered the instant litigation.   Plaintiff's age alone might easily prevent him from landing full-time employment again in any field.  Plaintiff is currently 62 years old. Plaintiff had envisioned a 15-20 year career as a professor, and invested over $250,000 and five years of his life to attain a doctorate in 2014 from UCLA, a foremost top-tier university.  Plaintiff graduated with his doctorate at age 59, the first in his cohort, by defending a theory of visual cognition that could have been expected to bring Plaintiff academic acclaim and financial benefits. Theory defenses are rare and important to the progress of science. Plaintiff's theory has applications in information science, archives, social science, art, social justice and medicine, to name a few.

Known age and racial bias in the workplace makes finding a comparable position nearly impossible, and Plaintiff can produce evidence from recent experiences where potential employers terminated their interest in him after learning about the situation at ESU, or never even acknowledged his application.  Hale has effectively been blacklisted.  Research in the employment field supports Plaintiff's concerns.  Studies have shown that less than 20% of

doctoral graduates land a tenure-track position upon graduation. Plaintiff landed such a position

at ESU, and planned to retire from ESU.

## VI.  CONCLUSION

For the reasons set forth above, and the undisputed evidence that conclusively shows that

Defendants violated Title VII and First Amendment Retaliation law, there are no genuine issues

of material fact.  Wherefore, MELVIN HALE respectfully requests that the Court grant its

motion for summary judgment.  Such a ruling would leave the appropriate damages and

injunctive relief as the only issues to be resolved at trial.


Dated: **August 18, 2016**                                Respectively submitted,


                                                          _____
                                                          /s/ Melvin Hale, Ph.D., Plaintiff *pro se*

## <u>CERTIFICATE OF SERVICE</u>

**Case No. 15-4947-SAC-KGS**

I hereby certify that I have served this <u>MELVIN HALE'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON ALL CLAIMS</u> on August 18, 2016.  I personally mailed a copy of the document in the above action by first class mail, postage prepaid, addressed to the following:

Anne Gepford Smith
Assistant Attorney General of Kansas
Memorial Bldg., 2nd Floor
120 SW 10th Avenue
Topeka, KS 66612-1597

I am not a party to this matter.  I declare under the penalty of perjury that the foregoing is true and correct.

<u>/s/ Angelica G. Hale</u>
P.O. Box 6176
Goodyear, AZ 85338

# EXHIBIT "A"

**Partial Transcript of Phone Conversation Between Dr. Melvin Hale and Dr. Mirah Dow**

Provided electronically to the Court as "Voice 003.m4a"

**Date**: August 17, 2015.

**Plac**e:  Each party was at their respective domicile; Hale in Emporia, Kansas and Dow in Eureka, Kansas.

**Time**:  The evening of August 17, 2015, approx. 8:00pm – 10:00pm.

**Subject**:  The "Investigation" at Emporia State University of Dr. Hale's Report of a Bias Incident in Office 413.

1:00   **MH** – "When we went to see David Cordle, when we went to see Ray Lauber, we made it clear that we felt that the culture of gossip and spreading people's business and information around was rife [in SLIM], and that if this were a medical institution we would be hit with HIPPA violations from sunrise to sunset cause this is people's private business that they want to talk about, and it's not professional."

      **DOW** – "…this problem [has] been in our office for a very long time. And I also told them that, you know, I've spoken up about it more than once, saying, 'This is going to eventually get us in trouble.'"

2:20   **MH** – "How far do they think they can go with this Mirah?  I guess that's my question.  I mean, all we have been doing is trying to be very above board and outright and direct [about the report of the bias incident]."

2:32   **DOW** – "They've got a lot to lose, they've got a lot to lose.  And they're gonna, no matter how dirty it is, they would in a minute put you and me on the [de]fensive so that we have to represent ourselves to prove otherwise.  That's the game here."

9:08   "They're looking for any excuse in the world…for it to be something other than what it is."

**MH** – "Well ok, this is just so frustrating.  I was told that an investigation, a proper investigation, involves a panel of individuals, not one person."

9:25    **DOW** – "I have never known of any investigation."

10:59   **MH** – "What is the tone [here] now and what are people saying about me?  I mean, have you heard anything?"

11:25   **DOW** – "Honestly, nobody talks to me about it.  The only thing I know is when I have tried to speak up, it's like flipping a switch on Gwen.  She just says everything that's on her mind at the moment…you know how she does that."

**MH** – "Yeah, but I mean she has to know that you have an opinion."

**DOW** – "She doesn't want to hear about it. I tell you [that] for sure. She does not want…she doesn't want to hear it.  Man…You remember that whenever, whenever you first told me [about the bias incident]. Even though it was a week or two later, I said that I was gonna speak to Gwen.  And I did.  And I said I think that Melvin would feel an awful lot, [a] bit better, or different at least, about this, if something [was done].  Why don't you just ask him what it is that he'd like for you to do?  I mean, I said, I think maybe that there ought to be some sensitivity kinda training or event or something. You know, I wanted so bad to say: 'In my training, in my professional work, I truly believe that I've been taught, when something like this happens you should say straight out we are NOT going to have this here.'"

13:03   **MH** – "Right."

**DOW** – "And then start taking steps to raise people's awareness, whether they had anything to do with it or not. But boy, I'm telling you what. She has exactly the opposite idea about that!"

2

21:15   **MH** – "You, know coming in the door I had no interest whatsoever in trying to throw

SLIM under the bus, and I didn't.  And now I'm stuck in the position of having to take

the position with the ALA that this department only deserves conditional accreditation

until [Alexander] leaves; until this culture changes.  I don't know what else to say...I

don't feel good about this because I know it impacts far more people than just myself, to

have to go outside and march and demand that the ALA consider this as a major

problem...[But] I can't get anybody's attention in Plumb Hall (ESUs admin building)...

and that's why we're doing our march on the 15th."

32:25   **DOW** – "Well, the signs ought to read 'This is Kansas and we're not going to stand for

this!'"

**MH** – (laughing) "Well that's good. You know, actually I am not trying to impugn the

integrity of Kansans at all...I've had enough people from Kansas you know, residents as

well as other faculty, make it very clear to me that this is really a bad seed [here], and it

needs to be dealt with and I just feel bad.  I feel bad because I've been asked to...put on

my battle fatigues and come out and fight.  I didn't come here for that.  I came here to put

on my professional clothes and go teach a class.  That's what I came here to do... But it's

almost life or death; you gotta go in there and fight this battle.  And I'm just saying, if it

appears that I'm fighting, you know, pretty hard, I'm having to do this.  I've been forced

to."

24:55   **DOW** – "Well I see that. It's clear to me… Anybody that can excuse such racism has got

a problem. That was my opening comment when I got a chance to talk to Ray. I said,

'There is NO place for discrimination in education. I don't want to be a part of the

problem.' I've been trying to figure out as best I know how to figure it out from people

who are sources of authority on how NOT to be guilty of this.  Some people aren't
interested at all.  I said, 'I know full well that in our profession there's a large growing
body of literature about cultural competencies. And we have to make it a purposeful and
intentional practice to teach it and learn what that means.'"

26:27   **MH** – "Well I believe that, and I've seen you do it, and I've learned a lot from you in
teaching, you know, professional ethics, and I know you believe in that and I don't doubt
that for one second."

27:03   **DOW** – "Because [racism] is so deeply entrenched, that's what education does.  It opens
people's minds. It shows you what's wrong with the profession that [racism] has
dominated and stayed in control and not been questioned.  That is what's wrong.  We're
at a place of higher-ed for heaven's sake!"

**MH** – "Right."

27:40   **DOW** – "Why would we not be on the side of going about this in a way that would say,
"We don't want this to happen here. We're gonna do everything we know how to do in
the name of curriculum, and professionalism, and scholarship. To do otherwise…that will
never mean anything to Debra Rittgers.  Never."

28:07   **MH** – "I know.  And you know, I'm sorry to say, I have a belief that Gwen's on the same
page."

28:19   **DOW** – "I'm afraid of it too."

28:20   **MH** – "I know she might be concerned that Deb knows where the bodies are buried, and
on that political level she might not, you know, she might be concerned about what she
could say or do.  But on a more personal level as a manager, if you feel you have an
employee that could be out of control, you go to them ahead of time and say,

'listen…these types of behaviors will not be tolerated and so you will be disciplined for these.' And even if they're your friend, your relative or whoever, you can say that.  And the fact that instead of, you know, making Deb pay for what she did, she's making Angelica pay for what she did.  She's making me pay for what she did, and hurting a lot of other people, hurting the program.  Now she's making the students in Portland pay for what she did.  I mean, how in the world can anyone even remotely suggest that Ashley Todd-Diaz, as good as she is at being an archivist, can go to Portland and teach an 801 class like I do.  I wanna know how that's possible.  That's ludicrous."

29:27   **DOW** – "It is impossible, and I said that.  I did speak out against that.  And [Gwen], just like the very first day, she cut me off…'I am not going to listen to you.'"   "And to take it away from you is …it's the kind of *low blow* I've come to expect… I don't ever want to really be afraid.  And I'm not really afraid.  But I am really concerned because <mark>this is only the start of it.</mark>"

32:05   **DOW** – "I'm not sure what I'm going to do Melvin. But I am trying to be smart about this. I really am. And I already know, I know when the *deep pockets* get tapped on the shoulder, they will fight to the bitter end and *they do not care who they hurt* when they do it.  And I am the least of their [worries].  *They'll punish me just like they'll punish anybody else*.  And once I'm on the outside, I don't think I'll be as powerful as I might be on the inside. And I don't like the word power, I really don't mean to say it that way. I'm just trying to have some influence. And I'm not done yet. And I have been doing something. You haven't seen it and I'm not going to tell you where it is right this minute."

33:19   **MH** – "OK, well…your heart's in the right place.  I wish you could take a stand.  I certainly don't want to see you in a position where you're being punished. But at the same time, we need to stop these people. And unless we get enough leverage for an independent investigation, we're not going to be able to stop them.  It is almost like we wouldn't be where we are right now in terms of the things you were talking about and stuff if people did not put things on the line.  That's why a lot of people did.  And thankfully not everybody from the civil rights movement is dead, but people did have to take a stand, and some had to lose their lives and their livelihoods and a number of other things before we got to this point, because freedom isn't free."

34:49   **MH** – "When you talk about the *deep pockets*, the deep pockets aren't going to be able to overcome the law.  Ok, the law is not on their side."

34:57   **DOW** – "No it isn't.  No.  *You've got the law on your side*. I do believe that.  I really do."

38:23   **MH** - "I never had any negative relationship with Gwen whatsoever until it became crystal clear to me that she had no intentions of investigating this and calling it a crime. When she started going down this road of saying what you said earlier that 'oh it doesn't matter if somebody writes that down. That word is not a crime.' Well maybe in and of and by itself it's not a crime if you write that you know on your own pad, on your own property and what have you. But if you write it to direct it at someone to insult them then that is racial, that's the law.  If it's directed at someone, then no, you can't write that. You can't just do that with impunity. And so I didn't come here for that and I'm not going to take that. And her assessment of that being A-OK, which it sounds like she's saying, that it's ok, it doesn't matter, you can write that word all you want. But what I was going to say earlier when you mentioned that…as scientists we all understand that you have to

look at the context of things that happen. You can't just take things in isolation, because you can take things out of context. You can take citations out of context. You can take events that happened out of context.  So you have to always look at the context. And the context here is what was written down. Brenda came to work. Her door was unlocked." "In addition to that, the Strader event was coming up for that Friday. This happened two days before that.  Angelica was busy doing what Angelica does, working her behind off to make that event a success."

40:58  **MH** – "So that's the context."

41:40  **DOW** - And there's this other thing that makes Gwen [get sympathy]…more for people to hear.  She tells them I'm sure how nice she was to you.  She's got this whole litany of how nice she was to you ever since you came. But that's no excuse for this."

42:22  **MH** – "Well, that's nice. I can tell about how nice we've been to her.  I can talk about going to her house and painting her basement and Angelica walking her dogs and taking them to the groomer.  We were all "nice" to each other.  And don't look at all the pictures!  I have so many selfies taken with Gwen [that] it isn't funny.  Selfies at Halloween, selfies at [the] ALISE [conference]; pictures with her all the time.  We're all smiling; look like family.  I'm upset with her because she's not dealing with Deb Rittgers."

42:31  **MH**:  "I have never told anybody at any time leading up to this situation that I had any negative thoughts or feelings about Gwen Alexander. Never, at any time. I have defended her. I have defended her to Chris [Hinson]. I have defended her to Rajesh [Singh]. I have defended her. Only to find out that when push comes to shove, and it's a choice between Angelica and me or Deb Rittgers, it's Deb Rittgers. That's where we have hit the wall. It

is as simple as that. Which now leads me to believe, which things led up to that?  What side was she on all along?"

44:06 **MH**:  "Now we have heard her say things to people to their face, because we've been around her just like a lot of folk have, and when that same person walks off, she'll say something derogatory about them."

44:19 **DOW** -  "Yeah, I know it. I know it. I see it too."

44:23 **MH** – "I won't do that!  I don't know of anyone that I hang out with that would behave like that because I don't like duplicity.  I will tell people to their face what I would tell about them behind their backs.  It really is me.  That is me.  I will not do it any other way.  That's how Betty raised me.  So if somebody acts like they got a problem, I'm not going to say "Oh, I'm so sympathetic to your problem and as soon as they walk away, be like "that person is the cause of their own problems."  If I feel like somebody's causing their own problems, I'll tell them, 'You're your own worst enemy…I'm not going to be duplicitous and tell somebody one thing, and then when they leave, say something else."

45:30 **DOW** - "And those of us who get lured into her 'good charismatic side?'  She uses it for her own benefit.  Honestly, I have a very hard time [with that].  I think she wants good things to happen at SLIM, but she really wants good things to happen for Gwen.  That's what I think…She so rarely says anything nice about the faculty.  I mean she just doesn't do it.  I don't imagine she would ever do it if somehow, in some of her training, you know, every now and then she goes to some seminar or something on leadership and she must hear or be reminded that you've got to thank people and [you've] got to compliment them from time to time, because I see a little uptick in that every now and then, and then

8

it goes right back to the same old thing.  She is not on the side of faculty in general. That

just is not her."

48:43   **MH** – "Here's a question I have.  Why isn't Jackie Vietti listening to the right story?"

48:51   **DOW** – "I don't know.  I really wanted to believe she'd do the right thing. But I've felt

awfully worried about this whole idea of an internal investigation. I felt really worried

about that when I came away from that meeting we had on Friday, because most of the

time, an internal investigation is never going to turn out right. The only thing of it is, to

me, is this is such a big, big issue given the time that it is in our society. She could really

make herself look bad to a lot of people if she doesn't do something."

49:53   **MH** - Well I had hopes for her you know, really when you kind of commended her in the

first place I'm like, 'Okay, this is great. Maybe she will, you know…'"

49:56  **DOW** – "Did you hear her say, she said it on purpose, this is calculated and rehearsed. I

KNOW it was. She said to that group. Here's why I accepted this invitation, and then she

talked about all ESU connections that she has. And she said, there's no hidden agenda.

She said it real quick and snappy."

50:25: **MH** – "Yeah. I was sitting right there in front of her when she said it. I heard it."

50:34 **DOW** – "Of course you did. She said it on purpose, because she knows somebody is going

to accuse her of that."

50:43 **MH**:  "Some of these facts are black and white. You know.  A lot of times things were

shades of gray.  In this situation things are pretty black and white.  They are, either this

person did it or they didn't.  Either this is their handwriting or it's not.  Either this crime

happened or it didn't.  It's really very straightforward.  You know?  Either Gwen knew

about this in advance or she didn't.  Okay?  Either she went to Brenda's office the day it

happened or she didn't…This is like when I was a kid growing up.  I would buy all these

Lego sets. They didn't call them Legos back then, they were something else.  But I would

build houses, they would have windows and doors.  All you really have to do is follow the

instructions. You didn't have to be creative or whatever.  Just put them together in the

order that they say and this is what you get."

51:42   **DOW** – "Yeah."

51:43   **MH** – "In this case, these facts are just like that. If you put these facts together in the

right order you're not going to come to a different conclusion than what the conclusion is.

At the end of the day, when I get pushed in a corner, I tend to just be rational. And

rationally speaking, these facts don't fit together in any way other than what they have.

She (Gwen) didn't do anything when it first happened which suggests that she knew it

had happened and who had done it, or she didn't care about it. Either way, it's

unacceptable. And after the fact when she was given all the facts, she still refused to do

anything…It's very simple. It's very straightforward. So, you know, I don't want to

belabor it, I've kind of had to take the position that with this whole thing I'm just going

to have to grind it out.  Okay?  I'm not going to get instant satisfaction; it's not going to

happen that way.  The way it's going to happen: I'm just going to have to keep pushing

the truth and keep turning on the light and turn on as many lights as I can until the glare

of the truth is just going to be too much to escape.  That's all I can do, and that's my

approach right now.  Just turn on as many lights as I can.  So…if you feel uncomfortable

working in the public, working out in front, I would say do as much as you can behind

the scenes, I mean you know these people.  You have credibility with a lot of people.

10

And I'm saying, use that credibility to sway people, to get them to see what is right and what is true here.  And if you just do it with a phone call."

54:15   **DOW** – "I don't know if it makes you feel any better or not, but I'm doing what I can do. And I do want to stay on the inside, and I can't tell you what it is right now, and you might not think it's very much but it feels like it could be."

54:15   **DOW** – "I told you several days ago that I think that the very best thing to do is to do our very best every single minute with whatever we're doing, and don't let them make you mad, don't let them cause you to raise your voice.  Don't let them even cause you to sound tense.  Anything that you can do to just stay on the same even keel as you were before this started can only help.  Because I'm telling you they're looking for anything they can."

54:58   **MH** – "I believe that. I believe that, and so far I haven't given them nothing.  And I don't plan to."

55:10   **DOW** – "I believe that."

55:13   **MH** – "I'm following first amendments rights, the freedom of speech, and I'm going to practice that to the nth degree.  But…this is not about going in that other direction at all. And if they're expecting that they're going to be highly disappointed, and it's unfortunate but I ain't going there.  You know, I've been in this rodeo before so I already know what that's about.  And I appreciate your, you know, reminding me.  I'll accept that.  That's ok.  But no.  They need to check themselves, because the truth is [coming] after them. Ok, the truth is on their trail."

59:33   **MH** – "In some cases, all you can do is just shine the light…That's all I'm trying to do. I'm not trying to get into debates with people and arguments about stuff.  I'm just trying

11

to shine the light because the truth is the light.  That's all I have as my defense right now.
So that's kind of what I'm doing; just trying to keep going one day at a time."

100:20 **DOW** – "Well, I think that's all you can do, and it seems like everything takes so long;
[like] to me the length of time of this 'so-called investigation.'  It's just really gone on a
long time. This makes me think, do you think they're actually doing something, or it's
like…what is it? I can't figure that part out."

100:46 **MH** – "Well, you know, I'm responding to something you said earlier; maybe they're
waiting for me to do something ridiculous.  Or something crazy.  I don't know what it is.
They're going to be waiting a long time though, because I'm just going to stay on this
channel.  It's just the way I was raised, to hold on like a bulldog once I think I've got my
teeth into something, and that's all I'm going to do. I'm only asking for 2 things at the
end of the day; an independent investigation and a handwriting test.  That's all I'm
doing."

102:02 **DOW** – "This is something of a disruption that Gwen has caused because of *her* choices.
You know, it's caused a hardship in the worst, worst way."

102:40 **MH** – "Yeah."

107:18 **DOW** – "in a certain way I see [Lauber] as very confident, perhaps under normal
circumstances, a very confident HR person.  But I think he's probably going to do what
[Vietti's] told him to do.  I'm sure that he's listened to Kevin Johnson and he's probably
heard Kevin Johnson's opinion of this as many times as anybody. *I don't know objective
he'll be able to remain*. I really don't."

12

108:13 **MH** – "Well Kevin Johnson, you would think, is not operating in a vacuum.  I mean, most of the [Kansas] Board of Regents are attorneys; at least half of them, and I'm sure they haven't been absent from this conversation."

116:15 **DOW** – "It's hard for a school especially a little group as small as this one to put up with so many [bad] things.  I mean we can go back to the time Gwen just let go of…what was her name?…Yvonne Ballester.  I mean she just marked her off and she was gone.  Nobody even got to say goodbye to her."

1:16:58 **MH** – "That's terrible."

# EXHIBIT "B"

**Recording of SLIM Faculty Meeting**   Provided electronically to the Court as "Voice 006.m4a"

**Date**: August 26, 2015.

**Plac**e:  SLIM Conference Room on 4th Floor

**Time**:  Approx. 1:30pm – 3:00pm.

**Subject**:  Statements made by Gwen Alexander and Andrew Smith shutting Hale down for
wanting to say a few words about the protest march.


The relevant section which Plaintiff wants the Court to pay special attention to begins
approximately at 10:10, and continues for about five minutes; at which time Alexander shuts
down all further discussion on the march and the issues raised by Hale.

# EXHIBIT "C"

# EMPORIA STATE
## U N I V E R S I T Y
■ *Office of* THE PROVOST

Campus Box 4045
1 Kellogg Circle
Emporia, Kansas 66801-5415
620-341-5171
www.emporia.edu

August 28, 2015

Melvin Hale, Ph.D.
Assistant Professor
School of Library and Information Management

HAND DELIVERED

Dear Dr. Hale,

As the University continues to investigate the situation within the School of Library and Information Management (SLIM), the escalation of the conflict between you and Dean Alexander has risen to a level that is negatively affecting your colleagues as well as the department's ability to effectively conduct business. In response to this escalation, you and Dean Alexander will both be entering a cooling-off period through September 18, 2015. The goal of this period is to provide time for the investigative process to be completed, while also protecting you, Dean Alexander, and your colleagues from further escalation. Below are our expectations for you during this period.

Effective immediately, you will work from home and will not report to or be present in any SLIM office or area, including your own office. Additionally, communication between you and anyone at SLIM will be limited to those purposes necessary for the instruction of your current courses. Since your current courses are all online, you are to make the necessary arrangements to meet the needs of instructing your courses from home during this cooling-off period. Your office in SLIM will remain untouched, and you will be notified should anyone need to access the office.

On September 1, 2015, Associate Provost Gary Wyatt will step in to serve as Acting Dean of SLIM for the duration of the cooling-off period. Should you need to come into the office for any reason, access will need to be coordinated in advance through Dr. Wyatt. You may contact Dr. Wyatt via e-mail at gwyatt@emporia.edu or by phone at (620) 341-5899. Should the occasion arise that you need to communicate with Dr. Alexander or anyone else at SLIM for a reason not directly related to your own course instruction, that communication will also be routed through Dr. Wyatt. Prior to September 1, please direct those communications to me. Should you receive any communication directly from Dr. Alexander or anyone else at SLIM for a reason not directly related to your own course instruction during this cooling-off period, please notify me immediately and do not respond to the communication.



An Equal Opportunity Employer

I do want to be clear that these restrictions do not affect your presence at the planned march on September 15, 2015. Please be aware, also, that the situation will be further assessed toward the end of the cooling-off period.

Dr. Hale, as we all know, this situation is difficult and tension-filled. Anger and frustration are to be expected, but we must each be accountable to treat others with respect and dignity. Your concerns are on the record and are being investigated. While the investigation is ongoing, continued accusations and language that can reasonably be interpreted as inflammatory in any and all of your business communications are not acceptable and will not be tolerated. The University expects these will stop immediately.

Thank you for your prompt attention to these expectations. Please do not hesitate to contact me should you have any questions or concerns.

Sincerely,

David P. Cordle
Provost and Vice President for Academic Affairs


C:      Dr. Jackie Vietti, Interim President
        Dr. Gary Wyatt, Associate Provost and Acting Dean of SLIM
        Judy Anderson, Executive Director of Human Resources
        Kevin Johnson, General Counsel
        David P. Trevino, Trevino Law Office LCC, 120 E. 9th Street, Suite 202, Lawrence, KS 66044
        File

2

# EXHIBIT "D"

*POLICIES/PROCESS*

### 3D.0106.02.02   RACIAL AND/OR ETHNIC HARASSMENT

Racial and/or ethnic harassment is a form of discrimination that is illegal under Title VII of the Civil Rights Act of 1964. No member of the university community shall engage in racial or ethnic harassment. Retaliation against an individual for making a complaint of racial and/or ethnic harassment will be treated as a violation of the racial and/or ethnic harassment policy. For the purpose of this policy, racial and/or ethnic harassment is defined as ethnic slurs and other verbal or physical conduct relating to race, ethnicity, or racial affiliation that:

1. has the purpose or effect of creating an intimidating, hostile, or offensive work or academic environment;
2. has the purpose or effect of unreasonably interfering with an individual's work performance, academic performance, living environment, if residing in University housing, or participation in any university-sponsored activity;
3. otherwise adversely affects an individual's academic or employment opportunities; or
4. is not legitimately related to the subject matter of a course.

Racial and/or ethnic harassment may be blatant or subtle. Examples of the conduct that is prohibited include, but are not limited to:

- ‹   derogatory name calling or language based on cultural stereotypes;
- ‹   incidents or behaviors which are derogatory to a racial or ethnic group; or
- ‹   repeated ignoring or excluding of one's presence or existence in a University setting.

### 3D.0106.02.03   OTHER HARASSMENT

No member of the university community shall engage in harassment on the basis of age, color, religion, marital status, national origin, disability status, veteran status, sexual orientation, or on any other factor that violates state or federal discrimination law. For the purposes of this policy, such aforementioned harassment is defined as unwelcome verbal and/or physical conduct which:

1. Has the purpose or effect of creating an intimidating, hostile, or offensive work or academic environment;
2. Has the purpose or effect of unreasonably interfering with an individual's work performance, academic performance, living environment, if residing in University housing, or participation in any university-sponsored activity;
3. Otherwise adversely affects an individual's academic or employment opportunities; or,
4. Is not legitimately related to the subject matter of a course.

### 3D.0106.03   ROLE OF THE AFFIRMATIVE ACTION OFFICER AND TITLE IX COORDINATOR

The Affirmative Action Officer will assist in the complaint process, however, is not permitted to be an advocate for either party and is obligated to assure fairness to both parties and to protect the University's interests.

The Title IX Coordinator will oversee investigations when the university receives a complaint regarding a violation of Title IX.

For inquiries regarding Affirmative Action and/or Title IX, contact the Executive Director of Human Resources and Affirmative Action in the Office of Human Resources, phone 620-341-5379.

### 3D.0106.04   AFFIRMATIVE ACTION ADVISORY COUNCIL

The Affirmative Action Advisory Council (hereafter referred to as the "Council") includes seven representatives appointed annually by the President of Emporia State University. Representatives, except for students, are appointed to serve 3 year terms with at least one representative completing his/her term each year. Student representatives are appointed to serve 1 year terms. However, a reappointment to serve consecutive terms may be considered with the approval of the Affirmative Action Officer and the President of the University.

The representatives will be appointed as follows: two faculty representatives, one professional staff representative from Student Affairs, one professional staff representative at-large, one representative from university support staff, and two representatives from the student body. The Affirmative Action Officer meets with the Council and serves as an ex-officio member.

# EXHIBIT "E"

11/24/15 Facebook Post

**<u>SLIM Student</u>**

Thanks for letting me know. I got into the Serbia trip and the section under academic references included the line "Dr. Hale is working off campus at this time, so you should not ask him for a reference." I thought that was weird since I don't know how that'd be relevant.  Let your husband know I send my regards too.

# EXHIBIT "F"

----- Forwarded Message -----

**From:** Melvin Hale <*******@yahoo.com>
**To:** "angelicahale7@yahoo.com" <********@yahoo.com>
**Sent:** Tuesday, August 25, 2015 12:38 PM
**Subject:** No talk zone

Mirah passed by and was talking for a minute, then said she remembered that Ray said don't talk to me. Just fyi...

# EXHIBIT "G"

their perspective, that is when you understand things that are important. Even if it isn't considered a hate crime, it is emotionally harmful. These are things that scar a person for the rest of their life." A true and correct copy of the Emporia Gazette story is attached as **Exhibit A**, and is incorporated by reference herein. The author of those comments: defendant Elijah. She mentioned permanent scarring, and she recommends that people talk to the Hales in order to understand things. What would make a person with these beliefs abruptly cut off all communication? An unconstitutional gag order from the university, and perks?

The following policy is found in both the student and employee manuals as factors when determining Racial and/or Ethnic Harassment: "Racial and/or ethnic harassment may be blatant or subtle." Examples of the conduct that is prohibited include, but are not limited to:

"Repeated ignoring or excluding of one's presence or existence in a University setting." *Student Policy Manual*, 3D0106.02.02. A true and correct copy of the policy is attached as **Exhibit B**, and is incorporated by reference herein.

Defendants Elijah and Wilson, and those they led, did exactly that; so according to its own policy, ESU and all defendants are guilty of Racial and/or Ethnic Harassment. Elijah had regular communications with Angelica Hale up until a week after she had a private meeting with Vietti; a meeting with Vietti and the BSU Board; and finally, the regular meeting of the BSU on September 17th, at a minimum. Up to that time, Elijah sold March on Emporia t-shirts, and owed Angelica Hale a visit to return the leftover t-shirts and money from the fundraising. The call and the money for the sales never came. Elijah states that either she or BSU President Emmanuel Cockrell would be giving plaintiff or his wife a call to discuss the outcome of the meetings with Vietti, but that call never came, although Angelica stated that it was important for the Hales to

# EXHIBIT "H"

¿ Rachel?
See her tomorrow
between 1-5

Scott
Westsford
Tamara Para

· read about letterheads
X · get letter head paper for Angelica

how do you alphabetize in Excel?

A Last name
b First name
c cohort
D hometown    E address
1 Barna code    year graduated
G 1B Position
H 8 Positions Place
I email
J phone

√ delete amazon
Prime

Tresemme

Societal
issues
w/ information studies

Orange = unsure if correct person
yellow = can't find on Linkedin
blue = could not find

Consultant
financial services

Niggaz

3.5
1 hour
15 mostly

Goodwill Books
Scotts good will
Goodwill Industries of Central
Florida
5 8. 77.6

# EXHIBIT "I"

102.  Defendants Alexander, Vietti, Johnson and Lauber began calling the private office an unlocked "non-office" in an open area where people came and went throughout the day and evening.  (Doc. 13, pg. 35 & Doc. 17-1, pg. 21)

103.  Dr. Hale believes that three minor crimes occurred when the act was done in the private office: unlawful entry, vandalism and hate speech.

104.  Rittgers and Defendants Vietti, Johnson and Lauber claims that Rittgers had permission to use her master keys to enter the graduate student's office, but entry into any area with the intent to commit an act of vandalism, hate speech and retaliation is not lawful entry.

105.  Defacing another's property without permission is considered vandalism.

106.  Dr. Hale understands that these acts by themselves may not rise to the level of felonies, but not all crimes are felonies.

107.  Dr. Hale and Angelica Hale attended the *2015 U.S. Attorney's Kansas Hate Crimes Symposium* hosted by U.S. Attorney Barry R. Grissom held on November 4, 2015 in Kansas City, Kansas, where it was confirmed that hate speech is on the spectrum of hate crimes.  (Doc. 13, pg. 23)

108.  Defendants cannot categorically state that Rittgers is innocent, or lawfully exonerate her without violating the civil rights of Dr. Hale by treating him differently.   #7

109.  Dr. Vietti stated that she met with Defendant Rittgers on more than one occasion during the "investigation" to obtain her point of view.  (Doc. 13, pg. 41)   #6

110.  Dr. Vietti proclaimed that she was open to hearing all voices, but she steadfastly refused to meet with Dr. Hale or Angelica Hale to hear their voices during the "investigation."

14

# EXHIBIT "J"



Deidra Elijah and two other BSU members selling March On Emporia t-shirts
in the Memorial Union before the march.

# EXHIBIT "K"

# EMPORIA STATE
# U N I V E R S I T Y™
■ *School of* LIBRARY AND
INFORMATION MANAGEMENT

> Official visit from the American Library Association's Eternal Review Panel for Accreditation.

**Team Visit – Schedule of Activities**

**Team work room:  SLIM 4th Floor Conference Room 424**

**Monday, October 26**

Team arrives in at KC International Airport – will be picked up by SLIM driver

BBQ dinner delivered to the motel

Team members spent the night in Emporia

**Tuesday, October 27**

Team members have breakfast at motel - will be picked up by SLIM driver

8:30 a.m. – Team members arrive, work room SLIM, Room 424 (break, drinks and snacks in room)

9:00 a.m. –  Meeting with ESU President, Provost, Dean of Graduate School, Dean of SLIM, Assistant Provost - Institutional Research and Assessment (Plumb Hall)

9:30 a.m. – Meet with ESU Office of Diversity (Memorial Union)

9:50 a.m.  – Tour of SLIM offices

10:00 a.m. – Brief meeting with SLIM Dean (Dean's office at SLIM)

10: 20 a.m. – Team to work room, SLIM Room 424 (break, drinks and snacks in room)

10:30 a.m. – Team meets with MLS students (in-person and online), SLIM Room 319F

11:00 a.m. – Team members meet with SLIM faculty, Memorial Union Rooms



Andrew

Mirah

Sarah

> Dr. Hale not invited to meet ALA ERP.

11:45 a.m. – Break

12:00 p.m. – Team member lunch at Memorial Union, Skyline Room (served in private area)

1:15 p.m. – Meeting with SLIM faculty, Memorial Union Rooms

Brendon

Jim

Jenny

Sandy



2:00 p.m. – Team meets with regional program directors and dean's assistants (via telephone conference call), SLIM Room 319F

2:45 p.m. – Return to team work room, SLIM Room 424 (break, drinks and snacks in room)

3:00 p.m. – Tour of William Allen White Library, meetings with Dean of Libraries, Head of Instruction, Writing Center

3:45 p.m.  - Return to team work room, SLIM Room 424 (break, drinks and snacks in room)

6:00 p.m. - Team meets with SLIM advisory committee members; employers; slim faculty, administrators and staff; and others   (reception/dinner and online)

Team members spent the night in Emporia


**Wednesday, October 28**

Team members have breakfast at motel – will be picked up by SLIM driver

8:30 a.m. – Team members arrive, work room, SLIM, Room 424 (break, drinks and snacks in room)

9:00 a.m. – Team meets with SLIM office staff, SLIM

9:45 a.m.  – Return to team work room (break, drinks and snacks in room)

10:00 a.m. – Flex time for additional meetings or requests

11:30 a.m. – Lunch, team in work room (lunch delivered)

1:00 p.m. – Team members meet with ESU President and Provost, SLIM Dean, exit meeting

1:30 p.m. – Team members depart for KC International Airport with SLIM driver (Must arrive at Airport by 3:30 p.m.)

# EXHIBIT "L"





ESU Interim President Jackie Vietti attending a closed-door BSU meeting on September 17, 2015, two days after the first March on Emporia. BSU President Emmanuel Cockrell is seated on the left and Hispanic American Leadership Organization  (HALO) President Froilan Huachaca on the right.

# EXHIBIT "M"

Black Student Union Meeting
September 17, 2015
6:00 PM
Greek Room: Memorial Union

Apologizing for two weeks ago
    Be respectful during the meetings
Executive Reports
    President - Emmanuel Cockrell
        March on Emporia
    Vice President - Deidra Elijah
        Step Show Information
    Secretary - Michelle Wilkes
        Text Reminders
    Women's Chair - Kayla Gilmore
        Begin get togethers in October
    Public Relations - Froilan Huachaca
        Planning stages for continuing protests
    Social Chair - Jeremiah Johnson
        Sunday Dinner 9/17/15
    Community Service Chair - Ceanna Trice
        Reaching Out for step show
Conversation with President Vietti
    Introductions
    Discussions on personal view points
        Racial Discrimination
        Hate Crimes
        Diversity
    Internal Investigation conversation

**Attendance**
Jay Vehige
DeAsia Jones
Ivy Kennedy
Lashiya Smith
Champayne Bodie
Savannah Russell
Miquie Bowe
Angela Ross
Ceanna Trice
Jeremiah Johnson
Froilan Huachaca
Emmanuel Cockrell
Deidra Elijah
Kayla Gilmore
Marcus T. Williams
LaRhon Walker
Vanessa Kindall
Tyia Everidge
Michelle Wilkes
JaShawn Wallace

Black Student Union Meeting
September 24, 2015
6:00 PM
Greek Room: Memorial Union

Executive Reports
Emmanuel Cockrell - President
Deidra Elijah- Vice President
        Big 12
Kayla Gilmore - Women's Chair
        Book Club
Froilan Huachaca - Public Relations
        October 7 Marketing Materials
Topics For Discussion
        Have you ever disassociated yourself from people in your community?
        What happens when you disassociate yourself from people from your community?
        What does it mean to be classy?
DaAsia Jones
Ivy Kennedy
Champayne Bodie
Miquie Bowe
Vanessa Kindall
Savannah Russel
Mariah Love
Tyia Everidge
Froilan Huachaca
Emmanuel Cockrell
Michelle Wilkes
Kayla Gilmore
Deidra Elijah
Zauvi Laddimore
LaRhon Walker

As soon as Vietti leaves, the very next BSU meeting
convenes to discuss DISASSOCIATING.

Who were they disassociating from???

The Hale's know that they disassociated from them
around the exact same time.

Disassociating means the same thing as ignoring and
ostracizing, a Title VII violation per ESU policy manual.

# EXHIBIT "N"

1157 (D.N.M. 2012).   Upholding "permanent injunction limited to material found libelous after full trial." *Chambers v. Scutieri*, Docket No. A-4831-10T1 (N.J. Super. App. Div. Apr 04, 2013).

### Institutional / Structural Racism at Emporia State University

Although this memorandum deals specifically with the role of two defendants in the cover-up at ESU, it is symptomatic of a much larger issue, which is institutional and structural racism at ESU.  There is a significant disparity between the population of white faculty and white students to African-American faculty and students, and concerns about racism long predate the problems encountered by the plaintiff and his wife.

Just days ago, a student in SLIM was asked to take down a post supporting Dr. Hale and criticizing ESU on the Student Chapter of the American Library Association (SCALA) for Emporia State on Facebook by David Willis, the Denver area Regional Director for SLIM.  The student is a second-year student who was in Dr. Hale's popular class on Foundations of Library and Information Science, and knows his dedication to his students and his commitment to social justice.  Although there have been innumerable posts on the ESU SCALA page in Facebook, only those who favor or support the Hales have been removed and/or criticized, indicating that SLIM is actively engaged in censorship, a practice highly disfavored in the library community. The student was explicitly threatened and screamed at by David Willis, who is a non-party to this suit at this time.  This type of conduct is condoned and promoted by the culture at ESU and SLIM and passed on to the students.  Max Macias, another former student of color from the library program has had issues with racism at SLIM, and posted his discontent in a Facebook

# EXHIBIT "O"

post on the March on Emporia Facebook page, a true copy of which is attached as **Exhibit FF**, and is incorporated by reference herein.

Public universities have an obligation to not only teach ethical conduct, but to model it as well. ESU violated the public's trust, and defendants Wilson and Elijah supported that violation. As difficult as it may seem, ESU General Counsel Kevin Johnson's experience includes a stint as an Administrative Law Judge (pro tem) for the Kansas Human Rights Commission (KHRC). The challenges of fighting racism at ESU are formidable, made more difficult by the actions of defendants Wilson and Elijah. Both could have joined the ranks of other concerned students, faculty, alumni, and community who voiced support for plaintiff and what he was doing. What follows are a few of their comments from their Change.org petition:

"One would want to think: The president seems way too bent on shutting down every POV that isn't 'Nothing happened, let's drop this already' in all of these update announcement things she keeps sending to students."

"The administration of the school I am attending for my MLS, Emporia State University in Kansas, has recently made some very poor decisions not to punish racist acts, harassment and retaliations against a faculty member and former assistant to the dean of the School of Library and Information Management.

Libraries and librarians are supposed to be inclusive, and are supposed to support the needs of the community they serve, a value that strongly influenced my desire to go into the library field. It is heartbreaking to see this institution fall so drastically short of these basic tenets of the discipline in which they purport to educate future librarians. It is reprehensible that such behavior should be allowed to go unpunished."

# EXHIBIT "P"

**From:** Melvin Hale
**Sent:** Wednesday, August 26, 2015 4:00 PM
**To:** Gwen Alexander
**Subject:** Today's Faculty Meeting

 Hi Gwen,

 I don't really understand your <mark>hostile attitude</mark> today in the faculty meeting when I asked to say a few words about the March on Emporia.  In the last faculty meeting, you were the one who brought it up.  You asked whether it was still on, and I replied that it was.  All I wanted to do today was reiterate that we are still holding the march despite the change in dates for the visit of the External Review Panel from the ALA for accreditation.  I did not intend to discuss any particulars whatsoever.  I also believe that sharing a letter of support from LIS educators, researchers, and practitioners is not an activity that should have been prohibited, as a matter of freedom of speech.

 Regards,

 Melvin

 Melvin Hale, Ph.D.
Assistant Professor and Director of Archives Studies
Emporia State University
School of Library and Information Management
Campus Box 4025
1 Kellogg Circle
Emporia, KS 66801-5415

# EXHIBIT "Q"

79.  Vietti refused to remove Lauber from proceeding with the report, neither would Lauber recuse himself.

80.  At the end of August 2015, reports of the bias incident at ESU made the national news when the Associated Press (AP) carried a story entitled *Emporia State couple claims racial harassment at university*.  (Doc. 13, pg. 57)

81.  Dr. Hale and his wife merely demanded that the bias incident be properly investigated, and that ESU adhere to the tenets of the Clery Act.

82.  ESU and Defendants Vietti, Cordle, Alexander, and Anderson, Johnson, Lauber told the media and the campus on numerous occasions that ESU would make a fair, logical and thorough "investigation" of the bias incident allegations.  (Doc. 13, pg. 35)

83.  Beginning on September 9th, 2015, and on multiple occasions thereafter, Defendants Vietti, Cordle, Wyatt, Anderson, Johnson, and Lauber announced to the media, campus and public that as a result of a "fair, logical and thorough investigation" they concluded that no crime had occurred.  (Doc. 13, pg. 35)

#33

84.  Dr. Mirah Dow secretly offered a different opinion.  On August 17th, 2015 she stated to Dr. Hale that "When I heard Jackie [Vietti] say 'there are going to be recommendations,' I thought, I kind of viewed that optimistically.  Because, while she might not say 'there was a crime,' I wish she would."

#41

85.  Dr. Dow also stated to Dr. Hale that "You and Angelica both went about [reporting the bias incident] in a very prudent way.  It was responsible yet it wasn't flamboyant or unreasonable.  You know, you tried to solve it."

11

# EXHIBIT "R"

Starting at about 12 minutes into the recording of the KVOE broadcast, Johnson allows his imagination to run wild, describing Office 413 (Doc. 17-1, pgs. 21-22) and the chain of events as follows (every statement indicated in *italics* is false):

"I'll just use my hand on the table. You can translate that [into]whatever you translate it into. Everything was on I believe the *3rd floor of SLIM. The student's office was at one end of a hallway, I think there was a T-section, she was right near the T-Section, I believe.* Anyway, *it was a separate office that she was using but it wasn't dedicated to her use. It was storage.* And *at the time there was a lot of furniture and things being moved and stored, [and] people were in and out all the time.*

"*She found it on her notebook while she was in that office*, although she said it could have been written where she was, *where she might have been somewhere else.* So the assumption's been, "*I found it here, maybe it was written nearby persons* (inaudible).



*She wanted to report it to Dean Alexander, which would be the thing to do, so she goes out of her office, goes down the hall to the Dean's office and she's not there. She's out of the office for some reason. So she goes back to the hall,* so *her office is here, she comes to the hall a little bit down the hall a ways away from her office, is a separate office*, and *that's where Mrs. Hale's office was.* She was *the* assistant to the dean. So *the student, thought it would make sense if the dean's not here, I want to report it, I'll report it to the assistant to the dean*, which, *makes sense.*

"So she did. She showed it to Mrs. Hale, um and *said, words to the effect that "I was going to report this to the dean, but she's not here so I'm telling you about it so it could be passed on*" or *something of that nature*, I don't know the exact words. And *so Angelica said*

5

*"ok"* and *she took a picture of it*, *of the word on the page* with her camera, her phone, on her phone. *And so the student I think at that point went back to her office.* Um I don't know if she took her notebook at that point or not. But *then Mrs. Hale showed it to her husband who was in another office* and said *"this is what the student just showed me,"* and they were both offended because it's an offensive word.

*"And from there, it [was] just based on things that they have put out through open letters and other expressions, written expressions, a person could get the impression that the word was, it happened in Mrs. Hale's office, or it happened somewhere else*. But it happened in that student's office. And *she brought it*, if she hadn't, *if Dean Alexander had been there that day, there's a good chance that neither Mr. and Mrs. Hale would ever have seen it. So, ==it's kind of a fluke== that they saw it to begin with*."

#34

Question: So in that case?

Johnson: "For that reason *we don't have any*, *we can't reasonably conclude that it was written with the intent to offend them*."

The entire recording of the ESU press conference can be found on the KVOE website under the title *"ESU formally exonerates employee accused of racial slur*." It is currently available at the following URL: http://kvoe.com/newsedit/10322-esu-no-racial-discrimination-or-hate-crime-in-slim-department. The recording is at the bottom of the page. To fully appreciate the derision and contempt heaped upon the Hales, it is valuable to listen to the recording. The KVOE article is attached as **Exhibit A**, and incorporated by reference herein.

Vietti's opening remarks begin with "Angelica and Melvin Hale filed a complaint of an alleged hate crime with the Emporia State University police department. Our on-campus police

# EXHIBIT "S"

EMAIL MESSAGES IN MAY 2015 REGARDING EVALUATION

OF ANGELICA HALE'S GRADUATE ASSISTANT

**From:** Angelica Hale
**Sent:** Tuesday, May 05, 2015 6:22 PM
**To:** Gwen Alexander
**Subject:** RE: GA evaluations

Hi Gwen:

Andrew sent the form to me last week, so I filled it out and gave it to him at that time.

Angelica

**From:** Gwen Alexander
**Sent:** Tuesday, May 05, 2015 6:20 PM
**To:** Angelica Hale
**Subject:** FW: GA evaluations

Please fill this out for Brenda's work. Thanks.
Gwen

**From:** Andrew Smith
**Sent:** Friday, May 01, 2015 9:14 AM
**To:** Mirah Dow; Robin Kurz; Sarah Sutton; Kathie Buckman; Angelica Hale; Gwen Alexander
**Subject:** GA evaluations

Hi Folks:

Attached please find an evaluation form for evaluating your graduate assistant. I would greatly appreciate your assistance in completing this evaluation, as we are currently conducting interviews of both current and prospective graduate assistants as we look to staff our GA positions for next year.

Many thanks,

Andrew

Andrew J. M. Smith, Ph.D.
Associate Professor & Associate Dean
School of Library and Information Management
Emporia State University
Campus Box 4025
1 Kellogg Circle
Emporia, KS 66801-5415

# EXHIBIT "T"

153.  At the same time that ESU began to publicly promulgate the narrative that a hate crime did not occur, people rapidly began to withdraw their support from Dr. Hale.

#42

154.  On Information and belief, Defendant Brooks, the newly appointed Assistant Dean of Student Affairs for Diversity, Equity and Inclusion at ESU was promoted from his former role as Director of Diversity and Inclusion at ESU as an incentive to abandoning the Hales' cause.

155.  On information and belief, Interim President Vietti is one of Brooks' professors in his doctoral program at Baker University, placing Vietti in a position of undue influence.

156.  At the onset, the BSU was very involved in protesting racism.  Doc. 17-1, pg. 5)

157.  Deidra Elijah sent an email to Dr. Vietti in which she stated: "I think it is truly sad that the University continues to sweep racial issues under the rug."  (Doc. 17-1, pg. 15)

158.  A supportive message to the Hales posted on Deidra Elijah's Facebook said: "As the Black Student Union Vice President, we will do any and everything in our power to support!!!"  (Doc. 17-1, pg. 17)

159.  Shortly after Dr. Vietti conducted her series of meetings with faculty, staff and students of color from organizations like the BSU, and students like Deidra Elijah, Emmanuel Cockrell, Ceanna Trice, Kayla Gilmore, Tyia Everidge, Derek Wilson, student advisor Javier Gonzalez, Froilan Huachaca, Katelyn Ferrari, and most ESU students previously involved with the protest marches, abruptly stopped communicating with the Hales.  The second march was lightly attended. (Doc. 17-1, pg. 13)

# EXHIBIT "U"

From:  Shelly Rowley <******@gmail.com>       09/21/15 at 7:56 PM

To:       Melvin Hale <******@yahoo.com>

Thank you for all of this. Derek is upset because he was trying to show support by providing the link to the Facebook page.  What he didn't know was that Deb Rittgers had been named on the page. This caused him to almost lose his Presidency of the Honors College Student Organization and possibly be removed from the honors college because Deb's daughter is an honors college student. As a result of his sharing the link and subsequent viewing by all honors college students of her mom's name as a suspect, many students began harassing the daughter calling the daughter a racist and asking why her mom is a racist. This, as you can imagine, created an issue and Derek was brought in to explain why he sent the link at that time. Was he trying to hurt the daughter on purpose?  He had to withdraw his support at that time because the posting of that information and his support almost cost him greatly. He still believes something happened that was very wrong, but he can't support vilifying a specific person who is innocent until proven guilty. All his words. He's my teaching assistant so he and I discussed it in depth. He really wishes there was a handwriting sample to test and doesn't understand why the paper wasn't saved. I will provide him with this information though.

# EXHIBIT "V"

experiences working on Security at ESU indicates that Vietti and Johnson lied about the circumstances surrounding Office 413, thus any pronouncements they made about a hate crime happening or not happening were flawed.

**Deidra Elijah** (A.K.A. Deidre Elijah)

Elijah is an influential student leader who assumed a leadership role in assisting the first March On Emporia that took place on September 15th, 2015. She has received multiple scholarships from ESU in 2014 and 2015. In December, 2015, the university announced in the media that Elijah received a new privately funded scholarship for the school year for education majors. The specter of losing her new education scholarship for providing any further support to the Hales could have been enough alone to persuade Elijah to make an unprincipled decision, but that is the type of price people pay every day to maintain their integrity. Besides that, Elijah professes that she aspires to be a leader, not a follower. She is President of the Zeta Phi Beta Sorority at ESU. A true and correct of a Zeta website page, and a Facebook page depicting Elijah are attached as **Exhibit Q**, and are incorporated by reference herein. She is wearing a March On Emporia t-shirt and a Love not Hate t-shirt in a Facebook post while selling March On Emporia t-shirts and soliciting petitions for the march while at a booth in the Memorial Union with two other BSU members, Ceanna Trice and Miquie Bowe; a true and correct copy of which is attached as **Exhibit R**, and is incorporated by reference herein.

In a Facebook post dated September 15th, 2015, Elijah states in response to a comment by Angelica Hale on Facebook that "It's been such an honor working with you all! Please let us know if you need anything!" Less than two weeks later Elijah disappeared from the face of the earth as far as the Hales were concerned. The issue is not *that* she quit communicating; it is *why*

# EXHIBIT "W"

#45

153.  At the same time that ESU began to publicly promulgate the narrative that a hate crime did not occur, people rapidly began to withdraw their support from Dr. Hale.

154.  On Information and belief, Defendant Brooks, the newly appointed Assistant Dean of Student Affairs for Diversity, Equity and Inclusion at ESU was promoted from his former role as Director of Diversity and Inclusion at ESU as an incentive to abandoning the Hales' cause.

155.  On information and belief, Interim President Vietti is one of Brooks' professors in his doctoral program at Baker University, placing Vietti in a position of undue influence.

156.  At the onset, the BSU was very involved in protesting racism.  Doc. 17-1, pg. 5)

157.  Deidra Elijah sent an email to Dr. Vietti in which she stated: "I think it is truly sad that the University continues to sweep racial issues under the rug."  (Doc. 17-1, pg. 15)

158.  A supportive message to the Hales posted on Deidra Elijah's Facebook said: "As the Black Student Union Vice President, we will do any and everything in our power to support!!!"  (Doc. 17-1, pg. 17)

159.  Shortly after Dr. Vietti conducted her series of meetings with faculty, staff and students of color from organizations like the BSU, and students like Deidra Elijah, Emmanuel Cockrell, Ceanna Trice, Kayla Gilmore, Tyia Everidge, Derek Wilson, student advisor Javier Gonzalez, Froilan Huachaca, Katelyn Ferrari, and most ESU students previously involved with the protest marches, abruptly stopped communicating with the Hales.  The second march was lightly attended. (Doc. 17-1, pg. 13)

# EXHIBIT "X"

# EMPORIA STATE
# UNIVERSITY

■ *Office of* THE PROVOST

Campus Box 4045
1 Kellogg Circle
Emporia, Kansas 66801-5415
620-341-5171
www.emporia.edu

December 14, 2015

Melvin Hale, Ph.D.
615 West 15th Avenue
Emporia, KS 66801

Dear Dr. Hale,

I regret to inform you of my decision not to renew your probationary faculty appointment at
Emporia State University for a third year. This decision is consistent with the recommendation
of SLIM Interim Dean Mirah Dow. Please be advised, therefore, that your employment with the
university will expire with the close of the 2015-16 academic year. `#47`

A steady stream of student complaints starting in Summer Term 2015 and continuing through
Fall Semester 2015 indicates that you have neglected your teaching responsibilities and failed to
engage with students in your assigned courses. In addition, since you did not submit a portfolio
for your second-year review as required by policy, the SLIM Faculty Promotion Committee had
no evidence of, and could not assess, your research and service contributions. My conclusion is
that you have failed to meet expectations in your work as a faculty member. `#46`

Emporia State University will continue to pay your salary and benefits through the end of your
2015-16 academic year appointment, but will assign you no instruction or other work obligations
during Spring Semester 2016.

The current prohibition on your being present in any SLIM office or area will remain in effect
through the end of your 2015-16 academic year appointment. The current prohibition on
communication between you and anyone at SLIM beyond what is necessary for the instruction of
your assigned courses will remain in effect through the end of your 2015-16 academic year
appointment; since no instruction will be assigned for Spring Semester 2016, you are therefore
prohibited from contacting any SLIM faculty member, staff member, administrator, or student
for any reason after December 15, 2015.

You will need to return your ESU-issued keys, Dell Latitude laptop, and iPad3 tablet to my
office no later than Tuesday, December 15, 2015.



I'M A HORNET.

1

An Equal Opportunity Employer

I wish you success as you pursue other opportunities in the future.

Sincerely,

David P. Cordle
Provost and Vice President for Academic Affairs


C:      Jackie Vietti, Interim President
        Mirah Dow, Interim Dean, School of Library and Information Management
        Judy Anderson, Executive Director of Human Resources
        Kevin Johnson, General Counsel

# EXHIBIT "Y"

**American University Washington College of Law**

# Digital Commons @ American University Washington College of Law

Faculty Collected Scholarship and Works

2016

# Angry Employees: Revisiting Insubordination in Title VII Cases

Susan Carle
*American University Washington College of Law*, scarle@wcl.american.edu

Susan D. Carle
*American University Washington College of Law*, scarle@wcl.american.edu

Follow this and additional works at: http://digitalcommons.wcl.american.edu/fac_collection

Part of the Labor and Employment Law Commons, Law and Gender Commons, Law and Race Commons, and the Law and Society Commons

### Recommended Citation

Susan D. Carle, Angry Employees: Revisiting Insubordination in Title VII Cases, forthcoming 10 Harvard L. & Pol. Rev. (2016).

This Article is brought to you for free and open access by Digital Commons @ American University Washington College of Law. It has been accepted for inclusion in Faculty Collected Scholarship and Works by an authorized administrator of Digital Commons @ American University Washington College of Law. For more information, please contact fbrown@wcl.american.edu.

# Angry Employees:  Revisiting Insubordination in Title VII Cases

*Susan D. Carle* [*]

ABSTRACT ................................................................................................2

INTRODUCTION .......................................................................................3

I.   THE SETTING FOR TITLE VII REFORM .............................................9
     A.   Title VII's Enforcement Scheme ........................................................9
     B.   Low Win Rates for Title VII Plaintiffs ............................................11
     C.   Finding Paths to Address Second Generation Discrimination ............14

II.  HOW TITLE VII COURTS GET INSUBORDINATION CASES WRONG............18
     A.   Insubordination as the Legitimate Nondiscriminatory Reason for an Adverse Employment Action......................................................................22
     B.   Mixed Motive Analysis ...................................................................29
     C.   Retaliation Cases: The Unduly Narrow Confines of "Reasonable" Opposition Conduct .............................................................................34

III. CONTRASTING THE NLRB'S APPROACH IN INSUBORDINATION CASES..37
     A.   The NLRB's *Atlantic Steel* Doctrine ...............................................38
     B.   The NLRB's Provoked Insubordination Doctrine ..............................43
     C.   The NLRB's General Approach to the Appropriateness of Employee Conduct .45

IV.  REVISING TITLE VII INSUBORDINATION DOCTRINE ...................47
     A.   Reforming Title VII Insubordination Doctrine from Within ..............49
          1.   *Probing Insubordination Cases where the Record Contains Evidence of Discrimination* .........................................................................50
          2.   *Rejecting Mixed Motive Defenses when Discrimination and Insubordination Interrelate*.....................................................................53
          3.   *Expanding Opposition Conduct Protection*...................................53
     B.   Borrowing from the NLRB....................................................................56
          1.   *Borrowing from the NLRB's Provoked Insubordination Doctrine*................59
          2.   *Applying the* Atlantic Steel *Factors in Title VII Discrimination Cases* .........63

---

[*]     Professor of Law, American University Washington College of Law; J.D. Yale Law School, 1988.  I would like to thank Binny Miller, Michael Selmi, Charles A. Sullivan and the participants in the 2013 Colloquium on Scholarship in Employment and Labor Law for very helpful comments on an earlier draft, and Daniel B. Amodeo, Walakewon Blegay, Sara Falk, David Kutch, and Erin Zacuto for excellent research assistance.

2                        *Angry Employees*                    [16-Sep-15

V.   CONCLUSION ..........................................................................................64

## ABSTRACT

    *In too many Title VII cases, employees find themselves thrown out of court because they reacted angrily to reasonable perceptions of employer discrimination.  In the race context, supervisors repeatedly call employees the n-word and use other racial epithets, order African American employees to perform work others in the same job classification do not have to do, and impose discipline white employees do not face for the comparable conduct.  In the gender context, courts throw out plaintiffs' cases even where supervisors engage in egregious sexual harassment.  Employees who react angrily to such demeaning treatment—by cursing, shouting, refusing an order or leaving the workplace—find themselves fired for "insubordination."  Their acts fall short of threats of violence and are brief in duration, but courts nonetheless uphold employers' invocation of "insubordination" as a "legitimate, nondiscriminatory reason" for plaintiffs' discharge.  The article argues that courts should more carefully scrutinize the relationship between discrimination-tinged work environments and employees' angry reactions.*

    *This article makes specific proposals about how Title VII courts should handle insubordination cases that raise discrimination concerns.  To gain ideas for this purpose it looks both to Title VII precedent and doctrines the National Labor Relations Board has developed in the exercise of its special expertise in regulating workplace relations.  Unlike many Title VII courts, the NLRB and courts reviewing its decisions often grant some leeway to "angry employees"—i.e., employees who have gone some distance past the line of proper decorum (but not too far) in expressing indignation at what they reasonably perceive as violations of their statutorily protected rights.  Instead of routinely accepting insubordination as legitimate grounds for an adverse employment action, as Title VII courts often do, the NLRB more carefully scrutinizes the context giving rise to "angry employees."*

    *This article argues that Title VII courts should do more of that scrutiny too.  It proposes doctrinal modifications Title VII courts could implement in the exercise of their interstitial statutory interpretative powers to better serve Title VII's dual purposes of (1) better enforcing the workplace antidiscrimination mandate and (2) encouraging employers and employees to resolve discrimination disputes in real time in workplaces rather rendering employees so docile that that they must "make a federal case" out of all discrimination disputes.*

INTRODUCTION

To read federal case law decided under Title VII of the Civil Rights Act of 1964[1]—the provision that prohibits employment discrimination on the basis of race, sex and other characteristics—is to be struck by the continuing racial and sexual hostility in U.S workplaces today, and also at courts' too frequent unwillingness to address it. Courts throw out plaintiffs' cases even where the facts involve such egregious employer behavior as, in the race context, supervisors repeatedly calling employees the n-word and using other racial epithets, ordering African American employees to perform work others in the same job classification do not have to do, and imposing discipline white employees do not face for the comparable conduct.[2] In the gender context, courts throw out plaintiffs' cases even where supervisors have engaged in egregious sexual harassment.[3] Why such results? In all the cases just described, employees reacted angrily to employers' demeaning treatment, and then found themselves fired for "insubordination." In other words, employees cursed, shouted, refused an order, or left the workplace in response to what they reasonably regarded as humiliating discriminatory treatment. (The article will refer to such acts, which fall short of threats of violence and are brief in duration, as "mild to moderate" insubordination). When these plaintiffs filed cases to challenge their terminations, courts upheld their employers' invocation of "insubordination" as the legitimate, nondiscriminatory reason for the plaintiffs' discharge.

To be sure, employers are entitled to enforce legitimate workplace rules prohibiting employee insubordination. But in the cases just described, the scenarios were more complex than courts were willing to recognize. Employee insubordination occurred in reaction to troubling evidence of employer discrimination—even though the evidence did not suffice to establish a Title VII violation under the high burdens of proof plaintiffs bear in proving an actionable claim.[4] The case law reveals troubling cases of employers whose agents engaged in conduct rife with blatant and provocative race and/or sex animus, yet received no censure for terminating employees on insubordination grounds because the employees reacted, understandably enough, with anger at the treatment they endured. This article will argue that,

---

[1] Civil Rights Act of 1964, Pub. L. 88-352, 86 Stat. 109 (1964).

[2] See cases discussed in Section II-A *infra*.

[3] *See* text accompanying nns. 91-95 *infra*.

[4] In many of these cases, the plaintiff cannot prove an underlying discrimination claim because the acts do not rise to the "severe and pervasive" level necessary to prove a hostile environment harassment claim and/or lead to an adverse employment action only after the plaintiff has been insubordinate. For further discussion of the high burden of proof Title VII plaintiffs bear, see *infra* nns. 62 & 230.

in such cases involving evidence of provocative discriminatory acts, courts should examine with special care an employer's reliance on insubordination as the legitimate, nondiscriminatory reason for an adverse employment action.

The scenarios just described have thus far received too little attention from Title VII courts, scholars and policy makers. As this article will show, some courts' reasoning in Title VII insubordination cases is not only logically untenable but also undermines the objectives of Title VII. Mishandling insubordination leads to premature dismissal of lawsuits despite strong evidence of discrimination-tinged work environments. Indeed, mishandling insubordination cases creates perverse incentives, resulting in employers having higher chances of prevailing in discrimination suits when their conduct is so infuriating that it causes employees to lose their temper. Moreover, Title VII courts' failure to deal thoughtfully with insubordination cases contravenes the statute's objective of encouraging employees and employers to resolve antidiscrimination disputes in the nation's workplaces, *before* cases end up in court.

This article will propose a number of ways that Title VII courts could improve their jurisprudence in the insubordination situation. To gain ideas for this purpose it looks both to Title VII precedent and to the doctrines the National Labor Relations Board") (NLRB or "the Board") has developed in insubordination cases. Unlike many Title VII courts, the NLRB and courts reviewing its decisions often grant some leeway to what this article will refer to as "angry employees"—*i.e.*, employees who have gone some distance past the line of proper decorum (but not too far) in expressing their indignation at what they perceive to be illegal treatment. Instead of routinely accepting insubordination as legitimate grounds for an adverse employment action as Title VII courts often do, the NLRB scrutinizes the relationship between insubordination and an employee's exercise of statutorily protected rights. This article will argue that Title VII courts should do more of that scrutiny too.

The NLRB's institutional capacity and historical experience shape its perspective on the acceptable dynamics of workplace relations between employers and employees. Contrasting images of acceptable employee conduct emerge as a result. Whereas Title VII courts protect employees only if they are docile and impeccably behaved, the NRLB is more likely to protect employees even when their conduct is less than perfect, as discussed further in Section III *infra*. Employees in NLRB cases sometimes argue with supervisors, raise their voices, curse, and refuse an order—all without losing their statutory protections.[5] To be sure, the Board draws lines as to when

---

[5] *See, e.g.,* NLRB v. Steinerfilm, Inc., 669 F.23d 845, 851-52 (1st Cir. 1982); Opelika Welding, 305 NLRB 561, 568 (1991); Atlantic Steel, 245 NLRB 814, 816 (1979).

insubordinate conduct goes too far and becomes the legitimate basis for discipline. The conduct may not involve violence or actual threats of violence; it may not substantially interfere with workplace productivity; and it may not continue over a sustained period rather than being a short, spontaneous outburst by an employee who generally exhibits acceptable workplace conduct but has been angered by a supervisor's problematic act.[6]

In other words, both Title VII courts and the NLRB draw lines as to acceptable employee conduct, but they draw those lines in different places. Under NLRB precedent employees may stick up for themselves more vigorously at the moment of offense. Even if employees go a bit over the line in their efforts at self-advocacy, the NLRB reasons that it is better to err in the direction of protecting self-advocacy because doing so ensures more secure protection of employees' exercise of statutorily protected rights.[7] Under Title VII courts' very different way of looking at matters of employee conduct, on the other hand, employees engage in self-expression at the moment of a dispute only at serious risk of termination without later legal protection. The current Title VII regime insists on a kind of "sanitized workplace"[8] where employees must behave with decorum, remaining docile to the point of virtual passivity, or risk termination. To energetically express outrage at discrimination in real time at the workplace is to risk creating a fact scenario that will prevent later prevailing in court.

In other areas of Title VII doctrine, however, the U.S. Supreme Court has crafted federal common law doctrines to create incentives for parties to resolve discrimination allegations in workplaces rather than courts. The vicarious liability affirmative defense to supervisor sexual harassment, which calls on employers to set up internal complaint and investigation procedures,

---

[6] *See infra* Part III.

[7] To reiterate, this argument is *not* that "anything goes"; angry behavior can obviously go far over the line of what can be tolerated in a work environment. *See*, *e.g.*, Smith v. Bennett, 50 FEP Cases 1762 (D.D.C. 1989) (employee allegedly repeatedly phoned her supervisor and swore at him while he was in meetings; banged on his door until led away, requiring three employees to spend the afternoon calming her; and confronted the supervisor by the elevator and screamed threats using swear words). Likewise, some conduct by employees in special positions of trust cannot be tolerated even if it might be protected in other contexts. *See, e.g.,* Laughlin v. Metropolitan Washington Airports Authority, 149 F.3d 253, 260 (4th Cir. 1998) (confidential employee who stole company documents lost opposition clause protection). This article's point is simply that courts applying antidiscrimination law too often err in the opposite direction, by holding that *no* emotional outburst or expression of anger is tolerable in the workplace regardless of the circumstances leading to such acts.

[8] *Cf.* Vicki Schultz, *The Sanitized Workplace*, 112 Yale L.J. 2061 (2003). Schultz's classic article focused on employers stripping romance and sex out of the workplace but many of her insights apply to the sanitization of workplaces of other emotions as well.

is a prime example of the Court's initiative in this regard.[9]  Title VII courts could similarly fashion doctrines to encourage employers to rectify the kinds of offensively discriminatory workplace environments and supervisor actions that provoke insubordination in reaction to reasonably perceived humiliating treatment.

It is no wonder that courts become the primary adjudicators of Title VII discrimination disputes:  Employees in Title VII cases end up "making a federal case" out of matters that could be better resolved in real time between the parties, precisely because Title VII courts lack sufficiently robust employee self-help doctrines. Just as the NLRB has done, Title VII courts could develop doctrines that better protect employees who have been provoked into conduct that somewhat exceeds the bounds of polite workplace behavior. This suggestion helps not only employees but also courts and even employers in the long run. Angry employees apprise employers of festering discriminatory situations; a bit of low-level workplace friction is better than later litigation.  This Article's proposed doctrinal reforms aim to create incentives for employers to rectify race- and sex-based friction *before* it blows up into a federal lawsuit.

A hypothetical illustrates the point of this Article's proposals more concretely.  Consider the following scenario, created out of an amalgam of cases discussed in Section II below:  Rosa Morales, a Latina assembly line worker, is subjected to constant racial and sexual slurs from her white male supervisor.  He also orders her to clean bathrooms, a job duty neither men of any race nor white women in her job category have to do.  One day her supervisor orders her clean bathrooms during her lunch break and she refuses. Her supervisor orders her into his office, but instead of complying with this order she angrily clocks out and leaves the workplace.  Her supervisor shouts to her as she leaves, "if you walk out of here now, you lazy Latina, don't expect to have a job tomorrow." The next day when Morales arrives for her work, her supervisor tells her that he has terminated her for insubordination.

Morales files a Title VII lawsuit alleging sex and race discrimination and harassment, and her employer moves for summary judgment. Under the doctrine too many courts apply today, Morales loses.  She did in fact commit insubordination under the definition contained in the company's policy manual, because she twice disobeyed her supervisor's direct orders—*i.e.*, to

---

[9] *See* Burlington Indus. v. Ellerth, 524 U.S. 742 (U.S. 1998); Faragher v. City of Boca Raton, 524 U.S. 775 (1998).  These two cases announced a new affirmative defense that the Court crafted in the exercise of its interstitial common law powers. Under it an employer is not held vicariously liable for supervisor sexual harassment provided the employer shows that it "exercised reasonable care to prevent and correct promptly any sexually  harassing behavior" and "the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer."  *Ellerth*, 524 U.S. at 765.

enter his office and to remain at work through the end of her shift—and that insubordination constituted a "legitimate, nondiscriminatory reason" for her termination regardless of what happened before.[10]

But what if the court had investigated the connection between Morales's "insubordinate" act of violating her supervisor's orders and his prior provocatively discriminatory conduct? Her supervisor's statements calling her a "lazy Latina "and other derogatory names might not be sufficient to establish hostile environment discrimination and did not involve an adverse employment action, but they do cast light on the underlying realities in this case. After investigating this connection, the court could conclude that Morales's evidence would allow a rational trier of fact to find that race- and sex-based acts provoked her insubordination. Morales would go on to get her day in court, and, if able to persuade the factfinder that race and sex-based provocation, based on reasonable perceptions of discrimination, caused her insubordination, could win reinstatement and other appropriate Title VII relief. In turn, her employer would learn that prohibiting supervisors from engaging in provocative, discrimination-tinged conduct would not only lower its potential costs for defending Title VII claims, possibly losing them, and/or having to defend them beyond the summary judgment stage, but also, best of all, would avoid unnecessary employee terminations in the first place.

To develop the arguments underlying this article's doctrinal reform proposals, I proceed as follows: Section I situates this article in the important recent literature examining Title VII's failures on a variety of fronts, because any proposal for reform must take into account these critiques. Section II documents examples of Title VII courts' approaches to assessing discrimination-related insubordination cases, some erroneous and some handled properly.[11] More specifically, Section II identifies three categories of cases: (A) those in which courts regard employee verbal outbursts or similar acts of mild or moderate insubordination as the "legitimate nondiscriminatory reason" for an adverse employment action; (B) those in which courts use mixed motive analysis, sometimes correctly and sometimes not; and (C) those in which courts analyze facts under the "opposition conduct" clause of the Title VII anti-retaliation provision, intended to protect

---

[10] The court also does not sustain Morales' sex and race harassment claims because she did not complain about this through company channels, and because the courts find that the harassment was not sufficiently severe and pervasive to amount to hostile environment discrimination in any event, and no tangible employment action occurred before she was terminated for insubordination. *See generally supra* n. 9 (discussing legal standards for hostile environment discrimination).

[11] In the interests of manageability, this article confines its discussion to Title VII federal court of appeal cases, but its analysis can be easily extended to other antidiscrimination statutes, such as the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*, and Title I of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*

employees against retaliation for exercising rights to complain about conduct unlawful under the Act.[12]

Section III compares this body of Title VII case law to NLRB doctrine, discussing: (A) the NLRB's *Atlantic Steel* doctrine, used to evaluate whether an employer should have tolerated an employee's brief angry outburst or other form of insubordination (such as disobeying an order) when the employee was pursuing statutorily protected rights; (B) its "provoked insubordination" doctrine, which holds that in certain circumstances an employer may not discipline an employee for insubordination when it was provoked by the employer's conduct regardless of whether statutory rights are involved; and (C) the Board's general principle of granting employees the benefit of a doubt when behavior is mildly insubordinate but understandable in overall context.

Section IV suggests a series of tweaks to Title VII jurisprudence, all easily accomplished through the courts' exercise of their interstitial common law authority in areas of federal statutory interpretation that could serve to better protect "angry employees." More specifically, Sections IV-A-1 & 2 propose that courts more carefully examine employer assertions of insubordination as the "legitimate, nondiscriminatory reason" for taking an adverse employment action against an employee by (A) looking for evidence of either discriminatory animus, a discrimination-charged work environment, and/or hostile acts towards the plaintiff that a reasonable person in the plaintiff's position would perceive as evidence of discriminatory treatment, even if this evidence is insufficient to satisfy the high standards for proving underlying discrimination claims. Where such evidence is present, courts should (B) examine whether the plaintiff's insubordination was related to these conditions. Where the answers to questions (A) and (B) are affirmative, courts should (C) decline to accept on face value the employer's proffered reason of insubordination as a legitimate, nondiscriminatory reason for an adverse employment action. Instead, court should (D) engage in searching scrutiny of the facts, as indeed, some Title VII judges have already called for in insubordination cases. Even better, in the presence of evidence raising discrimination concerns, courts could even ( E) switch the burden of *disproving* pretext to employers when an employee has allegedly been terminated for insubordination. Courts should also (F) expand the scope of the *manner* of conduct protected under the opposition clause of Title VII's

---

[12] See 42 U.S.C. § 2000e-3(a). This provision states, in relevant part: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has *opposed* any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or *participated* in any manner in an investigation, proceeding, or hearing under this subchapter." (emphasis supplied).

anti-retaliation provision in order to protect mild to moderate insubordination that is proportionate in relation to the egregiousness of the employer conduct the plaintiff sought to oppose (Section IV-A-3).

Finally but no less importantly, courts could (G) adapt the NLRB's provoked insubordination and *Atlantic Steel* doctrines to more finely calibrate the balance between plaintiffs' conduct in insubordination cases raising discrimination concerns and the egregiousness of employer agents' misconduct, as further discussed in Section IV-B below. Taken together, these doctrinal reforms would better advance Title VII's important dual objectives of eliminating problematic discrimination in the nation's workplaces while also encouraging employers and employees to work out discrimination-related disputes in real time in workplaces rather than later in courts.

I.     THE SETTING FOR TITLE VII REFORM

Proposals for reform of Title VII must take account of the statute's background and the current state of Title VII law. Reform proposals should be in the realm of the possible, and should also address scholars' assessments of the flaws and limits of Title VII's functioning in today's political and judicial climate. As this Section will argue, in today's "second generation" stage of developing employment antidiscrimination law, doctrine should seek to shape employers' incentives to deal with discrimination problems *before* they become federal court cases. This Section briefly sketches the state of Title VII enforcement and lays the background against which this Article's reform proposals will be made.

A.   *Title VII's Enforcement Scheme*

Today's Title VII jurisprudence arises from peculiarities of Title VII's legislative history. This history caused courts to become the primary adjudicators of Title VII claims. Courts are inundated with Title VII cases and eager to dismiss them at the earliest stage of litigation possible. They have developed doctrinal "short cuts" to accomplish this, with results many employment discrimination scholars find unfairly stacked against plaintiffs.

It is no wonder this has occurred. When Congress first proposed Title VII, its drafters envisioned a regime in which complaints of discrimination would be resolved by an adjudicatory agency much like the NLRB— where complainants have a limited right to federal court review.[13] In an attempt to "defang" this newly proposed federal administrative agency, however,

---

[13] *See* H.R. REP No. 88-914, *reprinted in* LEGISLATIVE HISTORY OF TITLES VII AND XI OF THE CIVIL RIGHTS ACT OF 1964, at 2001, 2057 (1964) (reflecting Congress's intent to create an enforcement regime for Title VII similar to the enforcement powers set forth for the NLRB under the NLRA).

congressional Republicans altered this proposal to require plaintiffs to maintain lawsuits in court.[14] At the time Republicans apparently believed that this statutory scheme would be less onerous on employers, both because of the short timelines involved and because they hoped that conciliation would often resolve disputes.[15]   What resulted instead, however, was enormous pressure from privately filed Title VII federal court cases, especially because the EEOC's conciliation process rarely results in settlement.[16]

Today some courts and policymakers rue Title VII's statutory design.[17]   Civil rights advocates, however, often see the private federal right of de novo action as a great benefit to plaintiffs—which it might be if Title VII jurisprudence had developed to grant plaintiffs' strong enforcement rights.[18]   The real fact is that, in a host of ways, courts engage in improper or illogical reasoning to rid their dockets of Title VII cases.   Many of these trends have been well documented, as the section below will summarize briefly.

---

[14] 42 U.S.C. § 2000e-5(f) (1).  As finally enacted in 1964, Title VII gave the EEOC no litigation authority but only powers to investigate and attempt to "conciliate" employment discrimination claims. See H.R. REP NO. 87-1370 reprinted in LEGISLATIVE HISTORY OF TITLES VII AND XI OF THE CIVIL RIGHTS ACT OF 1964, at 2155, 2057 (1964) (promoting conciliation under Title VII, and noting that the EEOC will have less enforcement power than the NLRB).  For a comprehensive historical analysis of the EEOC's use of informal procedures to resolve discrimination complaints, see generally Marjorie A. Silver, *The Uses and Abuses of Informal Procedures in Federal Civil Rights Enforcement*, 55 GEO. WASH. L. REV. 482 (1987).

Amendments in 1972 granted the EEOC more enforcement powers. *See* 42 U.S.C. §2000e-5. To this day, however, the EEOC litigates only a minuscule number of all cases filed under the several statutes it is charged with enforcing. See CHARGE STATISTICS FY 1997 THROUGH FY 2013, EEOC, http://www.eeoc.gov/eeoc/statistics/enforcement/charges.cfm (last visited May 28, 2014) (reporting a total of 93,727 charges filed with the Commission in 2013); see also EEOC LITIGATION STATISTICS, FY 1997 THROUGH 2013, EEOC, http://www.eeoc.gov/eeoc/statistics/enforcement/litigation.cfm (last visited May 28, 2014) (noting that the EEOC sponsored a total of 148 suits in 2013, which was less than 1% of all cases filed with the Commission).

[15]   1 STATUTORY HISTORY OF THE UNITED STATES CIVIL RIGHTS 090-91(Bernard Schwartz ed.) (detailing the importance of the congressional compromise that emphasized private initiative in enforcement).

[16] Indeed the agency has come under fire for a lack of meaningful conciliation attempts. S*ee Mach. Mining v. EEOC*, --S.Ct. -- Case No. 13-1019 (2015) (holding that EEOC conciliation efforts are subject to limited judicial review).

[17] *See, e.g.*, Stanley Sporkin, *Reforming the Federal Judiciary*, 46 SMU L. REV. 751, 157 (1992) (arguing that Title VII cases contribute to an overload of the judicial system and that specialized courts should be established to address this overflow issue).

[18] *See, e.g.*, Richard D. Kahlenberg & Mosha Marvit, WHY LABOR ORGANIZING SHOULD BE A CIVIL RIGHT (2012) (arguing that labor rights should be re-codified in the U.S. statutory code under Title VII because its de novo right to federal court is better than the NLRB's administrative adjudication scheme).

B.  *Low Win Rates for Title VII Plaintiffs*

In the first decade and a half after Congress passed Title VII of the Civil Rights Act of 1964, committing the country to a new era of nondiscrimination in employment,[19] many federal courts battled entrenched traditions to demand that employers eliminate discriminatory employment practices.[20]  But after that early heady period, federal courts, and especially the U.S. Supreme Court—turned conservative by the early 1980s—began a period of retrenchment on employment anti-discrimination doctrine.[21]  In the 1980s and 1990s, the Court issued many pro-defendant opinions that heightened the standards for proving employment anti-discrimination claims.[22]  Plaintiffs found it increasingly difficult to prevail, law firms that specialized in bringing plaintiffs-side employment antidiscrimination cases found it increasingly difficult to stay afloat, and juries and public opinion generally took a turn against employment discrimination plaintiffs.[23]

---

[19] *See* 9 LEGISLATIVE HISTORY OF THE CIVIL RIGHTS ACT OF 1964 PUBLIC LAW 88-352 14135 (1964) (statement of Congressman Abernathy)  ("Just as with the Declaration of Independence and the Constitution, enactment of the civil rights bill marks the beginning of a new era in our life as a free people . . .").

[20] Key U.S. Supreme Court cases from this era include McDonnell Douglas v. Green, 411 U.S. 792 (1973) (discussed *infra* in text accompanying nns. 195-200); Griggs v. Duke Power Co, 401 U.S. 424 (1971) (approving the disparate impact theory of discrimination); and Teamsters v. U.S., 431 U.S. 324 (1977) (approving a large "pattern or practice" employment discrimination case).

[21] *See* William A. Wines, *Title VII Interpretation and Enforcement in the Reagan Years (1980 - 89): The Winding Road to the Civil Rights Act of 1991*, 77 MARQ. L. REV. 645, 659–89 (1994) (conducting a statistical analysis of Title VII opinions throughout the 1980s to show the trend towards restricting Title VII's provisions).

[22] *Id.*

[23] A large literature has studied this trend among the public, the media, and judicial decision-makers.  *See*, *e.g.*, Katie R. Eyer, *That's Not Discrimination: American Beliefs and the Limits of Anti-Discrimination Law*, 96 MINN. L. REV. 1275 (2012) (surveying the social psychology literature documenting fact-finders' tendency to discount evidence of discrimination); Laura Beth Nielsen & Aaron Beim, *Media Misrepresentation:  Title VII, Print Media, and Public Perceptions of Discrimination Litigation*, 15 STAN. L. & POL'Y REV. 237, 238 (2004) (analyzing media reporting and negative public perception of Title VII cases, such as a case in which the media portrayed a plaintiff as "not strong-willed enough to withstand teasing"); Elizabeth Schneider, *The Changing Shape of Federal Civil Pretrial Practice:  The Disparate Impact on Civil Rights and Employment Discrimination Cases*, 158 U. PA. L. REV. 517 (2010) (discussing the trend by federal courts to prematurely dismiss employment discrimination and other civil rights cases); Michael J. Zimmer, *Systemic Empathy*, 34 COLUM. HUM. RTS. L. REV. 576 (2002-03 (analyzing causes of legal system's lack of empathy for employment discrimination plaintiffs); Michael Selmi, *Why Are Employment Discrimination Cases So Hard To Win?*, 61 LA. L. REV. 555 (2001) (arguing that various kinds of bias account for inordinately low win rates for plaintiffs and ruling out other explanations).

Although evidence points to continuing discrimination in employment,[24] courts often fail to penalize employers for conduct that is troubling in relation to Title VII's anti-discrimination goals.  A number of studies expose these statistics:  even though workplace discrimination remains a serious national problem, Title VII plaintiffs rarely win their cases.[25]

Scholars have generated a large literature examining the factors that account for this state of affairs.[26]  These factors include cognitive biases that lead courts and juries to favor employers' explanations.[27]  In addition, courts have turned many issues that might be viewed as questions of fact into questions of law, resulting in early dismissal of cases even when underlying

---

[24] *See*, *e.g.*, Marc Bendick Jr. & Ana P. Nunes, *Developing the Research Basis for Controlling Bias in Hiring*, 68 J. Soc. Iss. 238, 243–249 (2012) (noting net rates of 20–40% discrimination in employment tester studies); *see also* Jerry Kang et al., *Implicit Bias in the Courtroom*, 59 UCLA L. Rev. 1124, 1154–55 (2012) (providing examples of implicit bias leading to discrimination as identified in various tester studies).

[25] One such study comes from the Federal Judicial Center.  *See* Joe Cecil & George Cort, "Report on Summary Judgment Practice across Districts with Variations in Local Rules (Aug. 13, 2008), available at http://www.uscourts.gov/uscourts/RulesAndPolicies/rules/sujulrs2.pdf. Plaintiffs in Title VII cases fare less well in federal court than do plaintiffs in any other kind of case, including torts and contracts.  *Id*. at 9, 16, 17 and accompanying tables.  According to this study, plaintiffs in employment discrimination cases during the period between 1970 and 2006 won 3.59 percent of pretrial adjudications, whereas plaintiffs in non-employment cases won 21 percent of their pretrial adjudications.  For the small group of employment discrimination cases that did make it to trial, the win rate for plaintiffs in federal district court was fifteen percent, much lower than the fifty-one percent win rate for non-employment cases.  Kevin M. Clermont & Stewart J. Schwab, Employment Discrimination Plaintiffs in Federal Court: From Bad to Worse?, 3 Harv. L. & Pol'y Rev. 103, 128-29 (2009); see also Kevin M. Clermont and Stewart J. Schwab, How Employment Discrimination Plaintiffs Fare in Federal Court, 1 CORNELL LAW FACULTY PUBLICATIONS 429, 444 (2004); Wendy Parker, Lessons in Losing:  Race Discrimination in Employment, 81 NOTRE DAME L. REV. 889, 940 (2006) (providing "a comprehensive, national examination of routine race and national origin employment discrimination lawsuits" and concluding that, "[a]lthough all types of employment discrimination cases are 'hard to win,' that difficulty is especially pronounced for race and national origin claims," which "are proving almost impossible to win in federal court.")

[26] A recent symposium entitled *Trial by Jury or Trial by Motion:  Summary Judgment,* Iqbal*, and Employment Discrimination*, 57 N.Y.L. Sch. L. Rev. 659 (2012-2013), explores these issues in detail in a collection of articles by leading scholars, some of which will be cited below.

[27] *See*, *e.g.*, Ann McGinley, *Cognitive Illiberalism, Summary Judgment, and Title VII: An Examination of* Ricci v. DeStefano, 57 N.Y.L. Sch. L. Rev. 865 (2012-2013) (using the social psychology literature on "cognitive illiberalism," pioneered by scholars such as Dan Kahan, to analyze judges' unwillingness to fairly evaluate facts in Title VII cases); Kang, *supra* note 24, at 1156–59 (noting that jurors "frequently engage in motivated reasoning" and thus commit errors of implicit bias in civil rights cases).

facts strongly suggest discrimination.[28]   At the most basic level, courts have
set very high standards of proof in Title VII cases: Under disparate treatment
theory plaintiffs must persuade the trier of fact that it is more likely than not
that an invidious discriminatory motive led the employer to take an adverse
employment action against the plaintiff.[29]   Under disparate impact analysis
plaintiffs must put forth elaborate statistical analysis and expert testimony
identifying a specific practice and proving it had a statistically significant
adverse impact on members of plaintiff's class merely to make out a prima
facie case.[30]

     A host of other pro-employer doctrines contribute to plaintiffs' loss
rate as well.  One example is the Court's evolving "stray comments" doctrine,
which distinguishes between supervisor statements that can be taken as
admissions of discriminatory motive and mere "stray comments" that cannot
be accorded such strong evidentiary weight.  Expansive use of this doctrine
has made it harder for plaintiffs to meet their burden of proving
discrimination because evidence that is arguably probative of a supervisor's
state of mind, such as the use of racial epithets, ends up being dismissed as
mere "stray comments."[31] On top of these hurdles, new opinions heightening
the pleading standards for federal court filings, which the Court announced
in recent years in the *Iqbal* and *Twombly* cases, further decrease Title VII
plaintiffs' chances.[32]

---

[28]   *See generally* Kerri Lynn Stone, *Shortcuts in Employment Discrimination Law,* 56
ST. LOUIS U. L.J. 111, 113, 168 (2011) (identifying "short cuts" courts use in Title VII cases
and arguing that, taken together, these "compris[e] a larger movement of the judiciary toward
foreclosing employment discrimination plaintiffs' cases without the necessary analysis");
*see also* Anne Lawton, *The Meritocracy Myth and the Illusion of Equal Employment
Opportunity*, 55 MINN. L. REV. 587, 634-42 (2000) (demonstrating how courts are
"converting contested issues of fact into issues of law," and in so doing increasing
employers' chances of winning on summary judgment and on circumstantial evidence cases
after trial).

[29]  The Court's latest articulation of this burden of proof is in *Reeves*, 530 U.S. 133, as
discussed *infra* n. 62.

[30]  Title VII, § 703 (k), 42 U.S.C. § 2000e-2(k).

[31]  *See* Keri Lynn Stone, *Taking in Strays:  A Critique of the Stray Comment Doctrine in
Employment Discrimination Law,* 77 MO. L. REV. 149 (2012) (persuasively arguing that
courts too often dismiss probative evidence of discrimination as mere "stray comments"  in
order to grant summary judgment to employers despite strong evidence of discriminatory
motive).

[32]  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (holding that new pleading standards
apply to all types of cases including Title VII claims); Bell Atl. Corp. v. Twombly, 550 U.S.
544, 544 (2007) (holding that plaintiffs' claims must have facial plausibility to survive a
motion to dismiss and that to have such plausibility complaints must aver facts detailed
enough that, if proved true, they would allow a court to enter judgment in the plaintiff's
favor).  These standards require plaintiffs to plead very specific facts to support their legal
claim of discrimination, even before they have begun discovery.  In many instances plaintiffs

Of course, there is not necessarily anything "wrong" with the fact that few Title VII cases result in wins for plaintiffs in court today, provided that Title VII's employment nondiscrimination goals are being satisfied. Thoughtful scholars have argued that assessments of Title VII's efficacy should include its symbolic and incentive-producing effects. If Title VII law can induce employers to adopt antidiscrimination polices without being hauled into court, then its objectives are being met regardless of plaintiffs' win rates through lawsuits. Put otherwise, plaintiff wins are not the goal of Title VII: employment nondiscrimination is. An important article making this argument is Susan Sturm's "Second Generation Discrimination: A Structural Approach."[33] Sturm calls on courts, policymakers and scholars to adopt a new approach to the way they think about Title VII law. Her analysis of how Title VII law can create incentives for resolving disputes outside courts can help guide proposals for Title VII doctrinal reform.

### C. *Finding Paths to Address Second Generation Discrimination*

In a classic article, Sturm identifies the problem of "second generation" discrimination. Such discrimination is not blatant (such as signs saying "no Irish need apply") but instead involves "patterns of interaction" and cognitive bias.[34] Sturm points out that second generation discrimination is much harder to reach by simple legal edicts: "the complex and dynamic problems inherent in second generation discrimination cases pose a serious challenge for a first generation system that relies solely on courts (or other governmental institutions) to articulate and enforce specific, across-the-board rules."[35] She argues that antidiscrimination law should approach second

---

cannot meet these heightened pleading standards and find their claims thrown out of court for failure to state a claim upon which relief can be granted, even though discovery could have produced ample concrete evidence to support plaintiffs' case theories. For further discussion, see Joseph A. Seiner, *After* Iqbal, 45 WAKE FOREST L. REV. 179, 187 (2010) (finding that federal courts grant motions to dismiss in employment discrimination cases far more often under the *Twombly* standard than under the standard applied previously); Suzette M. Malveaux, *Front Loading and Heavy Lifting: How Pre-Dismissal Discovery Can Address the Detrimental Effect of* Iqbal *on Civil Rights Cases*, 14 LEWIS & CLARK L. REV. 65 (2010) (finding civil rights cases particularly vulnerable to dismissal under the new *Iqbal* standards) ; Patricia W. Hatamyar, *The Tao of Pleading: Do* Twombly *and* Iqbal *Matter Empirically?*, 59 AM. U. L. REV. 553, 608-09 (2010) (finding rising rates of dismissals on 12(b)(6) motions in Title VII cases following the Court's decisions in *Iqbal* and *Twombly*); Joseph A. Seiner, *The Trouble with* Twombly*: A Proposed Pleading Standard for Employment Discrimination Cases,* 2009 U. ILL. L. REV. 1011 (2009) (finding a higher percentage of decisions granting motions to dismiss in employment discrimination cases after *Twombly*).

[33] Susan Sturm, *Second Generation Employment Discrimination: A Structural Approach*, 101 COLUM. L. REV. 458 (2001).

[34] *Id.* at 460.

[35] *Id.* at 461.

generation discrimination in a problem solving mode that "shifts emphasis away from primary reliance on after-the-fact enforcement of centrally defined, specific commands."[36]  Rather than thinking about law in terms of rule enforcement, which focuses the creation of legal claims, lawyers and other legal actors should use law to create incentives for employers to "identify, prevent, and redress exclusion, bias, and abuse," *before* cases get to court.[37]

Sturm gives several examples of how the Court's Title VII jurisprudence has created incentives for employers to address discrimination problems internally.  Chief among her examples is the Court's initiative in crafting an affirmative defense to employer vicarious liability in supervisor sex harassment cases.[38]  This defense allows employers to avoid liability for supervisor sex harassment if (1) they have set up reasonable policies to deter and investigate sex harassment cases and (2) plaintiffs have failed to use them.[39]  Sturm argues, against critics of this doctrine,[40] that this example of a "second generation" approach to employment antidiscrimination rules will help eliminate discrimination.  It will do so, Sturm explains, by encouraging plaintiffs to raise issues *within* the workplace to be dealt with effectively there, even though it also makes cases much harder for plaintiffs to win later.[41]  Sturm's point is that the main objective of civil rights law is not necessarily to create more opportunities for plaintiffs to win cases in courts; rather, the core objective may be to bring about workplaces in which lawsuits are not needed, because problems have been resolved there rather than being

---

[36] *Id.* at 462.

[37] *Id.* at 463.

[38] *See supra* n. 9 and accompanying text for a discussion of this doctrine.

[39] *Id.*

[40] See, e.g., Anne Lawton, *Operating in an Empirical Vacuum: The* Ellerth *and* Faragher *Affirmative Defense*, 13 COLUM. J. GENDER & L. 197 (2004) (arguing that courts' focus on paper policies and procedures ends up shifting the burden of proof on prevention back to employees, contrary to the Court's intent); John H. Marks, *Smoke, Mirrors, and the Disappearance of "Vicarious" Liability: The Emergence of A Dubious Summary-Judgment Safe Harbor for Employers Whose Supervisory Personnel Commit Hostile Environment Workplace Harassment*, 38 HOUS. L. REV. 1401, 1405 (2002) ("This Article challenges the logic and the policy implications of [the *Ellerth*] safe-harbor strategy and argues that post-*Ellerth* lower courts have been far too deferential to the strategy at the summary judgment stage of litigation."); Susan D. Carle, *Acknowledging Informal Power Dynamics in the Workplace: A Proposal for Further Development of the Vicarious Liability Doctrine in Hostile Environment Sexual Harassment Cases*, 13 DUKE JOURNAL OF GENDER LAW & POLICY 85 (2006) (arguing that the Court's affirmative defense fails to appreciate workplace power dynamics).

[41] Sturm, *supra* note 33, at 483 (the sexual harassment affirmative defense "creates considerable incentives for [the] employer to focus on the meaning and application of the antidiscrimination norm in relation to its own workplace culture and dynamics."

16                                    *Angry Employees*                           [16-Sep-15

removed to outside institutions.[42]

Sturm describes in depth the policies of three model employers: Deloitte & Touche, a major accounting firm; Intel Corporation, a "driving force behind the global technology revolution,"[43] and home improvement retail chain Home Depot. Focusing on sex discrimination, Sturm shows how these three progressive employers set up internal processes to examine policies and reform them to increase women's career success. Sturm identifies "the pivotal role of intermediaries"[44] in these processes, and discusses some of the problems these employers encountered, including the fact that a large employer like Home Depot still faced discrimination suits where local managers circumvented central administration policies designed to promote fair and inclusive hiring and promotion. Thus, Sturm notes, litigation may still sometimes prove "essential to focus attention on identified problems where internal systems failed to correct them."[45] Sturm closes by calling for further inquiry into the role of intermediaries, and calls on companies to "learn from the Intels and Home Depots," to avoid becoming the next bad actor in the employment discrimination world.[46]

Sturm's analysis focuses on the practices of the "best," most well-meaning employers. These are often (though not always) employers that draw their employees from a professional, highly educated, and thus relatively privileged, labor pool: The Intel Corp. and Deloitte and Touche are cases in point: These employers must compete for top talent and use their progressive employment policies to do so.[47] Far too many other employers are less motivated to achieve high marks for their employment practices,

---

[42] Sturm goes on to identify the criteria for evaluating the effectiveness of such second generation antidiscrimination doctrines. These include whether they "[s]et the stage for institutional self-reflection," enable "organizations to address new problems," produce information about second generation problems, and "build the capacity of workplace participants to prevent and address bias." *Id.* at 489-90.

[43] *See* http://www.intel.com/content/www/us/en/company-overview/company-overview.html (last visited June 23, 2014).

[44] *Id.* at 522. These intermediaries in her case examples included senior officials, independent consultants, problem solving lawyers and employee identity caucuses. *Id.* at 522, 531, 544.

[45] *Id.* at 544.

[46] *Id.* at 568.

[47] *Cf.* Sarah Lacy, *Google Takes Another Big Step to Retain Employees: Autonomous Business Units*, TECHCRUNCH, Dec. 17, 2010, available at http://techcrunch.com/2010/12/17/google-takes-another-big-step-to-retain-employees-autonomous-business-units/ (discussing Google's policy of providing greater employee autonomy to retain workforce talent); Jennifer Ludden, Unlimited vacation Time Not a Dream for Some, National Public Radio, Aug. 12, 2010, available at http://www.npr.org/templates/story/story.php?storyId=129137542&ps=cprs (elite firms such as Social Strata and Netflix seeking to attract the best white collar professionals by offering unlimited time off).

especially if they rely on less skilled workers who are easily replaced.  Thus Sturm's excellent ideas may need modification to extend them to working environments in which employers are less willing to    engage in self-examination of their workplace practices.  This article argues that law should motivate them to do so anyway.

This article starts with Sturm's ideas about second generation antidiscrimination approaches but argues that they need to be expanded in several respects.  First, antidiscrimination law needs to be modified not only to create incentives by making Title VII cases easier for *employers* to win in some circumstances, as in sex harassment vicarious liability doctrine, but also by making it easier for *employees* to sustain cases against employers in other circumstances. Of course employers never like legal rules that increase the specter of liability, but incentives based on heightened prospects of liability may increase employer's level of care.[48]  If employers know that courts will look beneath their reasons for firing employees for insubordination to search for provocation arising from employees' reasonable perceptions of discriminatory conduct, employers will have greater incentives to look out for and eliminate such workplace scenarios themselves.  Although employers never like facing heightened risks of liability, altering liability standards may serve employers well in the end, by inducing them to eliminate festering atmospheres of racial, sexual and/or other forms of discriminatory hostility *before* they lead to insubordination situations and lawsuits.  Indeed, it would be hard for policy makers to squarely defend the case law discussed in Section II below:  Employer victories at summary judgment in discrimination-linked insubordination cases signal that employers have little reason to be concerned about supervisors who provoke employees by spewing forth the n-word, or engaging in egregious sex-based harassment or other manifestations of discrimination-tinged animosity.

This article proposes that second-generation regulation should consider both "carrot" and "stick" approaches to encouraging employers to eliminate workplace discrimination.   Strum's brilliant ideas require expansion to take account of not only the best employers, which respond well to the motivations of carrots, but also highly imperfect employers, which may be better incentivized by sticks.  This article's proposals address the highly imperfect world of most workplaces.  Just as employers may be less than ideal, so too may employees behave less than perfectly.  In a world of non-ideal conduct on both sides of the employment relationship, law should not ignore reality. Indeed, the less ideal the employer the more likely is the possibility that employees will react imperfectly to perceived and unrectified

[48] Indeed, this is the basic theoretical assumption underlying law and economic theories of how law creates behavioral incentives through legal liability rules.  *See generally* Guido Calebresi, THE COST OF ACCIDENTS:  A LEGAL AND ECONOMIC ANALYSIS (1970).

discrimination. Sturm's concept of "second generation" regulation, joined to the concept of the imperfect angry employee reacting to an imperfect employer, can point to new directions for Title VII doctrine.

One reason to modify Title VII doctrine is to create incentives for employers to do more to prevent the conditions that could lead to discrimination-related insubordination cases. Another reason is to better protect employee self-help efforts under Title VII even when they extend beyond the bounds of politeness. This is especially important given the low chances that Title VII plaintiffs will succeed through litigation, as discussed in Section I-B. If federal courts can no longer be looked to as staunch guardians of Title VII's nondiscrimination edicts in individual cases, might they still be convinced to set up "second generation" rules that would create incentives for employers to clean up discrimination-laden working environments? The proposals outlined in Section IV have this goal. Although there is no way to know whether there would in the end be fewer or more lawsuits under the proposals outlined below, there in the end could well be less discrimination, as employers respond to changed liability risks by striving to eradicate discrimination-tinged scenarios that would prevent a court from being able to grant summary judgment to employers in discrimination-tinged insubordination cases.

To sum up the points made above, today's federal courts, burdened by huge case dockets and guided by the Supreme Court's directives encouraging dismissal of Title VII cases at early stages of litigation, do not engage in searching scrutiny of the facts in Title VII cases. Facts that might have troubled pro-civil rights courts in an earlier period receive cursory treatment before case dismissal today. As a result, a "buzzing atmosphere" of discrimination—*i.e.*, manifest hostility around race, sex, and other protected characteristics—is evident in many case narratives even when plaintiffs do not succeed, as this article will discuss in detail in Section II below. Into this atmosphere steps the angry worker who has experienced situations indicative of discrimination. Attempting to engage in self-help, this angry employee engages in mildly or moderately insubordinate behavior, such as an angry outburst, uttering swear words and/or a brief refusal to follow a supervisor's instruction. The typical result is termination for insubordination. This terminated employee files a lawsuit, only to have the court uphold the employer's action on insubordination grounds. A more thoughtful approach could lead to different results. To begin the process of formulating a different approach to these cases, Section II will explore this pattern of troubling cases as a prerequisite to proposing doctrinal reform.

II.     HOW TITLE VII COURTS GET INSUBORDINATION CASES WRONG

In thinking about the state of Title VII insubordination law today,

consider the following facts, taken from the record in *Morgan v. National Railroad Passenger Corp*:   Abner Morgan, a trained and experienced electrician, applied for a position at an Amtrak maintenance yard in Oakland, California.[49]   Amtrak offered Morgan a job, which he believed was as an electrician.[50]  When he began work, however, he received the title of "electrician helper."[51]   Morgan was the only person ever hired as a "helper" in this yard.   Because of his job classification he was paid less than other workers who were doing the same electrician's work.   As Morgan saw it, the relevant difference was that these other workers were white and Morgan was black.

Morgan complained of race discrimination, setting in motion a series of negative interactions with management.[52]   He eventually succeeded in having his salary equalized through union arbitration, but he continued to face discipline that was harsher than sanctions imposed on other workers.   His supervisors ordered him to do demeaning cleanup work others did not have to do and called him racially derogatory names.[53]   The final incident leading to Morgan's termination took place when a supervisor yelled at Morgan to "get his 'black ass' into the office."  Morgan refused and went home, and Amtrak terminated him for violating the company's rule prohibiting insubordination.[54]

Morgan filed a lawsuit under Title VII of the Civil Rights Act of 1964,[55] offering as evidence not only his own treatment but also the testimony of fellow employees who described a "racially-laden atmosphere at the

---

[49] Morgan v. National RR Passenger Corp., 232 F.3d 1008, 1010-11 (9th Cir. 2000).   The facts offered here are those the court took as true for purposes of summary judgment.  *Id.*

[50] *Id.*

[51] *Id.*

[52] For example, Morgan was asked to attend a meeting in a supervisor's office, but when he insisted on union representation, as was his right under federal labor law, a supervisor refused to allow him and then fired Morgan for failing to obey orders to attend the meeting. Morgan filed a union grievance and his termination was reduced to a 10-day suspension, which was the most severe discipline ever imposed on an employee at the yard for more than a decade.   After he came back to work Morgan's problems at his job became even worse. When he applied to participate in an apprenticeship program, the yard supervisor told him he had "'a snowball's chance in hell of becoming an electrician'" at his yard.  *Id.* at 1011. Morgan never received a response from the main office about his application.  Based on this and other incidents, Morgan filed a race discrimination complaint with the EEOC.  He and other employees met with their congresswoman to complain about conditions at the yard. But instead of conditions improving, Morgan began to receive various disciplinary charges he believed were unfounded, such as a charge of absenteeism for taking leave he had properly requested and had approved.  *Id.*

[53] *Id.* at 1012.

[54] *Id.* at 1013.

[55] 42 U.S.C. § 2000 et seq.

Yard."[56]  He lost his first jury trial following the district court's decision to exclude evidence of this long history of race-based treatment against Morgan and others. His appeal from this ruling eventually produced an important U.S. Supreme Court opinion holding that pre-limitations incidents may be used to establish "hostile environment" discrimination[57] but not to support claims involving "discrete" acts of discrimination.[58]

A virtually unnoticed aspect of the *Morgan* case was Amtrak's invocation of "insubordination" as its "legitimate, nondiscriminatory reason"[59] for firing Morgan. As this article has already pointed out, Amtrak's theory that termination for insubordination constituted a legitimate, nondiscriminatory reason for Morgan's termination was problematic:  The alleged insubordination took place in reaction to the provocative, race-related acts of the employer's supervisors, and thus logically should not have been said to be a reason for his termination independent of the alleged discrimination.

This logical flaw in the employer's case theory in *Morgan* could be dismissed as an anomaly, if it were not for the fact that, in other cases as well, courts routinely enter judgment in favor of employers where the facts show that an employee was mildly or moderately insubordinate in reaction to perceptions of discriminatory treatment.[60]  To be sure, most employers have

---

[56] This evidence included testimony of approximately a dozen employees, including a former manager, stating that supervisors frequently made racial jokes, used the "n" word and other racial epithets, called an African American employee "boy," performed racially derogatory acts in front of higher management officials, and made negative comments about the capacity of African American employees.  *Morgan*, 232 F.3d at 1010-11.

[57] Under this theory of discrimination a plaintiff must show that racial harassment was so "severe and pervasive" as to constitute discrimination because it altered the "terms and conditions of employment" for the plaintiff.  *See infra* n. 230 (discussing doctrinal prerequisites for establishing hostile environment discrimination).

[58] National RR Passenger Comm'n v. Morgan, 122 S. Ct. 2061 (2002).  Commentators have criticized the Court's formulation of continuing violations theory in Morgan.  *See, e.g.*, Vincent Cheng, *National Railroad Passenger Corporation v. Morgan: A Problematic Formulation of the Continuing Violation Theory*, 91 CAL. L. REV. 1417, 1442 (2003) (arguing that *Morgan* rests on a "dubious doctrinal distinction.").  In the case itself, however, admission of the additional evidence of a long pattern of race-based harassment led to victory for the plaintiff on retrial.  *See* May 5, 2004 Jury Verdict, in Case No. C96-03585 SI, United States Dist. Court for the Northern District of California.  Morgan won a $500,000 jury verdict, which the judge adjusted downward, and the parties then entered into a confidential settlement dismissing an appeal.  *See* Stipulation to Dismiss the Appeal, Jan. 3, 2005, Dist. Ct. No. c-96 03 585 SI.

[59] Under Title VII, an employer must present a "legitimate, nondiscriminatory reason" for an adverse employment action after the plaintiff has made out a prima facie case of discrimination, and the plaintiff then bears the burden of persuasion that discrimination was the real reason for the action.  *See generally* Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 142-43 (2000) (citations omitted).

[60] In other words, an employee has made an angry outburst, cursed, and/or refused to

legitimate work rules prohibiting insubordination, just as Amtrak did.[61]  On first glance, finding an employee insubordinate under such rules appears to be an easy way to dispose of Title VII cases:  an employer alleges that an employee has violated reasonable rules prohibiting insubordination and the employee essentially admits to having failed to obey an order or using intemperate language towards a superior.  Under the relevant three-step test for satisfying the elements of proof in a Title VII case,[62] the decision-maker can quickly conclude that the employer's stated reason is the "real" reason for the termination, in which case the plaintiff's case fails. The result is a body of cases similar to *Morgan*, in which courts uphold plaintiffs' terminations despite troubling facts attesting to workplace atmospheres and supervisor conduct reflecting discriminatory animus.  Proper analysis requires more searching inquiry.

The cases in which Title VII courts have gotten insubordination wrong span the lifetime of Title VII; they are neither a historical relic nor a recent development.[63]  The number of these cases may be increasing, however, as courts stretch for ways to dismiss Title VII cases summarily. This trend should give observers reason for concern:  logical sloppiness may be developing into a line of doctrine that threatens to undermine employment antidiscrimination law.  In the interests of space and reader attention, this Section highlights only a handful of these cases, selecting a representative sample that spans a variety of federal courts of appeals in order to show that this problem of analytic error extends across jurisdictions, though some courts, especially in the Third Circuit,[64] have better track records than others. I examine federal courts cases only, since that is the focus of this article; state courts may be making similar errors (or, conversely, doing a better job).

The cases discussed below can be broken into several categories,

carry out a supervisor's order but has not gone so far as to engage in physical violence or threats of violence nor engaged in a long, sustained course of misconduct.

[61] Amtrak's rules stated "'[e]mployees must obey instruction, directions and orders from Amtrak supervisor personnel and officers. . .  Insubordinate conduct will not be tolerated,'" and further prohibited "profane or vulgar language." 232 F. 3d. at 1011-12 nns. 5 & 9.

[62]  As the Court most recently discussed in *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000), this three-step test requires (1) the plaintiff to make out the elements of the prima facie case, (2) the defendant to offer a legitimate, non-discriminatory reason for taking an adverse employment action against the plaintiff, and then (3) the plaintiff to persuade the finder of fact by a preponderance of the evidence that a discriminatory reason was the real reason for the action.

[63]  As I discuss further below, Terry Smith identified a similar phenomenon, which he called "subtle discrimination," in his powerful article, Terry Smith, *Everyday Indignities: Race, Retaliation, and the Promise of Title VII*, 34 Colum. Hum. Rts. L. Rev. 529, 535 (2003).

[64]  *See, e.g.*, Robinson v. Septa, 982 F.2d 892 (1993); Goodwing v. City of Pittsburgh, 480 F. Supp. 627 (W. D. Pa. 1979) *aff'd* 624 F.2d 1090 (3rd Cir. 1980).

namely: (A) single motive cases in which courts regard employee verbal outbursts as the legitimate, nondiscriminatory reason for an adverse employment action, despite evidence of related discrimination or retaliation; (B) cases applying Title VII mixed motive analysis but reaching similar result; and (C) cases analyzed under Title VII's "opposition conduct" clause, which protects employees against retaliation for opposing workplace discrimination.[65] The parts below discuss each category in turn.

### A. *Insubordination as the Legitimate Nondiscriminatory Reason for an Adverse Employment Action*

As already noted, the *Morgan* case,[66] better known for announcing new rules for application of continuing violations theory, is also, if read carefully, an insubordination case. Its facts follow a pattern seen in a troubling number of cases: an African American employee alleges that he has been "'consistently harassed and disciplined more harshly than other employees on account of his race,'" through such steps as denying him the right to participate in training opportunities and assigning him demeaning work beneath his job classification.[67] He also has evidence of supervisors' repeated use of racial epithets.[68] These incidents lead to an escalation of hostility between the employee and management that ultimately culminates in an altercation and the employee's termination for insubordination, later upheld in court.[69] Here are a few examples:.

*Clack v. Rock-Tenn Co.* arose in the Sixth Circuit on appeal from a district court's grant of summary judgment to an employer.[70] Clack, an African American line worker in a recycling plant, presented considerable evidence that he had been subjected to a long series of harassing statements and conduct by Murphy, his direct supervisor.[71] Murphy was white and known to openly express racial prejudice.[72] The incident that led to the Clack's termination occurred when Murphy ordered Clack to carry out a clean-up task that Clack believed was not within his job duties.[73] Clack refused and left the area to find the plant superintendent, after which Murphy sent him home for insubordination. The company general manager then conducted a limited investigation and accepted the plant superintendent's

---

[65] Title VII, § 704(a), 42 U.S.C. § 2000e-3(a).

[66] 536 U.S. 101 (2002).

[67] *Id.* at 105-08.

[68] *Id.* at 105 & n.1.

[69] 536 U.S. at 114 & n.8.

[70] 304 F.App'x 399 (6th Cir. 2008).

[71] *Id.* at 401.

[72] *Id.*

[73] *Id.*

recommendation that Clack be fired.[74]

On these facts, the majority opinion upheld the district court's grant of summary judgment for the employer, reasoning that, "although plaintiff established *a prima facie* case of both discrimination and retaliation, he has not demonstrated that defendants' stated reason for termination—insubordination—was pretextual."[75] The majority further opined that the evidence of Murphy's racial animus could not be imputed to higher management because Murphy's role had been limited to reporting the incident and letting higher management form their own opinions.[76] But this reasoning overlooked the evidence of blatant racial animus and Clack's reasonable attempts to protest.

This circuit has followed similar dubious logic in other recent opinions in Title VII insubordination cases as well.[77]

The *Clack* court's ruling produced a strong dissent from Judge Karen Nelson Moore. This dissent, along with others, can provide helpful guidance into how courts could better handle insubordination cases. Judge Moore pointed out that the record could well support the inference that higher management "knew about Murphy's racist remarks, his discriminatory

---

[74] *Id.*

[75] *Id.* at 401-02.

[76] *Id.* at 405-06. This reasoning rested in part on the "cat's paw" theory of when discrimination by non-decision makers can be imputed to an employer's managers, which has since been clarified by the U.S. Supreme Court in *Staub v. Proctor Hospital*, 131 S.Ct. 1186 (2011) (holding that illegally motivated actions by non-decision makers can be attributed to the employer where they are the proximate cause of an adverse employment action because they influenced the decision maker's deliberations).

[77] For example, in Davis v. Omni-Care, Inc., 482 F.App'x 102 (6th Cir. 2010), the African American plaintiff, who worked as a driver for a pharmaceutical provider, had been subjected to co-worker race harassment in the form of a noose hanging in the workspace. He complained to his employer but it merely promised to carry out diversity training. The employee became agitated when he learned that nothing more would come of his complaint. He began to fail to respond from the road to calls from his supervisor. When his supervisors informed him that he could either talk with them about his communications problems or go home, he opted to leave, after which he was fired. The district court granted summary judgment to the employer and the Sixth Circuit affirmed, holding that the plaintiff had failed to demonstrate that the decision-maker's legitimate, non-discriminatory reason for terminating employee for refusal to speak with a supervisor was a pretext for retaliation for his claims of hostile work environment.

Similarly, in Tibbs v. Calvary Methodist Church, 505 F.App'x 508 (6th Cir. 2012), an African American teacher alleged both age discrimination under the ADEA and race discrimination under Title VII after she was reassigned to a new classroom. She expressed hurt feelings and abruptly ended a meeting with her supervisor about the situation. Her supervisor then terminated her for insubordination for her conduct at the meeting. *Id.* at 509. The Sixth Circuit held that "Tibbs has failed to create a genuine issue of material fact on the pretext issue because she does not deny that she left the 'heated' meeting early, and her belief that she was not insubordinate is irrelevant in the analysis." *Id.* at 515.

treatment of African-American employees, and his hostility toward Clack particular," as shown by an affidavit of a fellow supervisor "who detailed a series of racist remarks by Murphy, some of which were specifically directed at Clack."[78]  Given this background, Judge Moore argued, it was noteworthy that the company decision-makers did "nothing to probe what role Murphy's racial animus might have played in the events in question"; they instead "conducted an investigation with blinders on."[79]  Moore argued that the district court should have considered the "taint of Murphy's discriminatory animus" and concluded that Clack had produced enough evidence of pretext to allow the case to be submitted to a jury.[80] This article will return to Judge Moore's approach for further discussion in Section IV-A-1.

The Seventh Circuit committed a similar logical error in *McClendon v. Indiana Sugars, Inc.*[81]  In that case, McClendon, an African American man, had worked his way up in a sugar processing plant from janitor to warehouse manager.[82]  He then found himself subjected to random searches after sugar disappeared from the plant.  During the course of one such search a plant manager allegedly called McClendon a "black thief."[83]  McClendon filed EEOC charges and then complained of unlawful retaliation when the company assigned overtime work to a less senior white employee.  When a supervisor directed McClendon to develop a list of performance goals for himself, he objected, believing he had been singled out for this task. McClendon became increasingly confrontational in several meetings with supervisors in which he questioned their motivations, and was terminated for insubordination.[84]

---

[78]  *Clack*, 304 F.App'x at 408–9 (Moore, J., dissenting).

[79]  *Id.*

[80]  *Id.* at 409-10.  Applying similar reasoning the First Circuit recently reached a correct result in a disability discrimination insubordination case.  *See* Kelley v. Corr. Med. Servs., Inc., 707 F.3d 108, 110 (1st Cir. 2013).  In that case the plaintiff, who had suffered a shattered pelvis, faced a variety of disability-related harassment incidents and then refused an impromptu work re-assignment on the ground that she did not yet have the stamina or capability to respond adequately to the intensive demands of that assignment, after which she was terminated for insubordination.  *Id.* at 114-15.  The district court held that Kelley presented a prima facie case of disability discrimination but that she failed to survive summary judgment because she could not show that the stated cause for her termination – insubordination – was a pretext for discriminatory intent.  *Id.* at 118.  The First Circuit reversed, however, holding that the court had disregarded the evidence of "ongoing disability-based animus and the way in which that animus might have influenced [the] adverse employment action" against the plaintiff.  *Id.*  Moreover, the court held that the employer should not be permitted to invoke the specter of insubordination in order to "mask [ ] retaliation for requesting [an] accommodation." *Id.* (citation omitted).

[81]  108 F.3d 789 (7th Cir. 1997).

[82]  *Id.*

[83]  *Id.*

[84]  *Id.* at 792-94.

A state agency ruling on McClendon's unemployment compensation claim found as a matter of fact that he had not been insubordinate, but the Seventh Circuit found this evidence irrelevant because in those proceedings the burden of proof had been on the employer rather than on McClendon as it would be in a Title VII case.  In affirming the district court's grant of summary judgment to the employer, the Seventh Circuit held that it was "not relevant whether Mr. McClendon actually was insubordinate.  All that is relevant is whether his employer was justified in coming to that conclusion."[85]  Concluding that the record raised no triable issue of fact "as to whether Mr. McClendon's supervisors believed in good faith that he was insubordinate," the Seventh Circuit found no reason to disturb the lower court's judgment for the employer.[86]

Here as in *Clack*, evidence of discrimination that rendered that the situation more complicated than simple insubordination did not motivate the court to take a closer look.  But as Judge Moore argued in dissent in *Clack*, the Seventh Circuit should have done so.[87]  Morgan, Clack and McClendon are examples of recent court of appeals cases.  There are also many more,[88] as prior scholars have documented in unearthing a host of cases that pose similar logical fallacies.  For example, more than a decade ago Professor Terry Smith noted the many cases involving employee "self-help" responses to what Smith called "subtle" workplace discrimination (which, in many of the cases he described, often seemed far from subtle indeed).[89]  Smith culled the psychology and sociological literature to illuminate the special harm minority workers experience when they confront such discrimination, and argued for courts to show greater sensitivity to the special injury these employees endure.

Smith based his analysis on a set of primarily district court cases he found in his research, and concluded with the suggestion that courts view these scenarios involving employees who respond strongly to perceived patterns of race discrimination as opposition conduct cases and expand

---

[85] *Id.* at 799.

[86] *Id.*

[87] *Clack v. Rock Tenn. Co.*, 304 F.App'x 399, 408-09 (6th Cir. 2008). (Moore, J., dissenting).

[88] *See, e.g.*, *Stallworth v. Singing River Health Sys.*, 469 F.App'x 369, 370 (5th Cir. 2012).  *Stallworth*, a religious discrimination case, involved a plaintiff's complaint to her supervisor about coworker harassment when she engaged in lunchtime prayer, after which her supervisor declined her requests to take part in a training program.  When she contacted another official in an attempt to obtain the training, her employer fired her on insubordination grounds.  *Id.* at 370.  Both the district court and Fifth Circuit rejected Stallworth's claims on summary judgment, holding that her "subjective belief that her actions did not constitute insubordination is insufficient to create an inference of discriminatory intent by" the defendant.  *Id.* at 372.

[89] Smith, *supra* note 63.

employee protections for such conduct, as I will discuss further in Section IV-A-3 below. Key at this point is the similarity between the "subtle discrimination" cases Smith collected and the insubordination cases I have collected here. Here is Smith's description of one such representative district court case:

> As Donald Edwards entered the coffee room of the factory where he worked, the plant manager offered a curious salutation, "Good morning, sunshine." Edwards parried, "Don't call me 'sunshine,' you motherfucker. My name is Donald Edwards." The plant manager, Donald Johnson, immediately fired Edwards for "gross insubordination." Their confrontation would later escalate into fisticuffs. Edwards, a forty-nine-year-old black man, sued his employer, alleging racial discrimination in violation of Title VII. In finding for the employer, the court noted several facts without apparent appreciation of their inconsistency with its judgment. First, Johnson, who is white, had previously referred to Edwards as "sunshine," a moniker that Edwards had earlier requested that Johnson not use. There was also evidence that Edwards had previously charged Johnson with racially motivated employment practices, such as denying the plaintiff proper routes, overtime, and equipment. Finally, under the relevant collective bargaining agreement, the plaintiff could not be fired merely for calling a supervisor "motherfucker," a fact that the court noted but did not impute to Johnson. Notwithstanding the racial aura—and the evident provocation—shrouding Edwards's dismissal, the court found that the dismissal was justified, not because of Edwards's initial response but because of the later physical altercation. Thus, Title VII's prohibition against discrimination on grounds of race did not protect the plaintiff.[90]

Professor Anne Levy has also contributed a fascinating article that collects analogous egregious cases in the sex harassment context.[91]  Levy analyzes opinions such as *Bohen v. City of East Chicago*,[92] a case involving

---

[90] *Id.* at 530, discussing Edwards v. Foucar, Ray & Simon, Inc., 23 Fair Empl. Prac. Cas. (BNA) 1644, 1645 (N.D. Cal. Aug. 19, 1980).

[91] Anne C. Levy, *Righting the "Unrightable Wrong:"  A Renewed Call for Adequate Remedies under Title VII*, 34 ST. LOUIS U. L.J. 567 (1990) (demonstrating through cases analyses that courts are unlikely to find a nexus between sex harassment and discharge for insubordination).

[92] 799 F.2d 1180 (7th Cir. 1986).

"allegations of egregious sexual harassment," in which the Seventh Circuit refused to overturn the district court's ruling that the plaintiff's insubordination was not linked to the abuse she suffered.  Levy argues that this plaintiff's conduct "may have been appropriate behavior in light of the outrageous facts in the case."[93]   After analyzing additional cases as well,[94] Levy concludes:

> It appears that many courts are either unable to understand or refuse to become involved in the possibility that management may have forfeited its right to subservient and respectful behavior in circumstances where it condones or engages in egregious harassment of its employees and when it has, in fact, broken the law and disregarded the rights of the victim.[95]

Smith and Levy's analyses differs from this article's in a number of respects,[96] but the phenomenon we each independently observe is similar:  In

---

[93] Levy, *supra* note 91, at 582.  As an example of a case in which the court got the analysis right, Levy cites Broderick v. Ruder, 685 F.Supp. 1269 (D.D.C. 1988), where the plaintiff demonstrated through ample evidence that "'her failure to interact with her supervisors was directly attributable to the atmosphere in which she worked.'" Levy, *supra* note 91, at 583-84, citing 685 F. Supp. at 1280 (footnote omitted).

[94] In the analogous race discrimination context, Levy analyzes EEOC v. Murphy Motor Freight Lines, 488 F. Supp. 381, 387 (D.Minn. 1980). There the district court concluded, erroneously in Levy's view, that "'a combination of rules violations, insubordinate attitude, and low productivity is sufficient to negate any alleged causal link between race and discharge.'"  Levy points out that this "conclusion was reached despite the court's additional finding that the plaintiff was subjected to 'vicious, frequent, and reprehensible instances of racial harassment.'"  488 F.Supp. at 384.  As Levy further explains, "[t]he facts of Murphy are particularly compelling. Written continually on blackboards and inside freight trailers in the workplace were such phrases as: 'Ray Wells [the plaintiff] is a nigger'; 'The only good nigger is a dead nigger'; and 'Niggers are a living example that the Indians screwed buffalo.'  A wooden cross identified with the Ku Klux Klan was attached to a cart used to move freight and a special lunchroom, where plaintiff was forced to sit alone, was identified by a sign as "nigger lunchroom."'  Anti-black articles and graffiti were continually on the wall and on company bulletin boards, the tires on plaintiff's car were slashed, and a foul-smelling substance was put in his shoes. All of this harassment apparently occurred with the knowledge and, at least, acquiescence of the supervisors who testified to seeing it. Levy, *supra* note 91, at 583, citing 488 F. Supp. at 384-85.

[95] Levy, *supra* note 91, at 583.

[96] For example, Smith's approach covers race discrimination only, because, as he persuasively argues, race is "different," Smith, *supra* note 63, at 529, whereas my approach would cover all types of Title VII discrimination as well as those covered by analogous anti-discrimination statutes such as the ADEA and ADA.  Smith focuses his proposed remedy on reforming retaliation opposition conduct law; I briefly discuss my agreement with his proposal but also offer a number of additional reforms in Section IV *infra*.  Levy's purpose is to analyze the many ways in which Title VII courts are failing to grant adequate relief in hostile environment cases, and she offers a statutory overhaul in Title VII's remedies provisions as her main proposed reform.  *See* Levy, *supra* note 91, at 568, 600.  I argue that

too many cases involving troubling facts about workplaces full of signs of discriminatory animus, plaintiffs routinely lose because they have reacted with anger, leading to their dismissal for insubordination.[97]

Still another helpful intervention comes from Prof. Charles A. Sullivan.  He writes about a retaliation case,[98] (in this instance under the participation clause[99]), in which a plaintiff was fired for telling an employee representative in an EEOC-arranged mediation to "shove" a settlement proposal "up your ass."[100] Sullivan notes that "[v]oices are raised and tempers flare in mediations across the country," and warns against creation of "a kind of civility code" in retaliation cases, noting that "it's scarcely surprising that etiquette will sometimes go by the wayside. Sullivan urges court to accept the reality that not all disputes are conducted in the stately minuet" the court seemed to expect.[101]

Smith, Levy, Sullivan and I have all pointed to cases with strong facts in plaintiffs' favor despite acts of mild to moderate insubordination. Sometimes, however, the facts for the plaintiff are not particularly strong. The background evidence of discrimination may be quite weak, for example, or the plaintiff's reaction may go beyond what this article has termed mild or moderate insubordination.[102]  Reviewing courts nevertheless get the analysis wrong by failing to even consider the employer's reason for discharge in light of whether a reasonable plaintiff would have cause to display indignation in light of justified perceptions of discrimination.  The answer to this question may be no, but courts should at least consider it.[103]

---

reform can be accomplished through the exercise of courts' interstitial common law powers.

[97] Another article that collects additional race discrimination/insubordination cases not discussed here is Richard Bales, *A New Standard for Title VII Opposition Cases:  Fitting the Personnel Manager Double Standard into a Cognizable Framework*, 35 S. TEX. L. REV. 95 (1994) (discussing insubordination cases involving personal managers) (citing EEOC v. Kendon of Dallas, Inc., 34 Empl. Prac. Dec. (CCH) ¶ 34,393 (E.D. Tex. Mar. 8, 1984)); see also Elizabeth Chambliss, *Title VII as Displacement of Conflict*, 6 TEMPLE POL. & CIV. RTS. L. REV. 1 (1997) (analyzing and critiquing courts' unwillingness to protect EEO officers from employer retaliation).

[98] Hatmaker v. Mem'l Med. Ctr., 691 F.3d 741 (7th Cir. 2010).

[99] For discussion of participation clause retaliation see *infra* n. 130.

[100] Charles A. Sullivan, "Taking Civility Too Far?" Workplace Prof Blog (Aug. 9, 2013), http://lawprofessors.typepad.com/laborprof_blog/2013/08/taking-civility-too-far.html   (last visited Jan. 30, 2014).

[101] *Id.*

[102] *See, e.g.,* cases cited *supra* n. 7 & *infra* n. 103.

[103] A case in this category is the Eighth Circuit's opinion in Garrett v. Mobil Oil Corp., 531 F.2d 892 (8th Cir. 1976).  There the plaintiff, an African American mailroom employee, believed she had been the victim of a discriminatory performance evaluation.  Without permission from her supervisor she left her work station in an attempt to see a manager, and resisted with rude language when ordered to return to work.  Later she and several other African American women with similar complaints again tried to visit this manager; he came

Mixed motive analysis is available in Title VII cases to deal with situations such these — where both legitimate and illegitimate reasons, such as a legitimate performance evaluation documenting inadequate performance as well as discrimination and/or opposition conduct—may have motivated an employer's adverse employment action against a plaintiff.[104]   One might therefore hope that in mixed motive cases courts would do a better job of analyzing insubordination cases.   Unfortunately, this is not always true. Although some courts do a good job with these cases, other courts do not. Cases in which courts do correct analysis can help point the way towards the development of proper principles to analyze insubordination cases generally, as discussed below.

### B. *Mixed Motive Analysis*

In the cases discussed in Part II-A above, insubordination cases are handled as "single motive" cases, meaning that the parties are contesting what single reason was the real reason for an employee's termination.   In many other cases, often involving facts in which employee conduct is troubling, either the plaintiff, or in some cases the employer, requests that the case proceed with instructions to the fact-finder to evaluate the mixed motive affirmative defense.   In these cases the parties have essentially acknowledged that multiple factors, some discriminatory and some legitimate or nondiscriminatory, motivated the employer's action.   The job for the trier of fact is to determine whether, at bottom, the employer would have made the same decision even if discrimination was not a causative factor in its conduct.[105]   Congress introduced more remedial complexity for mixed motive Title VII cases under the Civil Rights Amendment of 1991, but for our purposes these changes do not alter the analysis:   plaintiffs win complete relief if they show discrimination was a "motivating factor" in an adverse employment decision and the employer then fails to show that it would have made the same decision absent the discriminatory factor; employers receive

---

out of his office and demanded that she leave.  The company later notified her that she was fired for "repeated violation of by-passing your supervis[or] in presenting complaints to management and disrupting work." *Id.* at 895.

After a bench trial, the court found that the employer properly discharged the plaintiff for "leaving her work station, disobeying work rules in presenting her complaint to management and disrupting operations." *Id*. The Eighth Circuit affirmed, holding that the employer presented a valid reason for the discharge because "[c]ertainly an employer can fire a worker who refuses to obey reasonable regulations, leaves the work area without permission, and barges in on conferences and meetings of management personnel." *Id.* at 895-96.

[104] *See generally* Harold S. Lewis, Jr. and Elizabeth J. Norman, EMPLOYMENT DISCRIMINATION LAW AND PRACTICE 365 (2d ed. 2004).

[105] *Id.*

a far less painful liability judgment (consisting of declaratory relief only) if they show they would have made the same decision even if discrimination had not been a motivating factor.[106]

In cases arising in a mixed motive posture one might think that the link between the underlying allegations of discrimination and the allegedly independent nondiscriminatory reason for the discharge—*i.e.*, insubordination—would be clearer:  After all, if the employer's asserted legitimate reason for the discharge, namely, insubordination, was itself provoked by the very discrimination acknowledged to be a motivating factor in the employer's conduct, then the employer has not shown that it would have taken the same action absent discrimination.  Logically, if the decision-maker finds that discrimination or retaliation was a motivating factor, it cannot then be said that the employer had an *independent* legitimate reason for its action when it fires an employee for insubordination related to or caused by that discrimination or retaliation.  Discrimination or retaliation are instead intertwined with discrimination; the "reason" for the discharge would not have occurred if the discrimination or retaliation had not occurred.

Courts applying mixed motive analysis, however, have sometimes disregarded this logical point.  A few examples can suffice as illustration.  In *Matima v. Celli*,[107] the plaintiff, a black South African national with a master's degree in pharmaceutics, engaged in a long series of escalating verbal protests at the pharmaceutical company where he worked.[108]  Some of these protests were disruptive of the manager's time and efficiency.[109]  Matima's belief that he was being subjected to unlawful race and national origin discrimination triggered his protests.[110]  A jury found that he had not been subject to unlawful discrimination but had been subject to unlawful retaliation after he began to complain of discrimination.  The jury next concluded, on the basis of the court's jury instructions, that the employer would have discharged the plaintiff even in the absence of retaliation, and the district court entered judgment for the employer.

On appeal, the plaintiff pointed out that there was a patent logical flaw in the jury's conclusion that the employer would have fired Matima even if he had not complained of discrimination, since it was his perception of

---

[106] *See* Title VII, § 706(g)(B); 42 U.S.C. § 2000e-5(g)(B). Moreover, in the retaliation clause context, the Court recently held that *no* mixed motive analysis is available, meaning that plaintiffs now must prove that retaliation is the "but for" cause of the adverse employment action they endured.  *See* Univ. of Texas Southwestern Medical Ctr. v. Nassar, 133 S.Ct. 2517, 2528 (2013).  This makes retaliation cases even harder for plaintiffs.

[107] 228 F.3d 68 (2d Cir. 2000).

[108] *Id.*

[109] *Id.*

[110] *Id.*

discrimination that led him to complain.[111] The Second Circuit did not find this point compelling, however.  Instead it pointed out, "We have held generally that insubordination and conduct that disrupts the workplace are 'legitimate reasons for firing an employee,' and we see no reason why the general principle would not apply, even when a complaint of discrimination is involved."[112]  But this cannot be true in a mixed motive case where the insubordination and the discrimination are casually connected, as already discussed.

The Second Circuit further opined, "An employer does not violate Title VII when it takes adverse employment action against an employee to preserve a workplace environment that is governed by rules, subject to a chain of command, free of commotion, and conducive to the work  of the enterprise."[113]  The court noted that it was the employer that opted to proceed under a mixed motive analysis and thus agreed to shoulder the burden of proving that it fired the plaintiff for legitimate reasons.  But because a "wealth of testimony and incident was available to show that the plaintiff's behavior was disruptive," the Second Circuit concluded that record amply supported the jury's verdict.[114]

Here again the Court must be wrong as a matter of logic.  It may well be that Matima's termination was justified because his behavior went too far.  But it was not justified because it was a cause "independent" of the perceived discrimination.[115]  In cases like these, the underlying claim of discrimination and the resulting "insubordination" are not alternative, separate, and distinct causal factors; instead, one factor allegedly caused the other.  The correct way to decide such cases, as discussed further in Part IV-A-2, would (1) consider the relationship, if any, between the insubordination and the perceived discrimination, and then, if such a relationship exists, (2) balance the circumstances causing the insubordination against the nature or degree of the response.

Some Title VII courts correctly perform this analysis under mixed motive doctrine in insubordination cases, as already noted.  The Third Circuit's analysis in *Goodwin v. City of Pittsburgh* [116] is an example of such a well-reasoned case.  There the plaintiff, an African American traffic control worker, experienced discrimination in his wages and job classification.[117]

---

[111] *Id.* at 71.
[112] *Id.* at 79 (citations omitted).
[113] *Id.* (citations omitted).
[114] *Id.* at 81.
[115] *Cf. Staub*, 131 S. Ct. at 1192 (citing *Exxon Co,, U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 837 (1996)) (explaining proximate cause and independent cause analysis in employment discrimination cases).
[116] 480 F. Supp. 627 (W. D. Pa. 1979) *aff'd* 624 F.2d 1090 (3rd Cir. 1980).
[117] *Id.*

The EEOC conciliated this dispute and the employer adjusted the employee's pay prospectively.[118]  Soon afterwards, however, a white supervisor berated the employee with swear words and racial epithets.[119]  The plaintiff left his jobsite to find another supervisor and the situation eventually ended in a "heated verbal exchange" that resulted in the police and fire departments being brought in to calm the situation.[120]  The plaintiff received a suspension and filed a new charge with the EEOC for racial harassment, after which he was called to a meeting in which city mangers asked him to withdraw his EEOC charge.  In the course of a discussion in which he refused to do so, he called one of these superiors a liar, and was terminated because of his "uncooperative attitude" and "disruptive influence."[121]

After a bench trial, the district court held that the city's contention that it fired Goodwin for insubordination must be considered *in relation to* his prior protected activities.[122]  It concluded that a "retaliatory motive . . . played a substantial causal role in the decision to fire Goodwin when, on only one occasion, he called his boss "a 'liar,' under circumstances which were, at the least, provoked, and, at most justified."[123]  The court continued, "[t]o be sure, calling a supervisor a liar is a serious matter.  However, it takes on less significance if it occurs privately, during a heated debate initiated by the employer, about the employee's decision to engage in protected activities."[124]  The court ruled that Goodwin had satisfied Title VII's burden of showing pretext and entered judgment in his favor.[125]

---

[118] *Id.* at 690.

[119] *Id.*

[120] *Id.*

[121] *Id.* at 630-31.

[122] *Id.* at 634.

[123] *Id.*

[124] *Id.*

[125] *Id.* at 645-46.  Another case from the Third Circuit likewise balanced the underlying situation of egregious racial hostility in the workplace tension arising from opposition to this workplace culture. In *Moore v. City of Philadelphia*, white police officers brought suit under Title VII alleging that their supervisors retaliated against them for opposing racist slurs and other discriminatory practices against the African American officers in their police department. 462 F.2d 331 (3d Cir. 2006). The facts as to the egregious racial hostility in the workplace were compelling, as were the facts as to the retaliation the plaintiffs had endured for opposing it.  The district court nevertheless granted summary judgment to the police department, holding that the plaintiffs could not claim protection against retaliation for protesting discrimination against a racial group in which they were not members.  The court further opined that the situation was better viewed as one of mounting workplace tension and clashing personalities.

The Third Circuit reversed, however, correctly viewing the complex mix of motives and causal factors in the case in explaining:

These three police officers have sought to recover for a long, unpleasant experience working at the Philadelphia Police Department.  We

*Robinson v. SEPTA* presents another correctly reasoned analysis from the Third Circuit.[126] There the district court entered judgment for the plaintiff on race discrimination and retaliation claims involving multiple incidents of harassment and other employer conduct that, the district court found, were aimed at "generally trying to provoke Robinson to insubordination."[127] The employer asserted that Robinson had been properly fired for insubordination, but the district court rejected this claim. The Third Circuit affirmed, noting that "[a] play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, discrimination analysis must concentrate not on individual incidents, but on the overall scenario."[128]

*Robinson* captures an important point about mixed motive insubordination cases: To determine whether insubordination is an

---

find that a jury might well believe that their supervisors made their lives the "living nightmare" one supervisor promised as payment for opposing unlawful discrimination. It is true enough that only a portion of that nightmare can be attributed to a desire to retaliate against them . . . These officers have claimed many wrongs by many foes for many reasons. But this cannot obscure the fact that a jury might properly conclude that some of those wrongs by some of those foes were intended to silence the plaintiffs from identifying and opposing unlawful discrimination.

462 F.3d at 352.

[126]  982 F.2d 892 (1993).

[127]  *Id.* at 897.

[128]  *Id.* at 896 (quoting Andrews v. City of Philadelphia, 895 F.2d 1469, 1484 (3d. Cir. 1990)). Still another correctly reasoned case is *Brown v. Scotland County*, 2003 WL 21418099 (M.D. N.C. 2003). This case involved two plaintiffs: Brown, an African American detective who was fired after he truthfully described to the press an incident in which a fellow white detective called him the "n" word in front of a prisoner; and Jones, an African American deputy sheriff who was fired after he questioned Brown's termination. Brown filed suit raising First Amendment claims. The county claimed in response that its interest in sustaining discipline outweighed Brown's free speech rights, but the district court rejected this claim in light of Brown's "substantial interest in speaking about racial prejudice and discrimination in the Sheriff's department." *Id.* at *6. Jones sued, alleging that the county had engaged in unlawful retaliation and discrimination against him; the county argued that it had fired Jones for legitimate reasons because he had been "insubordinate" in the way he had raised questions about Brown's firing. The court rejected the county's argument, noting that the county's version of events was in dispute and, if Jones' version was believed, it would significantly undermine the county's "argument that firing Jones was necessary to maintain discipline." *Id.* at *6. But the court did grant summary judgment to the county on Jones' race discrimination claim, concluding that Jones had failed to offer any evidence that a white deputy would have been treated differently in the circumstances because of race. *Id.* at *11. This case is thus an example of facts that, while not strong enough to support a judgment of race discrimination under Title VII, could still present circumstances in which an employer's proffered explanation for an adverse employment action based on "insubordination" should lead a court to engage in further scrutiny of the potential link between a workplace tinged with racism and an aggrieved employee's allegedly "insubordinate" reaction.

independent, legitimate reason or a related reason for employee discipline, courts must look at all the "scenes in the play" to understand the context underlying the insubordination. Insubordination provoked by perceptions of discrimination should not be accepted as an independent factor for mixed motive analysis.

As the facts in *Robinson* reflect, insubordination cases often include retaliation claims. A plaintiff complains about discrimination and then experiences treatment the plaintiff perceives as employer retaliation for complaining. In reaction to escalating tension the employee displays anger, which the employer labels as insubordination and grounds for disciplining the employee. Title VII explicitly protects employees from retaliation, so any analysis of insubordination doctrine must study retaliation doctrine as a potential source of protection for employees in such scenarios. Unfortunately, Title VII law has not developed robust protections for employees in such situations, as Part II-C discusses.

### C. *Retaliation Cases: The Unduly Narrow Confines of "Reasonable" Opposition Conduct*

Another common scenario in which courts almost always fail to protect employees who have engaged in mildly or moderately insubordinate conduct involves "opposition conduct" retaliation cases. All major federal employment antidiscrimination statutes contain anti-retaliation provisions.[129] These generally distinguish between two types of retaliation, which correspond to two potential stages of antidiscrimination legal proceedings. The first stage, which is the one most often relevant here, involves employee complaints about discrimination that take place before or in the absence of a formal charge of discrimination filed with a public agency.[130] This type of conduct is known as "opposition conduct."[131] Employees typically lose their protection against retaliation when they engage in opposition conduct that the employer labels insubordination.

A classic case in this category is *Pendleton v. Rumsfeld*, which the Circuit Court of Appeals for the District of Columbia decided in 1979 over a powerful dissent by Judge Patricia Wald.[132] In *Pendleton*, the Walter Reed

---

[129] *See, e.g.*, 29 U.S.C. § 623(d) (2012) (ADEA anti-retaliation provisions); 42 U.S.C. § 2000e-5(b) (2012) (ADA anti-retaliation provisions); 29 U.S.C. § 215(a)(3) (2012) (FLSA anti-retaliation provisions); 29 U.S.C. § 58(a)(4) (2012) (NLRB anti-retaliation provisions); 42 U.S.C. § 2000e-3(a) (Title VII anti-retaliation provisions).

[130] The second stage is the period after the employee has filed a discrimination charge with a public agency. Conduct in this later period is known as *participation* conduct. The protections at this stage are usually more robust and will not be my focus here. *See generally* Lewis and Norman, *supra* note 104, at 148-52.

[131] *Id.* at 146-48.

[132] 628 F.2d 102 (D.C. Cir. 1979).

Army Medical Center fired one African American EEO officer and demoted another for attending a meeting of employees called to discuss and protest perceived employer discrimination.  There was strong evidence of racial troubles in the institution, including a job structure that placed African Americans in lower-level positions.  Other facts reflected management hostility towards efforts to fix these problems.[133]  Nevertheless, the lower court and the court of appeals both concluded that this background evidence was irrelevant to the case's proper disposition.[134]  There was some dispute about whether the two EEO counselor plaintiffs in the case had merely watched the protest or had actively taken part in it by speaking out against the perceived discrimination.[135]  The circuit court majority opinion, however, did not find this dispute material..  It instead agreed with the trial court that the plaintiffs' "manner" of protesting—in other words, their activity of attending a demonstration against race discrimination—was not protected opposition conduct because a "reasonable person" would have felt that EO officers' attendance at a protest "fatally compromised their ability to gain the confidence of middle management."[136]

In dissent, however, Judge Wald argued:  "I do not think a simple finding that two EEO Counselors 'actively participated' in a peaceful if noisy protest during a turbulent period in race relations at the medical complex, without more, renders their conduct unprotected under Title VII's ban against retaliation for opposition to discriminatory practices."[137]  Judge Wald pointed out that the counselors' presence at the protest may have helped them in their duties, as defined in their employment manual, to serve as "bridges" and attempt "informal resolution of disputes while keeping management informed of employee grievances."[138]  Judge Wald argued that the case should have been remanded for "more detailed findings about what they did and why it was inconsistent with their EEO Counselors' roles in context."[139]

Despite Wald's dissenting view about opposition conduct analysis, the case law has continued to develop in restrictive directions.  Courts have drawn the bounds of "reasonableness" for opposition conduct so narrowly as to the acceptable *manner* of protest as to exclude all mild to moderate insubordination, even when the facts show why an employee exhibited anger in complaining.[140]

---

[133] *Id.* at 109 (Wald, J., dissenting).

[134] *Id.* (affirming the district court's decision)

[135] *Id.* at 106.

[136] *Id.* at 108.  Chambliss collects and criticizes other EEO officer cases that adopt similar reasoning.  *See* Chambliss, *supra* note 97.

[137] *Id.* at 114

[138] *Id.* at 113.

[139] *Id.* at 114.

[140] Briane J. Gorod argues that another problem with opposition conduct retaliation

One example comes from another foundational opposition conduct case, *Hochstadt v. Worcester Foundation for Experimental Biology*.[141] In *Hochstadt* a biological research foundation discharged a cell biologist after she protested a disparity in her pay as compared to that of male Ph.D.'s in the same job classification.[142] The district court found, in rejecting the plaintiff's motion for a preliminary injunction reinstating her to her job, that the employer discharged Dr. Hochstadt for legitimate, nondiscriminatory reasons.[143] These reasons were that Hochstadt had complained about various discrimination-related matters in meetings to discuss workplace issues among her small group of cell biologists. Her complaints included her salary and the inadequacy of the Foundation's affirmative action program.[144] The court found that these complaints had "interfered with the meetings, disrupted the discussions, and eventually caused the discontinuation of the meetings."[145] Hochstadt had also sought to elicit salary information from other employees and had spread a rumor that the Foundation might lose federal funding for failing to comply with affirmative action regulations. The court concluded that these actions "showed a lack of cooperation, disruptive influence, hostility and threats towards the Institution and its Directors."[146]

The First Circuit agreed, concluding that the plaintiff was not insulated from adverse action for conduct that "went beyond the pale of reasonable opposition activity."[147] The court opined, "Congress certainly did not mean to grant sanctuary to employees to engage in political activity for women's liberation on company time."[148] Instead, it concluded, "[a]n employer remains entitled to loyalty and cooperativeness from employees."[149] The court then articulated a test for assessing opposition conduct that is still used to assess whether the manner of opposition is

---

analysis is the limited scope of reasonableness accorded to employees' perceptions of what constitutes illegal activity. *See* Briane J. Gorod, *Rejecting Reasonableness: A New Look at Title VII's Anti-Retaliation Provision*, 6 A.U. LAW REV. 1469 (2007). In contrast, the analysis in this article focuses on a different prong of the reasonable analysis, namely, that regarding the *manner* of protest.

[141] 545 F.2d 222 (1st Cir. 1976).

[142] *Id.* at 226.

[143] *Id.*

[144] *Id.* at 227.

[145] *Id.*

[146] *Id.* at 228.

[147] *Id.* at 230.

[148] *Id.* More than a tinge of sexism can be detected in the court's attitude. A different result would have been likely in the union context, typically more dominated by male employees in this historical period. NLRA doctrine would place less emphasis on the need for employees to display "cooperativeness" while protesting perceived violations of statutorily protected rights, as discussed further in Part III *infra*.

[149] *Id.*

protected.  Under it courts are called to "balance the employer's right to run his business" against "the rights of the employee to express his grievances and promote his own welfare."[150]  In application, this balancing results in courts always find that insubordination goes beyond the bounds of protected opposition conduct.[151]

   To be sure, the narrow scope of protection for opposition conduct presents a problem broader than insubordination cases alone.  Other scholars have amply documented this general problem, as I discuss further in Section IV-A-3 below.   Preliminarily, suffice it to say that opposition clause jurisprudence produces perverse incentives:  Employees risk being fired without recourse if they express themselves adamantly, and opposition clause jurisprudence thus pushes employees towards the courts for help in the first instance.  In short, this jurisprudence "sanitizes" workplaces—reflecting a vision of employees as docile and passive persons who should  do what they are told and refrain from all but polite complaints about perceived discrimination.

   In Section III below I contrast this vision of acceptable employee conduct with that which emerges from the jurisprudence of the NLRB.  That agency and reviewing courts more robustly protect employees as they seek to resolve employees' perceptions of law violations in the workplace.  To be sure, Title VII and the NLRA are different statutes with different purposes.  But Title VII courts have long borrowed from NLRB jurisprudence where they have found it helpful to do so, as discussed further in Part IV-B below.[152]  Looking to the jurisprudence of the NLRB can help illuminate ideas for doctrinal reform even though those reforms should be adapted for the Title VII context.  This is the purpose of Part III below.

III.   CONTRASTING THE NLRB'S APPROACH IN INSUBORDINATION CASES

   The NLRB's approach to insubordination differs from that of Title

---

   [150] *Id.* at 233.
   [151] *See, e.g., Clack*, 304 F.App'x 399, 403-07 (affirming the trial court's holding that an employee was insubordinate for abandoning his post to call a superior officer after being subjected to discriminatory conduct); *McClendon*, 108 F.3d 789, 799 (holding that management may properly terminate an employee based on a good faith belief that he is insubordinate); *Matima*, 228 F. 3d 68, 79 (finding employees' disruptiveness justified termination despite retaliation motive); Rollins v. Florida Dep't of Law Enforcement, 868 F.2d 397 (11th Cir. 1989) (denying a plaintiff protection from retaliation under the *Hochstadt* balancing test where his manner of complaining about race discrimination was deemed disruptive and impaired unit morale); Whatley v. Metropolitan Atlanta Rapid Transit Authority, 632 F.2d 1325, 1329 (5th Cir. Unit B 1980) (denying a retaliation claim where the plaintiff voiced  discrimination complaints in a hostile and accusatory manner). *But see* Moore v. City of Philadelphia, 462 F.3d at 352 (upholding the plaintiff's retaliation claims as discussed further *supra* n. 129).
   [152] See *infra* Part IV-B (text accompanying nns. 220-26).

VII courts.  Over decades the NLRB has developed specialized expertise in regulating workplace relations. Its doctrines tend to be more finely calibrated than those of Title VII courts, based on its long observation of dynamics between employers and employees.  It strives to balance protection of workers' rights with employers' ability to run their workplaces effectively. To this end, the NLRB has addressed insubordination in several ways.  One longstanding doctrine, commonly known as the *Atlantic Steel* test, applies four factors to analyze the relationship between employee insubordination and the exercise of protected statutory rights.[153]  A second doctrine, aptly termed the "provoked insubordination" doctrine, scrutinizes employer insubordination claims to see if there is evidence that the employer provoked the insubordination.[154]  If so, the Board holds that the insubordination cannot be grounds for the adverse employment action, provided that it did not go too far beyond the bounds of appropriateness, in which case it loses this protection.  A final set of Board cases does not so much define a doctrine as apply the general principle that fact-finders should view employee conduct through a context-specific lens.  This lens often gives some benefit of the doubt to employees for brief angry outbursts, harsh words or otherwise moderately inappropriate conduct in situations in which the conduct is understandable in context.  The sections below sketch each of these areas of NLRB case law in turn.

### A. *The NLRB's* Atlantic Steel *Doctrine*

The *Atlantic Steel* doctrine arises out of a Board opinion of that name.[155]   In it the NLRB clarified its protections for employee insubordination that occurs in the course of exercising protected statutory rights.[156]  The facts arose out a dispute between a foreman and a worker active in his union on the subject of a probationary worker performing overtime work.  The worker called the foreman either a "lying son of a bitch" or a "m--f" liar,   and the employer suspended and then terminated the worker for doing so.[157]  He alleged that the same foreman had repeatedly harassed him for circulating a petition concerning benefits, and that the real reason for his discharge was his exercise of his rights under Section 7 of the NLRA to engage in "concerted activities for the purpose of collective bargaining or other mutual aid or protection."[158]

---

[153] *Atlantic Steel*, 245 NLRB 814, 816 (1979).

[154] *See infra* Part III-B.

[155] *See generally Atlantic Steel*, 245 NLRB 814 (1979).

[156] *Id.*

[157] *Id.*

[158] *Id*. In arbitration, the employer argued that the employee had been discharged for insubordination and the arbitrator upheld the discharge on these grounds.  In a collateral

In considering this case, the Board announced that it would assess the inappropriateness of an employee's conduct by examining four factors: "(1) the place of the discussion; (2) the subject matter of the discussion; (3) the nature of the employee's outburst; and (4) whether the outburst was in any way provoked by the employer's unfair labor practice."[159] Under the facts at issue in *Atlantic Steel*, the Board held that the employee's action failed this test and therefore lost its protection.[160] Thus, the *Atlantic Steel* doctrine is far from "any anything goes" rule: the extent of tolerable employee insubordination depends on careful analysis of the circumstances.

The Board and reviewing courts frequently apply the *Atlantic Steel* doctrine. This doctrine sometimes produces favorable results for employees, though this certainly is not always the case, as the disposition in *Atlantic Steel* shows. In one recent case, *Kiewit Power Constructors Co. v. NLRB*,[161] for example, two employees disagreed with an employer's decision to shorten their break period.[162] When their supervisor warned them that they had taken too long a break, they shouted back that "things would get ugly" if they were disciplined.[163] They also told the supervisor that he had "'better bring [his] boxing gloves."[164] The employer fired both employees and they filed unfair labor practice charges, alleging that their statements were protected as concerted action under Section 7 of the NLRA. The Board ruled in the

---

unfair labor practice proceeding, however, the ALJ refused to defer to the arbitrator's decision. Instead, the ALJ found that the employer had unlawfully terminated the employee. The Board, in turn, overruled the ALJ and deferred to the arbitrator, holding that the ALJ had improperly applied its previous authorities, which provided that during "formal grievances or negotiating sessions which were conducted away from the production area . . . in the heat of the discussion, an employee [who] uttered an obscenity or used extremely strong language . . . was found to be protected as part of the res gestae." *Id.*

[159] *Id.* at 816. The *Atlantic Steel* doctrine derives from earlier cases that delineated broad bounds of protection for employee outbursts and similar behavior in the exercise of rights protected under the NLRA. *See, e.g.*, *Hawaiian Hauling Serv., Ltd.*, 219 NLRB 765 (1975) (using broad language to protect an employee discharged for calling his supervisor a liar during a grievance proceeding). These cases emphasized the need for "[a] frank, and not always complimentary, exchange of views" in furtherance of the collective bargaining process. *Bettcher Mfg. Corp.*, 76 NLRB 526, 527 (1948). The test excluded from protection only those "flagrant cases in which the misconduct is *so violent or of such a serious character as to render the employee unfit for further service*." NLRB v. Illinois Tool Works, 153 F.2d 811, 815-16 (7th Cir. 1946) (emphasis supplied; citations omitted). The *Atlantic Steel* test narrowed this doctrine. This article focuses on post-*Atlantic Steel* cases, though decision-makers, especially courts, still occasionally quote from these earlier cases.

[160] *Atlantic Steel Co.*, 245 NLRB at 817 ("[W]e conclude that it will effectuate the purposes of the Act to give conclusive effect to the grievance award, and, on that basis, we shall dismiss the complaint in its entirety.").

[161] 652 F.3d 22 (D.C. Cir. 2011).

[162] *Id.*

[163] *Id.*

[164] *Id.*

employees' favor, concluding that the two employees should be reinstated because their statements were merely figures of speech made in the course of exercising their rights to protest working conditions.[165]  The Board further emphasized that the statements, in context, were not real physical threats.[166]  On review the D.C. Circuit affirmed the Board's ruling, noting that in context it was reasonable for the employees to object forcefully to enforcement of the new break policy on the spot so that other employees would not think they consented to it.  The court also noted that the supervisor had chosen to "pick a public scene" for what was "likely to lead to a quarrel."[167]  Freely acknowledging the soundness of the employer's argument that it should have the right to maintain rules prohibiting harassment and abusive or threatening language, the D.C. Circuit nevertheless concluded that the statements at issue "did not involve the kind of insubordination that requires withdrawing the Act's protection.  It would defeat section 7 if workers could be lawfully discharged every time they threatened to 'fight' for better working conditions."[168]  Many other cases reach similar conclusions.[169]

---

[165] *Id.* at 29.

[166] Id. at 24.

[167] *Id.* at 27, citing NLRB v. Southwest Bell Tel. Co., 694 F.2d 974, 978 (5th Cir. 1982).

[168] 652 F.2d at 29, citing *Southwest Bell*, 694 F.2d at 978.

[169] For the reader who desires more supporting research regarding the Board's different approach, here are some other examples:   In a recent case, an ALJ found in favor of an employee in a disagreement over how her employer counted work hours.  *See Hitachi Capital America Corp.*, 2012 WL 2861686 (NLRB Div. of Judges, July 11, 2012), *aff'd* 361 NLRB 19 (2014).  In the course of this dispute the employee had written an email that her employer regarded as intemperate.  This contributed to the employer's decision to discharge her for insubordination.  Applying *Atlantic Steel* and citing much other precedent as well, the ALJ found in favor of reinstating the employee, noting that "[t]he protections of Section 7 would be meaningless were we not to take into account the realities of industrial life and the facts that disputes over wages, bonus and working conditions are among the disputes most likely to engender ill feelings and strong responses."  *Id.* (citing *Consumers Power Co.*, 282 NLRB 131, 132 (1986)).  The ALJ also rejected the employer's mixed motive defense, concluding that it had not shown that it would have fired this employee even if she had not written her email complaint.

The NLRB has decided similar cases throughout its many decades of NLRA enforcement, including a few that involve quite egregious employee misconduct.  In reverse chronological order, examples include *Plaza Auto Center*, 355 NLRB 493 (2010), in which an employee protested the way his employer calculated commissions on car sales and charged salespersons for damage found on cars.  In the course of a meeting the employer called to discuss these complaints, the employee told his supervisor that he was a "'F'ing mother F'ing," a "'f'ing crook,'" and "'an asshole,'" and further told his supervisor that "he was stupid, nobody liked him, and everyone talked about him behind his back."  *Id.* at 496; *see also* Plaza Auto Ctr., Inc. v. NLRB, 664 F.3d 286, 290 (9th Cir. 2011) (further discussing these facts in the course of enforcing the Board's order).  The employer fired this employee, and he filed unfair labor practice charges.  The ALJ considering these charges found the employee's behavior to exceed the bounds of protected conduct.

_____

The Board, however, reversed, finding the conduct protected under *Atlantic Steel*. Applying that test, the Board in *Plaza Auto* held that most of the relevant factors weighed in the employee's favor, including that (1) his cursing had taken place with only other supervisors present so his remarks did not undermine morale among other employees, (2) he was protesting pay policies and related terms and conditions of employment, and thus was clearly engaged in concerted action protected under NLRA Section 7, and (3) the employer's repeated invitations to quit if he did not like his work situation had been provocative. The Board further found that the employee's profanity was not as belligerent as the ALJ had characterized it, and that his conduct therefore did not render him "unfit for further service" as prior precedents had articulated as the bottom-line question underlying the *Atlantic Steel* four-factor inquiry. *Id.* at 496 ("[W]e conclude that Aguirre's outburst, while vehement and profane, was brief and unaccompanied by insubordination, physical contact, threatening gestures, or threat of physical harm. Therefore, we find that his conduct did not render him unfit for further service and thus did not exceed the bounds of statutory protection under Atlantic Steel's third factor.")

Another employee-protective case example is *Air Contact Transport Inc.*, 340 NLRB 688 (2003). There an employee had become loud and boisterous in the course of a discussion that arose after the general manager asked if employees had questions on work-related matters at the end of a work party held in a restaurant. The ALJ concluded, and the Board and Fourth Circuit affirmed, that the employee's conduct, while "perhaps imprudent," was not "indefensible." The Board noted that it had taken place during "undisputedly protective activity" and was "not so egregious as to remove him from § 7." *Id.* at 695; *see also* NLRB v. Air Contact Transport Inc., 403 F.3d 206, 212 (4th Cir. 2005).

The Board reached a similar conclusion in *Cibao Meat Products*, 338 NLRB 934 (2003), where an employer fired an employee for protesting after a supervisor told employees they must arrive early to open up the plant gate before starting work. The employee responded, in front of other employees, that opening the gate was the job of security, and that "we are the workers, the employees, after you open the factory." *Id.* Upholding the ALJ's findings, the Board reasoned that the employee's conduct "in the presence of other employees" was a protected initiation of concerted action, not unprotected insubordination as the employer claimed. *Id.*

In *Cibao Meat Products* the employee's language had been fairly temperate, but in *Southwestern Bell Telephone Co.* the Board protected a union shop steward who engaged in an intemperate spontaneous outburst after learning that the company had cancelled an agreement with the union over the allocation of overtime. *See* NLRB v. Sw. Bell Tel. Co., 694 F.2d 974, 978 (5th Cir. 1982). The employee's outburst included statements such as "I'll see you fry." *Id.* at 976. The next day the employee was called to a disciplinary meeting in which he told a supervisor to "shut up" and said "I don't have to take this [expletives deleted]," leading to his suspension for insubordination. Agreeing with the Board that the employee's conduct did not cause him to lose his protection under the NLRA, the Fifth Circuit held that the first outburst had taken place in the context of discussion of terms and conditions of employment, activity protected under Section 7, and that the second outburst had been provoked by the earlier disciplinary action. *Id.* at 976.

The Board has even protected use of strings of strong curse words in some contexts. In *CKS Tool and Engineering, Inc.*, 332 NLRB 1578 (2000), for example, a supervisor called a meeting about the need to increase employee production and an employee began to use loud and vulgar language towards the supervisor. The employer fired the employee for doing so, but the ALJ reached his own conclusion that the "disrespectful conduct was not so egregious as to take [the employee] outside the protection of the Act." *Id*. at 1283. The ALJ further held that the proffered reasons for the discharge, namely, "insubordination," were

These NLRB and reviewing court opinions applying the *Atlantic Steel* doctrine stand in contrast to many of the Title VII cases cited in Section I above, in which vulgar language, a raised voice, or disrespectful conduct towards a supervisor immediately cause an employee to lose protection under Title VII. Decision-makers in the NLRA context are more lenient about the bounds of protected conduct, though they, too, draw clear boundaries as to what degree of insubordination is permissible.[170] The image of the worthy employee that arises under the NLRA encompasses a more active, emotional, and sometimes ribald or vulgar human being (but not one who is threatening or destructive). This NLRB's image of the worthy worker arguably embodies a more realistic view of individuals contending with, and sometimes reacting imperfectly and overly strongly to, the stress of workplace interactions related to the exercise of protected rights.

To point this out is not to say, of course, that anything goes under the Board's precedents. To the contrary, employees found to have engaged in threatening behavior, or to have exceeded what a reasonable employer should tolerate by way of outbursts, swearing, harassment, or other inappropriate conduct, lose their Section 7 protection.[171] But the contrast remains clear: NLRB precedent recognizes more room for active protest in furtherance of

---

pretextual and rejected the employer's mixed motive argument as well. Subsequently the Board affirmed the ALJ in all relevant respects. *Id.* at 1578.

Finally, in *Severance Tool Industries*, 301 NLRB 1166, 1169 (1991), *aff'd* 361 NLRB 19, the ALJ found that an employee had used the term "son of a bitch" and "raised his voice in a disrespectful manner" in complaining about the employer's vacation pay policy. The ALJ concluded that "the evidence of disrespect, rudeness, and the use of vulgar language," did not bar the employee from the Act's protection, noting that numerous Board precedents "established that a 'certain amount of salty language and defiance' must be tolerated during such confrontations." *Id.* at 1170 (quoting NLRB v. Chelsea Laboratories, 825 F.2d 680, 683 (2d Cir. 1987); Syn-Tech Windows Systems, 294 NLRB 791 (1989)). Thus, the ALJ reasoned, even though the employer "characterized [the employee's] conduct as insubordinate, belligerent, and threatening, the record only supports a finding of disrespectful, rude and defiant demeanor and the use of a vulgar word." This level of misconduct, involving "an absence of any threats of violence, actual insubordination, or acts of violence," did not cause the employee to lose the protections of the Act. The Board affirmed on review. 301 NLRB at 1166.

[170] *See, e.g.*, NLRB v. Starbucks Corp., 679 F.3d 70, 78-80 (2d Cir. 2012) (noting that the Board has recognized only "'some leeway for impulsive behavior'" by an employee), quoting Piper Realty Co., 313 NLRB 1289, 1290 (1994).

[171] *See, e.g.*, NLRB v. Starbucks Corp., 679 F.3d at 78-80 (reversing the Board's application of the *Atlantic Steel* test where an employee engaged in an outburst in a public area in which customers as well as employees could see her, even though it was brief in duration and connected with her protected conduct of wearing a union button); Felix Industries v. NLRB 251 F.3d 1051 (D.C. Cir. 2001) (reversing the Board where the level of the employee's vitriol in calling his supervisor a "f--king kid" three times in a short conversation about the employee's right to receive premium pay for working night shifts was abusive and unprovoked).

protected statutory rights than Title VII federal court opinions do.

      The NLRB's *Atlantic Steel* doctrine is not the only helpful contrast to Title VII insubordination law.  Another helpful doctrine looks for "provoked insubordination," as discussed in Part II-B below.

            B.   *The NLRB's Provoked Insubordination Doctrine*

      As we have seen, whether management conduct has "provoked" an employee's response is factor four in the *Atlantic Steel* test.  But the Board's doctrines extend even beyond the *Atlantic Steel* context of Section 7 rights. The Board has held that employee insubordination cannot be grounds for discharge where an agent of the employer *provoked* an angry outburst or similar act, even when the employee was not engaged in action protected under Section 7.

      In brief, the Board's provoked insubordination doctrine holds that an "employer cannot provoke an employee to the point where she commits . . . an indiscretion . . . and then rely on this to terminate her employment."[172]  To determine whether application of this principle is appropriate, the Board balances the severity of the provocation against the response, so that the "more an employer's wrongful provocation the greater would be the employee's justified sense of indignation and the more likely its excessive expression."[173]

      Appellate courts reviewing Board cases have approved and applied the Board's provoked insubordination doctrine in many cases.  To take but one example, the First Circuit in *NLRB v. Steinerfilm, Inc.*, upheld the Board's reinstatement of an employee fired for insubordination on the reasoning that "[w]e think the Board could reasonably conclude that the insubordination was an excusable, if a regrettable and undesirable, reaction to the unjustified warning [the employee] had received just minutes before, and that the discharge was therefore improper.[174]  The court went on to observe that "[o]ther circuits have similarly recognized that, in a proper case, the Board may order reinstatement of an employee whose rudeness and 'excessive expression' were the result of unjustified treatment by the employer."[175]

---

[172] *Opelika Welding*, 305 NLRB 561, 568 (1991).

[173] *Id.* Situations in which the Board has applied this reasoning include "where the supervisor came up close to the employee and shouted at him, whereupon the employee placed his hand on the supervisor's chest and pushed him back; and where the supervisor appeared to be waving his finger in the employee's face, whereupon the employee defensively clenched his fists." *Id.* (citations omitted).

[174] 669 F.2d 845, 851-52 (1st Cir. 1982) (citing Trustees of Boston University v. NLRB, 548 F.2d 391, 392-93 (1st Cir. 1977)).

[175] *Id.* at 851-52 (citing Crown Central Petroleum Corp. v. NLRB, 430 F.2d 724 (5th Cir. 1970); Hugh H. Wilson Co. v. NLRB, 414 F.2d 1345, 1355-56 (3d Cir. 1969), cert.

To be sure, NLRB provoked subordination cases rest on rules that do not apply in the individual employment rights context typically at issue under Title VII. This is because, in a unionized workplace, a collective bargaining agreement typically mandates a "just cause" standard for employee discipline, meaning that an employee cannot be terminated for reasons that are unfair, unjustified, or arbitrary.[176] The Board's provoked insubordination doctrine essentially assumes a just cause standard in reasoning that an employer should not discharge an employee for insubordination where a supervisor's conduct unfairly provoked the employee's misconduct. In the nonunion context, in contrast, an at-will employment regime applies, under which employees can be discharged for any reason except a discriminatory or otherwise illegal one.[177] Thus the provoked insubordination doctrine cannot be imported wholesale into the individual employment antidiscrimination rights context because employees have no general protection against an employer treating them unfairly. But a more limited version, which protects employees where provocation *relates to discrimination*, or would at least lead a reasonable employee to perceive such a relationship between employer provocation and discrimination, would go far to advance Title VII's objectives. Such a rule would address the kinds of troubling cases documented in Section II *supra*, in which discrimination triggers alleged insubordination. This suggestion will be further developed in Section IV-B-1 below.

Before moving on to discuss in more detail how courts might adapt Board doctrine to fit the needs of Title VII cases, it is worth examining one additional feature of the NLRB's approach to the imperfections of employees' workplace conduct. This involves the NLRB's more tolerant approach in general towards an employee whose contribution to the workplace, while valuable, comes with some nonconforming conduct. Here too, the Board tends to grant greater leeway than Title VII courts, and here too, those courts would gain from borrowing from the NLRB's institutional wisdom and historically experience with regulating workplaces. Section III-C briefly discusses the Board's general approach to analyzing the appropriateness of employee conduct and suggests how it might help inform revisions in the way antidiscrimination courts approach questions of employee misconduct.

---

denied, 397 U.S. 935 (1970); NLRB v. Thor Power Tool Co., 351 F.2d 584 (7th Cir. 1965); NLRB v. M&B Headwear Co., 349 F.2d 170, 174 (4th Cir. 1965)).

[176] *See* Roger I Abrams & Dennis R. Nolan, *Toward a Theory of "Just Cause" in Employee Discipline Cases*, 1985 Duke L.J. 594, 611-12.

[177] *See* Clyde W. Summers, *The Contract of Employment and the Rights of Individual Employees: Fair Representation and Employment at Will*, 52 Fordham L. Rev. 1082, 1097 (1984).

## C. The NLRB's General Approach to the Appropriateness of Employee Conduct

Not only specific doctrines the NLRB has developed, but also Board's general approach to alleged employee misconduct can inform Title VII reform. The Board, possibly because of its specialty focus on the workplace and many decades of expertise in regulating the permissible bounds of employer-employee interactions, frequently displays greater sensitivity to the ways in which employee behavior might seem inappropriate from outside the particulars of an employment setting but may not in fact fall outside the scope of tolerable employee conduct in context. Again, its approach would have to be adapted somewhat to fit the needs of antidiscrimination analysis, but courts could easily do so.

Sometimes employees have personality traits that render them difficult in the workplace. Employees may be defensive, blunt, prickly, slightly paranoid, antagonistic and/or rigid. As already noted, under an at-will employment regime antidiscrimination law does not protect employees from adverse employment actions based on these attributes, such as quirky or difficult personality traits (at least outside any protections under the Americans with Disabilities Act on the basis of psycho-social disability).[178] This article's argument does not depend on expanding antidiscrimination doctrine to contravene the at-will employment regime that governs many of the nation's workplaces. In the discrimination context, however, sorting through what aspects of employee behavior are attributable to personality or other non-protected traits and what aspects are related to the experience of workplace discrimination can be extremely complex.

Professor Terry Smith has discussed this phenomenon in his excellent article on the everyday effects of what he calls "subtle" discrimination.[179] As Smith persuasively argues, we live in a nation that includes many individuals for whom the experience of discrimination is pervasive, raw, and mostly un-redressed. A bad experience or encounter that would seem relatively minor absent the element of a discriminatory atmosphere feels very different when it is the culmination of many similar experiences building up over time.[180] Individuals bring such background experiences with them into the workplace. A more context-sensitive approach in Title VII cases would take more

---

[178] *See* Susan D. Carle, "Analyzing Social Impairment under the Americans with Disabilities Act" (2015) (unpublished manuscript on file with author).

[179] *See* Smith, *supra* note 63.

[180] *See id.* at 535-45; *see also* text accompanying n. 90 (quoting case example Smith offers). The recently coined term microaggression captures a similar insight. *See* Tanzina Vega, *Students See Many Slights as Racial "Microaggressions,"* N.Y. TIMES, June 27, 2014, p. A1.

account of this broad range in employee understandings of both appropriate supervisor and employee conduct.

Here employment antidiscrimination courts might again take their lead from the NLRB, which in a variety of contexts "lets slide," in the interests of promoting the NLRA's objectives, employee behavior bordering on insubordination. The Board has faced particular challenges in assessing employee conduct in Internet and social media communications, where employer expectations and employee assumptions as to the bounds of appropriate behavior are very much in flux.[181]   In much the same way, understandings about what constitutes discriminatory behavior in the workplace—for example, what jokes are acceptable, and what ways of speaking to others are unacceptably rude—are also in flux.  There may be wide divergences in generally held understandings on these questions.  In these conditions, courts should err on the side of protecting employees whose conduct reacts to perceptions of discrimination.

An example of a Board case erring on the side of the employee for allegedly insubordinate conduct after undertaking adjustments based on workplace context is *Timekeeping Systems, Inc*.[182] There an employee of a small software engineering firm who worked on computer programming, Larry Leinweber, sent a lengthy "reply all" email complaining about the employer's change in its vacation policy and pointing out what he saw as errors in the way the firm's CEO, Markwitz, had described the policy. Markwitz found Leinweber's tone in the emailed memo inappropriate, viewing it as a personal attack and a slap in the face of employees "with good attitudes."   After Leinweber avoided making the public apology Markwitz requested and the two had a few more minor clashes, Markwitz fired Leinweber.

The Board affirmed the ALJ's findings that Leinweber's termination violated the Act. The employer argued that it would be wrong to "saddle Markwitz for many years into the future with the burden of a reinstated employee the likes of Leinweber," but the ALJ noted that:

> Leinweber is, I concede, a rather unusual person, perhaps one of the new breed of cyberspace pioneers who are attracting public attention, and at the same time—how else can I say it—a bit of a wise guy.  Still Markwitz [had previously] described Leinweber as "talented and intelligent," and he was willing to retain Leinweber after receipt of the offending message if Leinweber would publicly apologize.

---

[181] *Compare Hispanics United of Buffalo, Inc*., 359 NLRB 1, 4 (2012) (majority op.) (holding that Facebook postings were "concerted and protected"), *with id.* at 5 (Hayes, dissenting) (arguing that communications were not for mutual aid and protection).

[182] 322 NLRB 956 (1997).

Thus, the ALJ reasoned, reinstating Leinweber would not leave Markwitz "totally distraught," and this supervisor's "feelings must take second place to the dictates of the statute." In other words, the ALJ, as approved by the Board, considered the offending conduct in context, balancing the offense caused by the employee against the statutory purposes at issue and also factoring in the potentially unsettled norms in the particular employment setting—here involving "the new breed of cyberspace pioneers" who may hold different norms as to appropriate tone in work emails.

In a world of clashing perspectives, where norms of behavior and perceptions of discrimination often differ markedly and are in flux, institutions charged with regulating workplaces must adapt to ensure continued protection of employees' statutory rights. Just as "wise guy" cyberspace pioneers like Leinweber sometimes require an extra dose of tolerance, so too do indignant employees of color who live in the world Professor Smith describes of constantly experienced discrimination—or, as the recently coined term puts it, "microaggressions"—or in Professor Levy's context of outrageous sexual harassment.[183] Like the Board, Title VII courts should err on the side of protecting these employees' communications, even when they are somewhat intemperate, in the interests of preserving the "collective action" aspect of employee workplace rights. This focus on collective action has remained more salient under the NLRA than under individual employment antidiscrimination statutes, since collective action is the very right the NLRA protects.[184] But the protest aspect of Title VII, as recognized in its opposition conduct clause and early cases such as *McDonnell Douglas v. Green*,[185] remains important to implementation of that statute. Employees do still try to protest what they reasonably perceive as discrimination in a world in which prejudice is far from gone. When they do so it would behoove Title VII courts to recognize and protect them as imperfect and possibly annoying "squeaky wheels" who nonetheless function to further important public values.

IV.    REVISING TITLE VII INSUBORDINATION DOCTRINE

This article has argued that courts should be more cautious about accepting insubordination as the legitimate, nondiscriminatory reason for discharge in cases that raise discrimination concerns. In these situations,

---

[183] Smith, *supra* note 63; Vega, *supra* note 180; Levy, *supra* note 91.

[184] *See* Laura Beth Nielsen et al., *Individual Justice or Collective Legal Mobilization?: Employment Discrimination Litigation in the Post-Civil Rights United States*, 7 JOURNAL OF EMPIRICAL LEGAL STUDIES 175, 175 (2010) (conducting an extensive analysis of Title VII lawsuits filed in federal court from 1988 and 2003 and concluding that in this era collective legal mobilization was very rare and most cases were individual cases ending in small settlements).

[185] 411 U.S. 782 (1973).

some workplace friction may be necessary—even desirable—as employers and employees engage in dialogue about fairness in employment practices "under the shadow" of antidiscrimination law.[186]  If these arguments have merit, the question becomes:  What can be done to improve Title VII courts' handling of insubordination cases?   This section proposes a variety of measures that Title VII courts could take towards this end.   Courts interpreting Title VII could exercise their interstitial common law power to fill in statutory gaps[187] in a similar way to that in which the U.S. Supreme Court created the *Ellerth/Faragher*[188] affirmative defense to employer vicarious liability in supervisor sexual harassment cases.

     This article's proposals are, to be sure, different from the *Ellerth/Faragher* doctrine in that they enhance rather than decrease employer liability concerns—though only in a narrow swath of all cases, namely, those involving employee terminations for insubordination. As argued in Section I-C above, there is no reason second generation employment anti-discrimination approaches should not create incentives through sticks as well as carrots.  Requiring courts to more carefully scrutinize the factual scenarios underlying insubordination cases increases the incentives on employers to root out and extinguish environments manifesting troubling evidence of discrimination—such as, to use typical examples from the case law discussed in Section II above, supervisors' frequent use of the n-word, egregious sexual harassment, and assigning demeaning job duties others are not required to perform.   In turn, eliminating such environments avoids incidents of insubordination caused by reasonable perceptions of discrimination, which in turn avoids unnecessary terminations, which then in turn avoids lawsuits in court.  Of course employers will not like stricter rules, but their incentive effects may produce better results for employers, too, in the end.

     This section will propose several steps courts could take in this direction of enhancing employers' incentives to root out and extinguish troubling workplace conduct.  The precise contours of such doctrines will have to await the gradual development of law through decisions in specific cases decided by courts that have been sensitized to the issues this article raises, but a review of existing case law provides some indication of the directions in which such doctrinal development should go.

     More specifically, this section will suggest that courts could, in

---

[186] *Cf.* Robert N. Mnookin & Lewis Kornhauser, *Bargaining in the Shadow of the Law: The Case of Divorce*, 88 YALE L. J. 950 (1979) (examining how legal rules affect parties' negotiations conduct).

[187] *See* Henry M. Hart, Jr., *The Relations Between State and Federal Law*, 54 COLUM. L. REV. 489, 525–37 (1954) (explaining that federal courts retain interstitial powers to clarify statutory uncertainty and create uniformity in federal policy).

[188] *Ellerth*, 524 U.S. 742; *Faragher*, 524 U.S. 775.  These cases are further discussed *supra* in nns. 40-41 & accompanying text and in nns. 9 & 230.

appropriate cases, revise Title VII doctrine to protect employees from termination for mild or moderate insubordination in reaction to reasonable perceptions of discrimination in the following ways:

(A) Where an employer offers insubordination as the legitimate, nondiscriminatory reason for employee discipline, courts should consider whether discrimination concerns motivated the insubordination. If so, courts should decline to accept the employer's reason without more searching scrutiny. Courts should grant the plaintiff the opportunity for further fact development, including the opportunity to demonstrate that the insubordination charge was pretext for discrimination, as discussed in *McDonnell Douglas Corp. v. Green.*[189]

(B) When discrimination and insubordination are factually intertwined, courts should reject mixed motive defenses in Title VII insubordination cases. Under basic causation principles, such related causes are not independent causes.

(C) When considering retaliation claims, courts should broaden the protections accorded opposition conduct to extend to "mild or moderate" insubordination[190] in reaction to reasonable perception of discrimination.

(D) Where an employer has provoked an employee's insubordination through conduct a reasonable person in the employee's circumstances would view as discrimination, courts should apply a provoked insubordination doctrine modelled on the NLRB's jurisprudence of the same name. In other words, if an employee's mild or moderate insubordination was provoked by employer conduct a reasonable employee would perceive as discriminatory, the employee's termination should be reverse provided the degree of her insubordination was not out of proportion to the provocation.

(E) Finally, in all insubordination cases raising discrimination concerns, Title VII courts should apply the NLRB's *Atlantic Steel* factors to scrutinize the context underlying the inappropriate employee behavior.

Some of these doctrinal revisions involve reexamining Title VII precedent while others call for adapting doctrine from the NLRB. The discussion below will start with a discussion of the first category of reforms and then offer suggestions about borrowing from NLRB precedent.

### A.    *Reforming Title VII Insubordination Doctrine from Within*

Title VII doctrine has not developed uniformly or as a monolith. Courts have disagreed with each other and judges have disagreed within courts. Law established at one historical moment has been disregarded or deemphasized at another. Highlighting these moments of disagreement and

---

[189] 411 U.S. 792.
[190] *See supra* n. 7 (discussing examples of cases that go beyond the limits of mild or moderate insubordination).

historical forgetting illuminates junctures for future change. Section IV-A-1 notes some of these pivot points that illuminate opportunities for doctrinal revision going forward.

### 1.   Probing Insubordination Cases where the Record Contains Evidence of Discrimination

A first helpful step in reforming Title VII insubordination doctrine would look to the dissents of judges such as Judge Karen Nelson Moore on the Sixth Circuit and Judge Patricia Wald on the D.C. Circuit, as well as to the Court's early Title VII jurisprudence. As already discussed in Section II-B, Judge Moore's dissent in *Clack v. Rock-Tenn Co.* can provide helpful guidance. There she called on the district court to probe the "taint of . . . discriminatory animus" evident in the background facts in that case—including evidence of racist remarks by decision-makers, instances of discrimination against other employees, and displays of hostility towards the plaintiff that preceded the plaintiff's moderately insubordinate conduct (which was going home rather than carrying out his supervisor's order to perform a cleanup task the plaintiff believed was not in his job description).[191] Judge Moore also would have had the district court probe the possibility of pretext in the employer's decision to terminate Clack; in other words, the district court should have allowed the plaintiff to offer evidence that other employees who engaged in similar conduct after an altercation with a supervisor were not fired.[192] These kinds of evidence —background discrimination, expressed animus, and/or pretext—should have, in Judge Moore's opinion, sufficed to send the plaintiff's case to a jury rather than dismissal on summary judgment.[193]

Judge Wald's dissent in *Pendleton v. Rumsfeld* is similarly instructive. Like Judge Moore, Judge Wald would have required a much more searching inquiry into the background facts in order to assess the reasonableness of the plaintiffs' conduct in the situation. Judge Wald offered this dissent in an opposition conduct case, but the basic point remains the same: insubordination cases that arise in the context of protests about perceived discrimination fall in a special category and require more searching scrutiny before accepting an employer's asserted reason of insubordination for disciplining an employees.[194]

Still more helpful guidance comes from returning to the historical

---

[191] 304 F.App'x 399, 409–10 (6th Cir. 2008) (Moore, J., Dissenting).

[192] *Id.*

[193] *Id.* Employment discrimination scholars have likewise underscored the need for courts to take a more careful contextual view of the facts in Title VII cases. *See, e.g.,* Stone, *supra* note 28, at 169 (arguing that, in a host of ways, judges should carefully evaluate facts rather than applying "shortcut" doctrines to terminate assessment of facts in context).

[194] 628 F.2d at 109-14.

precedent of *McDonnell Douglas v. Green* to extract from it the wisdom of the Court's basic start in developing Title VII jurisprudence. Green's conduct was not simply a short angry outburst or an unreasonably insistent pursuit of complaints of discrimination, as in many insubordination cases today. Instead Green's behavior involved leading an organization that engaged in an extended course of plainly illegal actions, including stalling cars on company property to block others from coming to work and a "lock in," in which protestors barred the employer's workforce from leaving the plant by placing chains and padlocks on the workplace doors.[195]   Nonetheless, even on these vivid facts, the *McDonnell Douglas* Court held that Green's race discrimination case should be retried.[196]   The Court reasoned that the employer's proffered legitimate, nondiscriminatory reason:  namely, its policy of not rehiring employees who had previously engaged in illegal activity, had to be tested for pretext before being accepted as the "real" reason for not recalling him to work.[197]   The Court instructed the lower court to compare the employer's treatment of Green to that of other employees who had engaged in illegal acts.

Title VII courts today no longer have patience for this kind of close, skeptical analysis of employers' assertions that they are terminating employees due to misconduct, and this is one of a number of reasons why they often get insubordination cases wrong.

The Court in *McDonnell Douglas* cautioned that even what might look like an imminently valid, "legitimate, nondiscriminatory reason" for an adverse employment action—such as Green's leadership role in persistent, unlawful protest activity at the plant—could mask an invidiously discriminatory motive. To prevent such subterfuge, the Court held (noting similar case law developed under the NLRA), that finders of fact should look probingly into questions of pretext.[198]   In other words, the decision maker should ask whether other employees with different racial identities—or, to extend the analysis to opposition conduct claims, other employees who had not engaged in protected opposition conduct[199]—were treated similarly for similar misconduct.  If the answer to this question is "no"—in other words, if identity or protected opposition conduct are the "but for" cause of the employer's challenged act— then unlawful discrimination has been proved

---

[195] *Id.* at 795 n.3.

[196] *Id.*

[197] *Id.*

[198] *McDonnell Douglass, Corp. v. Green,* 411 U.S. 792 (1973).

[199] The Court in *Green* did not consider the retaliation issue because Green lost on that issue below and did not appeal this ruling.  *See* Green v. McDonnell Douglas Corp., 463 F.2d 337 (8th Cir. 1972), *vacated on other grounds*, 411 U.S. 792 (1973) (holding that participation in an unlawful "stall in" was not protected activity under Section 704 (a)).

and the plaintiff should prevail.[200]

Indeed, to better protect employees and deter the kinds of discriminatory atmospheres that often produce insubordination cases, courts could shift the burden of proof of pretext onto employers in insubordination cases raising discrimination concerns. This would help deter the continued existence of the kinds of discriminatory environments that still emerge from the facts of too many insubordination cases despite plaintiffs' inability to win their claims of underlying discrimination under the current high standards for proving such claims.[201] When an employer asserts insubordination as the reason for taking an adverse action against an employee who has raised discrimination concerns, courts could require the employer to prove that it would have taken the adverse action against the employee even if he or she had not complained of discrimination. In a discrimination case the employer would do so by putting on persuasive evidence that other employees who were not in the protected identity category suffered comparable discipline after engaging in similar insubordination. In a retaliation case based on opposition conduct, the employer's burden would be to persuade the finder of fact by putting on evidence that it had in the past taken the same adverse action against employees engaged in similar insubordination even when the underlying facts did not involve a discrimination complaint. In cases in which this evidence was unavailable or inconclusive, the plaintiff would win.

Such a burden-shifting rule would encourage employers to take steps to deter supervisor conduct that generates evidence typical of the cases discussed in Part II *supra*—such as blatant statements of prejudice against protected identity groups, low-grade harassment, failure to discipline co-workers, discriminatory task assignments, and the like. Just as the *Faragher/Ellerth* affirmative defense encourages employers to set up complaint procedures for sexual harassment,[202] an affirmative defense that made it worthwhile for employers to eradicate discrimination-tinged workplace environments could reduce the discrimination-related insubordination cases coming to the courts.

In sum, the basic analysis when an employer alleges insubordination as the reason for an employee's discharge should involve applying a several-part test that asks:

1) Is there evidence of discriminatory animus, a discrimination-charged work environment, and/or hostile acts towards the plaintiff that a reasonable person in the plaintiff's position would perceive as evidence of discriminatory treatment (even if insufficient to satisfy the high standards for proving the underlying discrimination claim)?

---

[200] *Green*, 411 U.S. at 805-07.
[201] See discussion Part I-B *supra*.
[202] *See* Sturm, *supra* note 33.

2) If so, was the plaintiff's insubordination related to these conditions?

Where the answer to questions (1) and (2) is affirmative, courts should:

3) Decline to accept on face value the employer's proffered reason of insubordination as a legitimate, nondiscriminatory reason for an adverse employment action, and instead

4) Engage in searching scrutiny of the facts, and in appropriate cases find the plaintiff's conduct protected, so long as it was not too extreme (as further discussed in Section IV-C below), and

5) Finally, in the presence of background evidence raising discrimination concerns, courts should switch the burden of *disproving* pretext to employers in insubordination cases.

These steps would go a long way towards improving Title VII courts' handling of insubordination cases.  But additional steps could help as well.

### 2.    Rejecting Mixed Motive Defenses when Discrimination and Insubordination Interrelate

Another simple but important step Title VII courts can take would involve declining to entertain mixed motive defenses where facts involve (1) employer conduct that raises discrimination concerns and (2) employee insubordination in reaction to it.    As discussed in Section II-B, insubordination cannot serve as an employer's legitimate, nondiscriminatory reason for disciplining an employee if the employer's discrimination and the employee's insubordination are factually intertwined.  As further discussed in Section II-B, such reasoning contravenes standard causation principles:  A factually related reason is not an independent cause; insubordination would not have happened if discrimination concerns had not triggered this reaction. Thus no mixed motive defense should be available to an employer that states that insubordination was the reason for an adverse employment action where the insubordination arose from an employee's reasonable perceptions of discrimination.  To be sure, under such facts an employer may have a defense that the insubordination went too far and thus lost its protection under Title VII opposition conduct doctrine.  But that is a different argument, and should be handled under opposition conduct doctrine as discussed further below.

### 3.    Expanding Opposition Conduct Protection

As discussed in Section II-C, courts draw the bounds of reasonable conduct in opposition cases far too narrowly, typically excluding any degree of employee misconduct from the opposition clause's protections.  As a result, courts usually refuse to grant opposition clause protection to an employee whose conduct falls with an employer's legitimate insubordination policy.   But this approach compounds the problem of unaddressed

discrimination in the nation's workplaces, permitting employers to fire employees for insubordination with impunity and leaving unaddressed the legitimate complaints that may have caused the employee's intemperate reaction. Improving Title VII courts' approach to insubordination cases thus requires revisiting opposition conduct doctrine.

Other scholars have already forcefully argued for the need to expand opposition conduct doctrine to more securely protect plaintiffs who engage in opposition conduct. This literature discusses many aspects of this complex doctrine,[203] but one revision most obviously emerges as of key importance in insubordination cases—namely, the need to expand the bounds of reasonableness as to the *manner* of opposition in order to protect instances of mild or moderate insubordination that are understandable in reaction to reasonable perceptions of discrimination. This article will build from this helpful literature and then offer some additional points to further support these important calls for reform.

Terry Smith, Richard Bales, Elizabeth Chambliss and others argue that more robust protection for opposition clause conduct would be an excellent way of granting greater protection to employees disciplined for seeking to protest discrimination.[204] As Smith explains, "the neglect and judicial misapprehension of [the opposition clause] is especially deleterious to the outspoken employee—the "race man," the "uppity nigger"—who, in short, dares to talk back to the boss, to cause trouble."[205] Thus Smith argues that courts should grant protection to the "employee who chooses to exercise self-help in opposing workplace racism rather than remain silent or avail herself of the cumbersome and expensive recourse of formal charge and suit."[206]

Similarly Richard Bales, in an article considering the appropriate rules for personnel managers' opposition conduct, criticizes the narrowness of the *Hochstadt* test,[207] pointing out that it causes far too many employees to lose protection for opposition clause conduct because most such conduct is at least a bit disruptive.[208] Bales would have the courts craft a rule that

---

[203] *See, e.g.,* Gorod, *supra* note 140 (arguing that courts should eliminate the aspect of the opposition clause reasonableness requirement that requires employees to demonstrate that they had a good faith, reasonable belief that a challenged practice violates Title VII); Matthew W. Green, Jr., *Express Yourself: Striking a Balance between Silence and Active, Purposive Opposition under Title VII's Anti-Retaliation Provision*, 28 HOFSTRA LAB. & EMP. L.J. 107 (2010) (analyzing issue of silent opposition).

[204] Smith, *supra* note 63; Bales, *supra* note 97; Chambliss, *supra* note 97.

[205] Smith, *supra* note 63, at 533 (citations omitted).

[206] *Id.* at 533-34.

[207] The *Hochstadt* test is discussed in Section II-C *supra*.

[208] *Cf.* Kiewit Power Constructors Co. v. NLRB, 652 F.2d at 29, citing *Southwest Bell*, 694 F.2d at 978 (holding that the employee's act "did not involve the kind of insubordination

would protect all opposition conduct provided it was not illegal or in conflict with the job duties the plaintiff was hired to perform.[209]

Elizabeth Chambliss, too, notes these problems with the *Hochstadt* test in her article focused on EEO officer retaliation clause protection.  As she notes in quoting a Ninth Circuit case, "'almost every form of opposition to an unlawful employment practice is in some sense disloyal to the employer, since it entails a disagreement with the employer's views and a challenge to the employer's policies.  Otherwise the conduct would not be 'opposition.'"[210]   Pointing to Title VII's legislative history, in which Congress's intent to promote private resolution of workplace disputes is clear, Chambliss argues for the importance of "hold[ing] Title VII to its original promise, by encouraging—and protecting—private workplace regulation."[211]

Chambliss's proposal, in the context of her focused examination of EEO officers' opposition conduct, is that all "[g]ood faith opposition that causes no measurable harm should be protected to protect the EEO officer's regulatory role."[212]   This proposal is a sensible one, but should be expanded to cover all employees in the insubordination context. Starting with Professor Sturm's ideas about "second generation" anti-discrimination rules, which should foster conditions for resolving continuing discrimination problems in workplaces rather than courts, this article has argued for an expanded idea of protecting *the whole host of figures* who may play crucial roles in resolving persisting discrimination problems in the nation's workplaces.  These "key intermediaries," to use Sturm's term, should t include the regular, line-level, non-managerial employees on which this article's analysis has focused.[213]  Chambliss's point thus should be expanded to counsel a similar adjustment in the standard for protecting employee opposition conduct more generally: Where such conduct does not cause appreciable harm—*i.e.*, harm beyond minor disruption and supervisor pique—it should be protected even if it arguably goes a bit too far, all in order to better foster the conditions for on-site resolution of discrimination protests.  Such protests are likely to be, as Chambliss notes, inherently somewhat "oppositional"—*i.e.*, something a bit more than polite—but protecting them as they occur in the workplace is a far more economical approach than later processing them as lawsuit in courts.[214]

---

that requires withdrawing the Act's protection.  It defeat section 7 if workers could be lawfully discharged every time they threatened to 'fight' for better working conditions.")

[209] Bales, *supra* note 197, at 117.

[210] Chambliss, *supra* note 97, at 28 (quoting EEOC v. Crown Zellerbach Corp., 720 F.2d 1008, 1014 (9th Cir. 1983)).

[211] Chambliss, *supra* note 97, at 54.

[212] *Id.* at 52.

[213] *See supra* Section II-C.

[214]  Chambliss, *supra* note 97, at 28 (citation omitted).

In sum, many scholars have offered various rationales that provide strong support for expanding the scope of the acceptable manner of opposition conduct in insubordination cases to cover what this article has defined as mild to moderate insubordination—*i.e.*, conduct that is nonviolent, brief and spontaneous rather than sustained or lengthy in duration, and has been provoked by reasonable perceptions of discrimination.

The analysis offered in this article further supports taking opposition conduct analysis a step further in the following way: The more outrageous the facts regarding background discrimination, the broader should be the zone of protection for opposition conduct the court should observe. In other words, humiliating treatment, as seen through the eyes of the reasonable person in the plaintiff's position,[215] should create a broader zone of protection with regard to the manner of opposition conduct than an insignificant slight.[216] Courts, understandably enough, often have trouble putting themselves in the shoes of average employees—a problem compounded by the likely class and social location differences between federal judges and the less privileged workers that make up much of the U.S. workforce.[217] But they could strive to develop increased sensitivity by applying such a sliding scale rule that starts by considering the situation from the perspective of a reasonable person in the plaintiff's position.

Workplaces need not be sanitized forums full of docile employees for purposes of Title VII law any more than they need be this under the NLRB's more expansive jurisprudence. Indeed, importing more of the NLRB's understanding of the realities of U.S. workplaces would be another excellent step in reforming Title VII courts' view of insubordination cases, as Section IV-B will discuss below.

### B. *Borrowing from the NLRB*

As this article has suggested in Part III above, one fruitful area for comparison on insubordination doctrine involves the NLRB's precedents, developed under a different statute to be sure, but likewise addressing workplace disputes that potentially implicate employees' statutory rights. This Section draws on the various lines of NLRB precedent discussed in Part III to suggest additional avenues for improving insubordination doctrine

---

[215] *Cf.* Harris v. Forklift Systems, 510 U.S. 17, 23 (using this formulation of the reasonable person standard in the context of Tile VII sex harassment).

[216] *Cf.* Opelika Welding, Mach. And Supply, Inc. v. AFL-CIO, 305 NLRB 561, 568 (1991) ("An employer cannot provoke an employee to the point where she commits such an indiscretion as is shown here and then rely on this to terminate her employment [citation omitted]. The more an employer's wrongful provocation the greater would be the employee's justified sense of indignation and the more likely its excessive expression.")

[217] *Cf.* Smith, *supra* note 63.

under Title VII.

Wholesale importation of the NLRB's case law would not be appropriate, of course. The statutory purposes underlying Title VII and the NLRA are in many ways different—for example, Title VII protects individual rights and pushes externally mandated nondiscrimination principles, whereas the NLRA's central concern is with protecting collective rights and permitting the parties to collective bargaining agreements to arrive at their own decisions about how to handle workplace relations. Even with these differences laid on the table, however, similar questions often arise in both the Title VII and NLRA contexts as to how to investigate, prove, and remedy violations of the respective workplace statutory rights the two laws protect.[218] As Professor Michael Green has recently pointed out, borrowing across these two statutes can present useful directions for the development of law.[219]

Indeed, in developing Title VII doctrine courts have frequently looked to NLRB precedent, on a wide range of issues. [220] A comprehensive discussion of these fascinating parallels is beyond the scope of this article, but a few examples can illustrate this long tradition: Title VII courts have frequently and explicitly borrowed from the NLRB to fashion doctrines on

---

[218] *Cf.* Michael Z. Green, *How the NLRB's Light Still Shines on Anti-Discrimination Law Fifty Years after Title VII*, 14 NEVADA L.J. 754 (2014) (arguing that NLRB law should be used to strengthen anti-discrimination protection in areas where Title VII enforcement leaves gaps).

[219] *Id.*

[220] *See, e.g.,* Franks v. Bowman Transp. Co., Inc., 424 U.S. 747, 775 n.34 (1976) (using NLRA remediation models for Title VII); Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 355, 366 (1977) (borrowing from NLRB reinstatement doctrine in allowing a non-applicant to proceed with discrimination claims); McDonnell Douglas v. Green, 411 U.S. 792, 804 (1973) (following NLRB precedent on employers' rights to not rehire an employee who has committed an illegal act).

reinstatement and back pay,[221] mixed-motive analysis,[222] and retaliation.[223] Similarly, Title VII courts have borrowed from NLRB doctrine to establish tests for enterprise liability and liability for acts of agents. [224] Due to such explicit borrowing across statutes, the case law on enterprise liability[225] and liability for the acts of agents[226] under the two statutes remains very similar

---

[221] In *Albemarle Paper Co. v. Moody* the Court explicitly fashioned rules for Title VII backpay to comport with NLRB practices. *See Albemarle Paper Co.*, 422 U.S. 405, 419-20 (1975) (acknowledging that "the Board, since its inception, has awarded backpay as a matter of course—not randomly or in the exercise of a standardless discretion, and not merely where employer violations are peculiarly deliberate, egregious, or inexcusable," and adopting the same standards for Title VII). *See also* Ford Motor Co. v. EEOC, 458 U.S. 219, 226 n.8 (1982) (citing *Albemarle Paper Co.*, 422 U.S. at 419 n.11) (observing that Title VII's remedial provisions are modeled after the NLRB's). Other examples of the Court explicitly borrowing from NLRB case law in fashioning remedies under Title VII include Pollard v. E.I. du Pont de Nemours & Co., 532 U.S. 843, 849 (2001) (citing Culpepper v. Reynolds Metals Co., 442 F.2d 1078, 1080 (5ᵗʰ Cir. 1971); United States v. Georgia Power Co., No. 12355, 1971 WL 162 (N.D. Ga. June 30, 1971)) ("Consistent with the Board's interpretation of this provision of the NLRA, courts finding unlawful intentional discrimination in Title VII actions awarded this same type of backpay under § 706(g)").

[222] *See* Price Waterhouse v. Hopkins, 490 U.S. 228, 245-50 (1989) (citing NLRB v. Transp. Mgmt. Corp., 462 U.S. 393, 403 (1983)) ("We have, in short, been here before. Each time, we have concluded that the plaintiff who shows that an impermissible motive played a motivating part in an adverse employment decision has thereby placed upon the defendant the burden to show that it would have made the same decision in the absence of the unlawful motive. Our decision today treads this well-worn path.") *superseded by statute*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1074.

[223] *See, e.g.*, Thompson v. N. Am. Stainless, LP, 131 S. Ct. 863, 871 (2011) (Ginsburg, J., Concurring) (citing NLRB v. Advertisers Mfg. Co., 823 F.2d 1086, 1088-89 (7th Cir. 1987)) (observing that the EEOC's retaliation doctrine is much like the NLRB's).

[224] EEOC v. Wooster Brush Co. Employees Relief Ass'n, 727 F.2d 566, 571-72 (6th Cir. 1984) (citing Baker v. Stuart Broadcasting Co., 560 F.2d 389 (8ᵗʰ Cir. 1977)) (providing a four-part test to assess whether common enterprise liability might apply under both the NLRA and Title VII); Sargent v. McGrath, 685 F. Supp. 1087, 1089 (E.D. Wis. 1988) (citing Radio Union v. Broadcast Service, 380 U.S. 255 (1965); Ambruster v. Quinn, 711 F.2d 1332 (6ᵗʰ Cir. 1983)) (noting that "several cases from other jurisdictions" adopting the NLRA test for enterprise liability provide a roadmap for Title VII enterprise analysis). Courts have recognized that the factual circumstances through which agency or enterprise liability might arise are similar under Title VII and the NLRA and thus the analysis should also be similar. *See, e.g.*, Ambruster v. Quinn, 711 F.2d at ("[W]e adopt a "facts and circumstances" test which pays heed to the factors found relevant to the question of single-employer status in the National Labor Relations Act context. This test seeks to effectuate the broad and remedial purposes of the Act reaffirmed in the comprehensive Equal Employment Opportunity Act of 1972.") *Abrogated on other grounds by* Arbaugh v. Y&H Corp., 546 U.S. 500 (2006).

[225] *See, e.g.*, NLRB v. Palmer Donavin Mfg. Co., 369 F.3d 954, 957 (6th Cir. 2004) (providing a four part test for common enterprise liability under the NLRA); EEOC v. Wooster Brush Co. Employees Relief Ass'n, 727 F.2d 566, 571–72 (6th Cir. 1984) (providing an identical four-part test for common enterprise liability under Title VII).

[226] *See* Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 75 n.2 (1986) (Stevens, J., Concurring) (citing Graves Trucking, Inc. v. NLRB, 692 F.2d 470 (7th Cir. 1982))

to this day.

In other areas, such as constructive discharge, members of the Court began by taking account of NLRB doctrine, but then reshaped or reformulated it to take account of the different context of Title VII.[227]  In much the same fashion, Title VII courts could look to NLRB doctrines on (1) provoked insubordination and (2) the *Atlantic Steel* factors, and then modify them as necessary to fit the Title VII context.

### 1.   Borrowing from the NLRB's Provoked Insubordination Doctrine

As discussed in Section III-B above, the Board's provoked insubordination doctrine seeks to deter supervisors from goading disfavored employees into misconduct that then becomes grounds for termination. Similar considerations should guide Title VII courts in fact scenarios raising discrimination concerns.  In these situations it may be even more important to deter supervisors from engaging in treatment tinged with discrimination, both because that kind of conduct may be especially provocative and because it violates Title VII's goal of reducing discrimination in the nation's workplaces.

As noted in Section III-B, however, a provoked insubordination doctrine in the Title VII context must be narrower than under the NLRA. This is because Title VII protects employees against discrimination but no other manifestations of workplace unfairness.  In contrast, the NLRB's cases applying its provoked insubordination doctrine typically arise under the "just cause" rules applicable in workplaces governed by collective bargaining agreements.  Provoked insubordination is much more broadly impermissible in the union context because it violates the standards for "just cause" termination, whereas Title VII grants no right against provoked insubordination unless related to discriminatory motives.  For this reason, a provoked insubordination doctrine under Title VII should be confined to provocations related to discrimination, because that is the only kind of fairness in employment Title VII protects.

In cases raising potential provoked insubordination issues, Title VII

---

(highlighting the identical tests for agency liability under Title VII and the NLRA).

[227] *See* Pennsylvania State Police v. Suders, 542 U.S. 129, 141 (2004) (looking to the NLRB's development of constructive discharge analysis as a starting point for developing Title VII doctrine).  Even the term "affirmative action" comes from the NLRA, though the story of that concept's transformation in the public mind in the antidiscrimination context is long and complex. *Compare* 42 U.S.C. § 2000e-5(g)(1) (2012) *with* 29 U.S.C. 160(c) (2012). *See* Franks v. Bowman Transp. Co., Inc., 424 U.S. 747, 770 (1976) (pointing to NLRB doctrine on affirmative action and holding that "[p]lainly the "affirmative action" injunction of § 706(g) has no lesser reach in the district courts" under Title VII).

courts should ask whether reasonable perceptions of discrimination triggered an employee's mild or moderate insubordination. Where the evidence supports this conclusion, the court should invoke a provoked insubordination rule to bar the employer from terminating the employee on grounds of insubordination even if the evidence of discrimination is insufficient to prove a Title VII discrimination claim. Introducing a provoked insubordination doctrine to Title VII jurisprudence would help ensure that courts take a second look in the many cases described in Section II above involving workplace atmospheres tinged with discrimination, even where facts are not sufficient to meet the plaintiff's high burden of proof on a discrimination claim.

At bottom, such provoked insubordination cases will become opposition conduct cases, in the sense that they fall within the category of cases in which an employee is seeking to protest discrimination but has been provoked to intemperate conduct through the acts of the employers' agents. The provoked insubordination doctrine remains a helpful additional tool for courts, however, because identifying the existence of provoked insubordination points out why the plaintiff's conduct should not lose its protection even if it goes somewhat beyond the strict decorum Title VII courts typically expect of employees. The doctrine explains why an employee's outburst or short-term refusal to follow a supervisor's order was reasonable opposition conduct in context— *i.e.*, because it was provoked. If a court were to apply the provoked insubordination doctrine in the *Morgan* case, for example, Morgan's insubordination in refusing to go into his supervisor's office and going home instead would remain protected conduct even though it violated Amtrak's insubordination policy. His supervisor's comment that Morgan must "get his black ass" into his office, coupled with a long history of supervisors' use of such racial epithets and other incidents of harassment, provoked Morgan's intemperate response. Plaintiffs' lawyers handling cases with facts supporting provoked insubordination claims, like those in *Clack* and *Morgan*, could use this concept to direct the fact finder's attention to the connection between workplace atmospheres tinged with discrimination and subsequent alleged "insubordination" by employees subject to it.

Many additional considerations counsel in favor of recognizing such a provoked insubordination doctrine in Title VII insubordination cases as well. Disapproving of provoked insubordination by protecting employees from discharge in such scenarios would deter employers' agents from exacerbating negative dynamics in workplaces tinged with discrimination— as, for example in workplaces in which supervisors use racially derogatory

language, even of the "stray remarks" variety.[228]  In the cases discussed in Part II above in which plaintiffs lost their discrimination claims, for example, such language included, in the race context, "nigger," "black ass," "black thief," and "sunshine," and acts such as hanging nooses. Such statements are surely provocative, even if not ultimately sufficient to prove discrimination. In these many cases discussed above, the controversy might never have come to court if agents of the employer had not berated the plaintiffs with racial or sexual epithets and/or assigned demeaning work outside the employee's job classification.

Importing a provoked insubordination doctrine into Title VII would also encourage employers to conduct more effective anti-discrimination training.   Just as the Court's *Ellerth/Faragher* affirmative defense in supervisor sexual harassment cases motivates employers to set up sexual harassment trainings,[229] a provoked insubordination doctrine in the Title VII context would create incentives for managers to emphasize the need to avoid demeaning racial or sexual epithets and/or other acts encoding messages that reasonable employees could perceive to be discriminatory and thus provocative.

Title VII hostile environment discrimination cannot alone take care of cases involving abusive and provocative, racially or sexually "loaded," language.  Hostile environment discrimination is a Title VII doctrine for proving discrimination in both the race and sex contexts, which holds that harassment on the basis of a protected characteristic, such as race, sex, religion, or national origin, constitutes discrimination if it is so "severe and pervasive" that it literally alters the terms and conditions of employment for the plaintiff. [230]   This doctrine cannot suffice to handle provoked insubordination cases because in many instances plaintiffs are unable to show

---

[228] For an excellent critique of "stray comments" doctrine, *see* Stone, *supra* note 35 (arguing that the stray comments doctrine results courts discounting  probative evidence of discriminatory intent).

[229] Sturm, *supra* note 33, at 483.

[230] *See* Meritor Savings Bank v. Vinson, 477 U.S. 57, 69-72 (1986) (citations omitted) (announcing this standard for hostile environment sex harassment); Cerros v. Steel Technologies, Inc., 288 F.3d 1040, 1044-45 (2002) (applying the same standard for racial harassment).  As Evan White persuasively points out, the combination of this high "severe and pervasive" standard with the *Ellerth/Faragher* affirmative defense to hostile environment liability makes it very difficult for plaintiffs to prevail in hostile environment cases because "once the harassment has gone on long enough to become severe or pervasive, the employer's affirmative defense is increasingly likely to bar the plaintiff's prima facie case.  The result is that as the plaintiff's prima facie case grows stronger, the probability that the employer will prevail on its affirmative defense also increases."  Evan D. H. White, *A Hostile Environment: How the "Severe or Pervasive" Requirement and the Employer's Affirmative Defense Trap Sexual Harassment Plaintiffs in A Catch-22*, 47 B.C. L. Rᴇv. 853 (2006).

a situation *so* "severe and pervasive" as to literally "change the terms and conditions of employment" for affected employees. Thus many of the cases discussed in Section II-A did not meet this high standard required for a plaintiff to prevail on a hostile environment theory; the decision maker remained unconvinced that the evidence of hostile environment, though abundant, had risen to a sufficient level of severity and pervasiveness.[231]

Even though plaintiffs cannot win hostile environment discrimination claims where they cannot make out these high proof standards, courts should not disregard the effects on employees of workplaces tinged with discrimination. Without a doctrine of provoked insubordination under Title VII courts essentially come to ignore—and thus in essence tacitly to approve—workplace situations that are highly problematic even if not illegal under the nation's antidiscrimination laws.[232] By ruling in defendants' favor to uphold the discharges of employees who react to discrimination-related provocation, courts send the message that such provocation is acceptable. Law should not send such signals, which encourage rather than deter discrimination-related talk and employee abuse and thus fuel, rather than alleviate, tensions within U.S. workplaces based on race, sex, and other sensitive protected identity characteristics.[233]

Those opposed to the changes presented here may point out their potential drawbacks. For example, one might point out: (1) These doctrinal changes require more searching scrutiny of the totality of the circumstances in particular cases as well as the reasonableness of employee perceptions of discrimination. Both of these inquiries will increase the time courts must spend on these types of cases. Yet isn't avoiding such probing, time- and resource-intensive inquiry the very reason courts use doctrinal shortcuts in Title VII cases? Moreover, a critic might point out, (2) would not the adoption of pro-plaintiff doctrines increase the incentives for employees to sue—or even to be insubordinate—knowing that such doctrinal changes would render courts more likely to find for employees?

The correct response to these objections is to acknowledge their legitimacy but point out the countervailing objectives achieved. To be sure, courts will have to examine the background facts in insubordination cases more carefully; that is the very point of the doctrinal changes I suggest. But my proposals call for greater scrutiny in only a limited set of Title VII

---

[231] *See, e.g., Clack*, 304 F.App'x 399.

[232] Smith, *supra* note 63.

[233] *Cf. Hitachi Capital America Corp.*, 2012 WL 2861686, citing *Consumers Power Co.*, 282 NLRB 131, 132 (1986) ("[t]he protections of Section 7 would be meaningless were we not to take into account the realities of industrial life and the facts that disputes over wages, bonus and working conditions are among the *disputes most likely to engender ill feelings and strong responses.*" (emphasis supplied).

cases—where, as this article has pointed out, the danger of incorrect outcomes is most severe. Courts *should* more carefully consider cases involving evidence of provocative discriminatory animus, such as the use of the n-word or egregious sexual harassment, despite the fact that (over)simplistic application of current Title VII doctrine results in premature denial of plaintiffs' claims.

Moreover, in these situations employees should have greater prospects of success, for all of the public policy, incentive-creating, and fairness reasons that the NLRB and reviewing courts have recognized in the cases discussed In Section III above. If employers respond to these changed incentives by refraining from terminating employees for mild or moderate insubordination provoked by reasonable perceptions of discrimination, then employers will face fewer, not more, lawsuits because they will have refrained from adverse employment actions in these fraught situations. If employers do not refrain from employee terminations in these situations, then courts should examine the underlying scenarios because of their troubling implications.

Finally, the proposed shifts in Title VII doctrine are narrow in scope. The proposals made here represent a surgical intervention rather than a grand attempt to redirect the great morass of Title VII case law. They identify and address a specific issue that can be fixed through doctrinal tweaks in a limited but important set of cases.

### 2.   Applying the *Atlantic Steel* Factors in Title VII Discrimination Cases

A final proposal for helping courts properly handle Title VII cases involving employee insubordination under facts raising discrimination concerns would have courts apply the *Atlantic Steel* factors for evaluating whether an employee's conduct has gone too far in response to perceptions of discrimination. Those factors, as discussed in Section III-A, look not only to the issue of provocation as just discussed above, but also to the time, place and manner of the employee's insubordination, the subject under discussion at the time, and the nature of the employee's reaction.[234] All of these factors would be equally appropriate to discuss in evaluating insubordination cases under Title VII. Applying them, courts might often hold that an employee's insubordination was too extreme in context to be tolerated, as, for example, under facts involving violence, threats of violence, or prolonged insubordination that substantially undermines the efficiency of the workplace or the authority of the boss. All of these considerations have frequently led the NLRB and/or administrative law judges to find that an employee's actions, though potentially protected under the NLRA, lost their protection

---

[234] *Atlantic Steel*, 245 NLRB 814.

by becoming too extreme. Similar results could be expected in Title VII insubordination cases. Plaintiffs would often lose, and would deserve to do so.[235] But applying the *Atlantic Steel* factors would still signal an important advance from Title VII courts' current jurisprudence because judges would at least be called upon to focus on and evaluate the connection between insubordination and underlying discrimination-tinged scenarios. Under current Title VII doctrine, which simply accepts insubordination as a legitimate reason for discharge and/or finds insubordination inappropriate opposition conduct *per se*, these inquiries do not even begin to occur. In the interests of promoting nondiscrimination in the nation's workplaces, they should.

## V.   CONCLUSION

This article has argued that courts evaluating employment antidiscrimination claims should borrow from the insights and approaches of both some Title VII courts and the NLRB in order to more sensitively and correctly handle "angry employee" cases. Doing so would not result in an "anything goes" philosophy towards angry employees; physically threatening, violent, or persistently inappropriate workplace behavior remains beyond the line under Board law just as it should in Title VII cases. However, Title VII courts could do a better job of protecting employee conduct directed against perceived discriminatory workplace treatment by giving more searching scrutiny to the facts in Title VII insubordination cases. The specific doctrinal reforms proposed above have this goal as their aim. Title VII courts could also attend to the factors the NLRB applies in deciding whether employee misconduct warrants loss of statutory protections. The approaches outlined above call on courts to interpret employment antidiscrimination rights so as to preserve a space for somewhat imperfect, sometimes intemperate, expressions of protest by employees who are experiencing workplaces in which troubling signs of discrimination continue to exist. By enhancing the legal protection of employees who challenge employer authority when exercised in a manner employees reasonably believe to be discriminatory, all actors in the employment context are granted more power to achieve change from within, a goal second generation antidiscrimination approaches embrace. Modification of Title VII doctrine to tolerate a broader range of employee protest behavior would have salutary results in encouraging employers and employees to work out problems in workplaces rather than in courts.

---

[235] *See, e.g.*, cases cited in n. 7 *supra*.

# EXHIBIT "Z"

**From:** Melvin Hale
**Sent:** Thursday, August 13, 2015 12:16 PM
**To:** Sarah Sutton
**Subject:** RE: Faculty meeting minutes

Hi Sarah,

Thanks for the kind words. They mean a  lot.

Melvin

---

**From:** Sarah Sutton
**Sent:** Thursday, August 13, 2015 7:58 AM
**To:** Melvin Hale
**Subject:** Re: Faculty meeting minutes

Hi Melvin,

Thank you. That is very gracious of you. I will amend the minutes.

I have to say that I really appreciate how gracefully you've handled the whole situation. I greatly appreciate that and respect you for it.

Sarah